UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA                          :
                                                  :
          -against-                               :
                                                  :          (S1) 07 CR 453 (SHS)
ROBERT COPLAN,                                     :
MARTIN NISSENBAUM,                                 :
RICHARD SHAPIRO,                                   :
BRIAN VAUGHN,                                      :
DAVID L. SMITH, and                               :
CHARLES BOLTON,                                    :
                                                  :
                          *Defendants.*            :
-----------------------------------------------------------------x


MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MARTIN NISSENBAUM'S
PRE-TRIAL MOTIONS


                                        CLAYMAN & ROSENBERG
                                        305 MADISON AVENUE
                                        NEW YORK, NEW YORK 10165
                                        (212) 922-1080
                                        Attorneys for Martin Nissenbaum


Of Counsel:

Isabelle A. Kirshner, Esq.
Brian D. Linder, Esq.

CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT

       THIS COURT SHOULD SEVER COUNTS FIVE,
       SIX, SEVEN AND EIGHT PURSUANT TO
       RULE 8(b), FED.R.CRIM.P. ................................................................................. 3

       DEFENDANT MARTIN NISSENBAUM IS
       ENTITLED TO A BILL OF PARTICULARS
       PURSUANT TO RULE 7(F), FED.R.CRIM.P. ................................................... 13

CONCLUSION ..................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                     :
                                             :
        -against-                            :
                                             :    (S1) 07 CR 453 (SHS)
ROBERT COPLAN,                               :
MARTIN NISSENBAUM,                           :    MEMORANDUM OF LAW
RICHARD SHAPIRO,                             :
BRIAN VAUGHN,                                :
DAVID L. SMITH, and                          :
CHARLES BOLTON,                              :
                                             :
                    *Defendants.*            :
------------------------------------------------------------x

## PRELIMINARY STATEMENT

Defendant Martin Nissenbaum respectfully submits this memorandum of law in support

of his pre-trial motions seeking an order of this Court (1) severing counts five, six, seven, and

eight, relating to the Tradehill Transaction, pursuant to Rule 8(b), Fed.R.Crim.P., since they are

improperly joined with the remaining counts of the indictment, (2) pursuant to Rule 7(f),

Fed.R.Crim.P., requiring the government to provide Mr. Nissenbaum with a bill of particulars

relating to certain allegations in counts one, two, three, and four of the indictment, and (3)

permitting Mr. Nissenbaum to join in the applicable motions of his co-defendants.

Martin Nissenbaum was a partner at Ernst & Young ("E&Y") located in its New York

office. He was a member of the Personal Financial Counseling group ("PFC") within National

Tax, the unit which provided expert tax advice to E&Y professionals in the field. Mr.

Nissenbaum was a subject matter expert in the areas of individual income taxation, retirement

benefits and compensation. He was not a subject matter expert for any of the allegedly

fraudulent tax shelter strategies.

The indictment provides few specifics with respect to Mr. Nissenbaum's conduct, as it relates to the crimes charged, other than with respect to the so-called Tradehill Transaction. This transaction was a tax strategy employed by defendants Coplan, Nissenbaum, and Shapiro, in addition to eight other partners at E&Y, in connection with their 2000 personal income tax returns. None of these other E&Y partners are alleged to have known of or participated in the allegedly fraudulent E&Y tax shelters, and none of the other defendants are alleged to have known of or participated in the Tradehill Transaction. Mr. Nissenbaum seeks an order of the Court severing the Tradehill Transaction counts since they are not properly joined with the remaining counts of the indictment. In addition, with respect to the other allegations in the indictment, Mr. Nissenbaum seeks a bill of particulars to apprise him of the specific acts of which he stands accused.

**ARGUMENT**

POINT I

THIS COURT SHOULD SEVER COUNTS FIVE,
SIX, SEVEN AND EIGHT PURSUANT TO
RULE 8(b), FED.R.CRIM.P.

<u>Introduction</u>

The instant indictment represents an attempt by the government to prosecute, in a single

trial, conduct that constitutes at least two separate and distinct series of acts or transactions

contrary to Rule 8(b), Fed.R.Crim.P.   First, the indictment alleges that all of the defendants

participated in the marketing, sale, and implementation of tax shelter transactions for clients of

Ernst & Young ("E&Y").   Second, the indictment alleges that three of the defendants, Coplan,

Nissenbaum, and Shapiro, along with eight other E&Y partners, participated in a separate tax

shelter transaction in order to reduce their personal income tax liability.   There is no allegation

either that the eight other E&Y partners participated in the alleged E&Y tax shelter transactions,

or that the other alleged co-conspirators, including defendants Vaughn, Bolton, and Smith,

participated in or were aware of the E&Y partners' personal transaction.   The mere fact that these

separate acts or transactions share certain similarities, such as an overlap of participants, or are of

a similar character, is not sufficient to justify joinder of these  allegations.[1]

<u>Summary of the Indictment</u>

Count one of the indictment alleges the existence of a single overarching conspiracy to

_____

[1]      Indeed, count one of the instant indictment actually alleges at least three separate series of
transactions.  In addition to the alleged E&Y tax shelter conspiracy and the Tradehill
Transaction, the indictment alleges that defendant Bolton implemented his own personal tax
shelters in 2000 and 2001.

commit tax evasion in violation of Title 26 United States Code §7201 and to make material false statements to the Internal Revenue Service ("IRS") in violation of Title 18 United States Code §1001. The tax evasion component of the conspiracy charge alleges that, between 1998 and 2006, the defendants engaged in a scheme to defraud the IRS "by designing, marketing, implementing and defending tax shelters...." Indictment, ¶13. Defendants Coplan, Nissenbaum, Shapiro, and Vaughn were members of a group within E&Y, initially known as VIPER and later as SISG, that worked with banks, financial institutions, investment advisory firms, and law firms, to design, market and implement tax shelter transactions. Indictment, ¶5. Count one describes six different allegedly fraudulent tax shelter transactions: four transactions which were marketed to and implemented by clients of E&Y, and two tax shelter transactions engaged in personally by four defendants.

The E&Y tax shelter transactions, CDS, COBRA, CDS Add-On, and PICO, were allegedly implemented so that wealthy E&Y clients could eliminate or reduce their income tax liability. Indictment, ¶14. CDS was marketed and sold by E&Y from the middle of 1999 through 2001; COBRA was marketed by E&Y in late 1999 and all but one client implemented the transaction in 1999; CDS Add-On was marketed for a brief period in mid-2000; and PICO was marketed and sold in 2000 and 2001. The indictment alleges that defendant Bolton's company, Bolton Capital Planning, was the general partner and investment adviser in 2000 and 2001 to each of the partnerships set up on behalf of the E&Y clients who participated in the CDS transaction.[2] Indictment, ¶23(a). Defendant Bolton implemented CDS Add-On on behalf of

---

[2]     Defendant David Smith's company, PCMG, was the investment adviser in connection with the 1999 CDS transactions. Defendant Smith has yet to appear in this case.

E&Y through the Bolton companies.  Indictment, ¶35.  The indictment does not allege that

Bolton played any role in the COBRA or PICO transactions.

 In addition to the tax shelter transactions implemented on behalf of E&Y clients, count

one of the indictment also alleges that four of the defendants implemented tax strategies to

reduce their own personal income tax liabilities.

 Specifically, count one of the indictment alleges that Bolton utilized two CDS

transactions, in 2000 and 2001, in order to offset income that he earned from implementing CDS

and CDS Add-On for clients.  Indictment, ¶¶83-85.  There is no allegation in the indictment that

any defendant other than Bolton knew of or participated in any way in this transaction.  In

addition, E&Y defendants Coplan, Nissenbaum, and Shapiro utilized a tax shelter in 2000 to

eliminate or reduce their tax liability resulting from income that all E&Y partners received in

connection with the sale by E&Y of its consulting business to a French company, Cap Gemini.

Indictment, ¶¶69, 71.  These allegations are repeated and separately charged as substantive tax

evasion counts against defendants Coplan, Nissenbaum, and Shapiro in counts five, six, and

seven of the indictment.  There is no allegation in the indictment that any defendant other than

Coplan, Nissenbaum, or Shapiro, participated in, or even knew of this transaction.  Rather, the

three defendants were part of a group of eleven E&Y partners who utilized this strategy, the so-

called Tradehill Transaction, and undertook to act as representatives for the other eight E&Y

partners.  Indictment, ¶71.

 Beginning in May 2003, the IRS conducted audits of the eleven E&Y partners' 2000 tax

returns and sent each partner three Information Document Requests ("IDR's") seeking

information and documents relating to the transaction.  Count one of the indictment alleges that

defendant Nissenbaum assisted an attorney, from the law firm that issued an opinion letter

relating to the transaction, in drafting responses to the IDR's. Indictment, ¶81. Count one of the

indictment further alleges that the responses to the second of the three IDR's, dated September

25, 2003, contained false and misleading statements. Indictment, ¶82. This allegation is

repeated and charged separately against defendant Nissenbaum in count eight of the indictment,

alleging obstruction of the IRS in violation of Title 26 U.S.C. §7212.[3]

Counts Five, Six, Seven, and Eight Should Be Severed Pursuant To Rule 8(b)

Where joinder involves both multiple offenses and multiple defendants, as is the case

here, Rule 8(b) applies.[4] *See United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir. 1988); *see*

---

[3]    Although not relevant to the instant motion, counts two, three, and four of the indictment
allege that the defendants unlawfully aided and abetted the evasion of income taxes due and
owing by three groups of E&Y clients who engaged in the CDS Add-On tax shelter transaction in
violation of Title 26 U.S.C. §7201 and Title 18 U.S.C. §2. Count nine alleges that defendant
Coplan obstructed the IRS in connection with the audit of a COBRA transaction in violation of
Title 26 U.S.C. §7212. Counts ten and eleven allege that defendants Coplan and Vaughn,
respectively, made false statement while testifying under oath in connection with examinations of
E&Y tax shelters by the IRS. Lastly, counts twelve and thirteen allege that defendant David
Smith evaded tax on income earned between 1998 and 2003 and filed a false tax return for the
calendar year 1999.

[4] Rule 8 provides, in relevant part:

(a)    Joinder of Offenses. The indictment or information may charge a defendant in separate
       counts with two or more offenses if the offenses charged… are of the same or similar
       character, or are based on the same act or transaction, or are connected with or constitute
       parts of a common scheme or plan.

(b)    Joinder of Defendants. The indictment or information may charge two or more
       defendants if they are alleged to have participated in the same act or transaction, or in the
       same series of acts or transactions, constituting an offense or offenses. The defendants
       may be charged in one or more counts together or separately. All defendants need not be
       charged in each count.

*also United States* v. *Rojas,* No. S401 Cr. 257, 2001 WL 1568786, at \*5 (S.D.N.Y. Dec. 7, 2001)

("the Second Circuit has ruled that when a defendant in a multi-defendant action challenges

joinder, whether of offenses or defendants, the motion is construed as arising under Rule 8(b)")

*(citing Turoff).* Thus, multiple defendants cannot be tried together on two or more "similar" but

unrelated acts or transactions; multiple defendants may be tried together only if the charged acts

are part of a "series of acts or transactions constituting an offense or offenses." *Turoff,* 853 F.2d

at 1043. Courts have looked to whether the joined offenses are "unified by some substantial

identity of facts or participants or arise out of a common plan or scheme." *United States v.*

*Sattar*, 272 F.Supp.2d 348, 378 (S.D.N.Y. 2003). Joinder of two separate transactions is not

permitted under Rule 8(b) "merely because they are of a similar character or involve one or more

common participants." *United States* v. *Lech,* 161 F.R.D. 255, 256 (S.D.N.Y. 1995).

For instance, in *Turoff,* the Court noted that acts involved in separate schemes were

sufficiently related not merely because they had a temporal and spatial relationship, but because

the success of one series of acts depended upon acts taken to further the other. *Turoff,* 853 F.2d

at 1044. *See also United States v. Santoni*, 585 F.2d 667, 673-674 (3d Cir. 2001)(tax evasion

counts could properly be joined with series of extortions since the tax evasion was necessary to

conceal the extortionate activity). Furthermore, as Judge Sotomayor emphasized in *Lech,* the

*Turoff* defendants were each aware of and participated in both schemes. *"Turoff* stands for the

proposition that Russo and Fulton may be tried together because they had specific knowledge of

each other's activities, jointly participated in many of the acts alleged in the Indictment, and used

that knowledge and participation as a springboard for the Richman and 125th Street Projects."

161 F.R.D. at 257.

As a *general* rule, when an indictment alleges the existence of an overall conspiracy linking various substantive crimes in an indictment, joinder of the substantive crimes may be appropriate at the pre-trial stage. *Id.* at 256. In the instant case, however, as set forth below, the specific allegations of the indictment demonstrate that the Tradehill Transaction was not part of any common plan or scheme alleged in count one of the indictment. Moreover, general allegations of a single overarching conspiracy, when the government has no "reasonable expectation" that it will adduce sufficient proof of such a singular conspiracy at trial, do not justify joinder of unrelated acts. *See United States v. Aiken*, 373 F.2d 294, 299 (2d Cir. 1967).

a. Counts Five, Six and Seven

Counts five, six and seven of the indictment allege that defendants Coplan, Nissenbaum, and Shapiro evaded the tax on income they received by implementing a tax shelter, the Tradehill Transaction. This transaction must be severed from the indictment for misjoinder of offenses under Rule 8(b) since it was not part of a common plan or scheme constituting an offense or offenses.

The government may contend that joinder of these counts with count one is proper because count one includes general allegations that the Tradehill Transaction was part of the E&Y tax shelter conspiracy. However, what is lacking in the indictment is any specific factual allegation that the Tradehill Transaction was in furtherance of the E&Y tax shelter conspiracy, that the success of the Tradehill Transaction depended upon the E&Y tax shelter conspiracy, or even that each of the alleged co-conspirators were aware of the Tradehill Transaction. Indeed, the allegations in the indictment demonstrate that the Tradehill Transaction was not part of a common plan.

-8-

The indictment alleges that the genesis of the Tradehill Transaction was the sale by E&Y of its consulting business to a French company, Cap Gemini. As a result of the sale, all E&Y partners, including Coplan, Nissenbaum, and Shapiro, received shares of stock in Cap Gemini. Although the partners were not free to sell the stock, it constituted income in the year 2000. Significantly, the income received by the defendants in no way related to any activity within the scope of the alleged E&Y tax shelter conspiracy. Following disclosure of the deal to E&Y partners, defendant Nissenbaum "began discussing with other E&Y partners the possibility of using a tax shelter to eliminate the income tax liability arising from their receipt of the Cap Gemini stock." Indictment, ¶71. The indictment naturally emphasizes that the discussion as to whether to invest in a tax shelter was held among a number of E&Y partners because it was *only E&Y partners* who were receiving the Cap Gemini stock. Thus, defendants Vaughn, Bolton, and Smith were not part of the discussions and there is no allegation that they were even aware of the Cap Gemini sale, the partners' receipt of this income, or the Tradehill Transaction itself. Indeed, the indictment alleges that eight other E&Y partners, with absolutely no link to the alleged E&Y tax shelter conspiracy, participated in the Tradehill Transaction. Finally, although the indictment does not identify the "tax shelter promoter" who was involved with the transaction (Indictment, ¶72), this promoter is not alleged to have played any role in the E&Y tax shelter transactions.

The government may argue that the Tradehill Transaction was related to the alleged E&Y tax shelter conspiracy because the strategy employed by the E&Y partners was a short option strategy "similar" to COBRA. Indictment, ¶69. However, joinder of transactions is not permitted merely because they are of a similar character or involve one or more common participants. *Lech, supra.*

The factual situation here is conceptually the same as the factual situation in *Rojas.* In *Rojas,* (a) there was an overarching conspiracy to sell narcotics in order to enrich the participants of the overarching conspiracy, and (b) a few of the participants in the first conspiracy also participated in a second conspiracy to sell narcotics, but this second conspiracy was not intended to enrich the first conspiracy, or otherwise further the first conspiracy. The conspiracies (1) had overlapping participants, and (2) both had the general goal of selling narcotics. These facts, however, did not support joinder because one offense "was not part of, and did not seek to advance the other." *Rojas,* 2001 WL 1568789, at \*5-6.

The instant indictment is conceptually the same as *Rojas* because, although the instant indictment alleges a single overarching conspiracy, it is plain that count one of the instant indictment combines at least two separate conspiracies.[5] The Second Circuit has identified three principal factors in determining whether a conspiracy count combines separate conspiracies into a single count: mutual dependence, common aim or purpose, and mutual awareness. *E.g. United States v. Van Wort*, 887 F.2d 375 (2d. Cir. 1989). The element of mutual dependence as between the participants in the alleged E&Y tax shelter conspiracy and the alleged Tradehill Transaction is utterly lacking; there is no allegation that the success of one alleged transaction depended upon the success of the other. Nor is there any apparent common aim or purpose as between these alleged transactions. The focus of the alleged E&Y tax shelter strategy was to market strategies on behalf of E&Y and to reduce the income tax liability of E&Y clients. While the Tradehill Transaction had the objective of reducing the partners' individual tax liability, there was no

---

[5]    In addition to the alleged E&Y tax shelter conspiracy and the Tradehill Transaction, the indictment alleges a third scheme: that defendant Bolton implemented his own personal tax shelters in 2000 and 2001.

-10-

connection to E&Y as a firm or to its clients.[6] Finally, the mutual awareness element is plainly

lacking as well. The Tradehill Transaction involved eleven participants, only three of whom are

alleged to have played any role or have had any awareness of the alleged E&Y tax shelter

conspiracy. So too, three of the alleged defendants, Vaughn, Bolton, and Smith, are not alleged

to have had any awareness of the Tradehill Transaction.

Thus, as in *Rojas,* the Tradehill Transaction was not a part of, and did not advance, the

objectives of the E&Y tax shelter conspiracy alleged in count one. Accordingly, as the Tradehill

Transaction was not part of any common plan or scheme alleged in count one of the indictment,

counts five, six, and seven must be severed from the indictment pursuant to Federal Rule of

Criminal Procedure 8(b).

b. Count Eight

Count eight of the indictment alleges that, on behalf of the eleven E&Y partners who had

engaged in the Tradehill Transaction, defendant Nissenbaum caused false and misleading

statements to be submitted to the IRS in response to one of three IRS Information Document

Requests ("IDR's"). Indictment, ¶¶81, 82, 129. The IDR's were issued by the IRS in connection

with audits of the eleven E&Y partners' 2000 income tax returns. Plainly, the allegations in

count eight are related to the charges in counts five, six, and seven, and these counts are properly

joined with each other. Just as clearly, for the reasons stated with respect to the Tradehill

---

[6]     Paragraph 18 of the indictment describes the objectives of the E&Y tax shelter
conspiracy: enabling the co-conspirators and the entities with which they were affiliated to
participate in the tax shelter market, preventing E&Y's high-net worth clients from taking their
business to competitors, ensuring that the unit within E&Y that developed and marketed
strategies to individuals would prosper within the firm, enhancing the individual E&Y
defendants' standing within the firm, and permitting the Bolton companies to obtain access to
E&Y's high net worth clients. None of these asserted objectives were served by the Tradehill
Transaction.

Transaction tax evasion counts themselves, the allegation that Nissenbaum obstructed the IRS in connection with its examination of the Tradehill Transaction tax returns was not part of the common plan or scheme alleged with respect to the E&Y tax shelter transactions. Accordingly, count eight, too, must be severed from the indictment pursuant to Federal Rule of Criminal Procedure 8(b).

POINT II

DEFENDANT MARTIN NISSENBAUM IS
ENTITLED TO A BILL OF PARTICULARS
PURSUANT TO RULE 7(F), FED.R.CRIM.P.

The purpose of a bill of particulars is to identify the nature of the charges pending against a defendant, thereby enabling him to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).   Mindful that the decision of whether to grant a bill of particulars must be "informed by considerations of whether the requested particularization is necessary to defendant's preparation for trial and avoidance of unfair surprise at trial," *United States v. Strawberry*, 892 F.Supp. 519, 526 (S.D.N.Y. 1995), the particulars sought by the defendant Nissenbaum relate to allegations in the indictment that fail to apprise him of the nature of the allegations against him individually. Courts should require the government to provide a bill of particulars when the indictment fails to identify the conduct that a defendant undertakes in furtherance of a lengthy multi-faceted conspiracy. *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).   Moreover, "while a bill of particulars is not intended, as such, as a means of learning the government's evidence and theories, if necessary to give the defendant enough information about the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories." *Id.* (Internal quotes and citation omitted).

As shown below, the requests made by the defendant for particulars are specifically tailored to inform him of the specific acts of which they stand accused.  The defendants have not

been informed, from the indictment or from the discovery materials, of critical and basic information known to the government: "the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990). This is essential information to which the defendant must be entitled.

According to the indictment, the CDS Add-On ("Add-On") strategy was marketed for a brief period in mid-2000. Indictment, ¶35. The Add-On strategy is one of the allegedly fraudulent transactions that was involved in the E&Y tax shelter conspiracy. Moreover, in counts two, three and four, the defendants are alleged to have aided and abetted attempts to evade taxes by individuals and entities that participated in the Add-On strategy. However, neither the indictment nor the voluminous discovery materials relating to the wide-ranging tax shelter allegations provides Mr. Nissenbaum with notice of the conduct relating to these allegations of which he stands accused.

Accordingly, with respect to the Add-On strategy, Mr. Nissenbaum requested that the government identify: (a) who among the "E&Y defendants" created a false cover story in order to imbue the transaction with a meaningful business purpose (Indictment, ¶40); (b) who among the "E&Y defendants" offered Add-On to existing entities, and what "E&Y personnel" met with representatives of those entities (Indictment, ¶46);  and who among the "conspirators" arranged for the Add-On clients to sign false and fraudulent representation letters prepared by Law Firm A (Indictment, ¶51).

Similarly, with respect to counts two, three, and four, Mr. Nissenbaum asked  the government to identify who at "E&Y" requested that a representative of each of the entities involved in those counts sign false and fraudulent representation letters (Indictment, ¶¶102, 121);

-14-

who at "E&Y" prepared the amnesty letters submitted to the IRS by L. Trading Group
(Indictment, ¶103), C. Partnership (Indictment, ¶110), and T.M. and K.M. (Indictment ¶124); and
who at "E&Y" met with representatives of C. Partnership (Indictment, ¶107) and spoke with
K.M. (Indictment, ¶117).

     The purpose of these requests is to provide Mr. Nissenbaum with notice of what it is that
he is accused of doing in connection with the Add-On allegations.  Simply put, by what conduct
is it alleged that Martin Nissenbaum aided and abetted the alleged tax evasions?  The indictment
does not allege a single act by which Mr. Nissenbaum is alleged to have furthered this
transaction.[7]  Since there are no allegations in the indictment or in the discovery materials that
notify the defendant of the conduct supporting these allegations, he is unable to prepare an
adequate defense to these charges.

     The indictment also charges Martin Nissenbaum with participation in the allegedly
fraudulent PICO transaction that is part of the E&Y tax shelter conspiracy.  PICO, which was
marketed and sold in 2000-2001, involves 96 separate transactions.  Indictment, ¶54.  As with
CDS-Add On, neither the indictment nor the voluminous discovery materials relating to the
wide-ranging tax shelter allegations provides Mr. Nissenbaum with notice of the criminal
conduct relating to these allegations of which he stands accused.  There are few, if any,
allegations which identify Mr. Nissenbaum's participation in the PICO transaction.  The
indictment states that he was among a number of individuals who received an email from his co-

---

[7]    Count one of the indictment alleges that Mr. Nissenbaum was one of a number of
recipients of emails sent by others at E&Y.  Indictment, ¶¶39, 42, 48.  It is difficult to understand
how his receipt of an email, absent an allegation that he did something in response to the email,
could constitute aiding and abetting the three instances of income tax evasion alleged in counts
two, three and four of the indictment.

defendant in June 2001 (Indictment, ¶58(b)), and further alleges that in or about 2000-2001, he

participated in presenting the PICO strategy to clients. Indictment, ¶ 97(ff).

Accordingly, with respect to the PICO transactions, Mr. Nissenbaum requested that the

government identify (a) who among the "conspirators" developed a false cover story to be

provided to the IRS (Indictment, ¶57); and (b) who among the "conspirators" arranged for the

balance of E&Y's fee to be paid by the client and created a phony contract (Indictment ¶ 58(f)).

Finally, Mr. Nissenbaum asked the government to provide particulars with respect to the

allegation that he participated in presenting the PICO strategy to clients in or about 2000 and

2001. Indictment, ¶97(ff).[8] Specifically, Mr. Nissenbaum is entitled to the names of the clients

to whom these presentations were allegedly made, and the approximate dates, times, and places

of the PICO presentations.

The purpose of these requests is to provide Mr. Nissenbaum with notice of what it is that

he is accused of doing in connection with the PICO allegations. The indictment fails to notify the

defendant of what, if any, conduct he engaged in which is alleged to have furthered the goals of

the charged conspiracy.

The statements of the court in *United States v. Smith*, 16 F.R.D. 372, 374-375 (W.D. Mo.

1954),[9] are particularly relevant to Mr. Nissenbaum's requests for these particulars in this case:

> Nor is it an answer to a motion for a bill of particulars for the
> government to say, "The defendant knows what he did, and

---

[8]     Mr. Nissenbaum is also entitled to particulars concerning a similar allegation, that he
participated in presenting the CDS strategy to clients in 2000 and 2001. Indictment, ¶97(ee).

[9]     The decision in *Smith* was explicitly approved "as an illustration of wise use of ...
discretion" by the Advisory Committee which proposed the 1966 amendments to the Federal
Rules of Criminal Procedure. *See Advisory Committee's Note to Amended Rule 7(f)*, 39 F.R.D.
168, 170-171 (1966).

> therefore has all the information necessary." This argument could
> be valid only if the defendant be <u>presumed</u> to be guilty.   For only if
> he is presumed to be guilty could he know the facts and details of
> the crime.  Instead of being presumed guilty, he is presumed
> innocent.  Being presumed to be innocent, it must be assumed "that
> he is ignorant of the facts upon which the pleader founds his
> charges."   This conclusion seems to me to be elementary,
> fundamental, and inescapable.

(Emphasis in original).

This defendant, too, is presumably innocent of the crimes alleged and the need for

specificity of the indictment must be reviewed in that light.  For the above reasons, the

defendant's motion pursuant to Rule 7(f), Fed.R.Crim.P. should be granted.

## CONCLUSION

For the foregoing reasons, the Court should grant Martin Nissenbaum's motions seeking an order of this Court (1) severing counts five, six, seven, and eight, relating to the Tradehill Transaction, pursuant to Rule 8(b), Fed.R.Crim.P., since they are improperly joined with the remaining counts of the indictment, (2) requiring the government to provide Mr. Nissenbaum with a bill of particulars relating to certain allegations in counts one, two, three, and four of the indictment, pursuant to Rule 7(f), Fed.R.Crim.P., and (3) permitting Mr. Nissenbaum to join in the applicable motions of his co-defendants.

Dated: New York, New York
        May 5, 2008

CLAYMAN & ROSENBERG

By: _____
        Isabelle A. Kirshner, Esq.
        Brian D. Linder, Esq.
        305 Madison Avenue
        New York, New York 10165
        (212) 922-1080

-18-