UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - --x

UNITED STATES OF AMERICA              :

      - v. -                                     :

ROBERT COPLAN,                          :              (S1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,                       :
BRIAN VAUGHN,
DAVID L. SMITH, and                    :
CHARLES BOLTON,

                            :

                Defendants.

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


# GOVERNMENT'S MEMORANDUM IN OPPOSITION
# TO DEFENDANTS' PRETRIAL MOTIONS


MICHAEL J. GARCIA,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*


LAUREN GOLDBERG,
MARSHALL A. CAMP,
*Assistant United States Attorneys*
    *Of Counsel.*

## TABLE OF CONTENTS

THE TAX SHELTER FRAUD SCHEME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    Defendants' Attack On The Substantive Tax Evasion Counts
        Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            1.    Pleading Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            2.    Elements of Tax Evasion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    Shapiro's Motion Ignores The Allegations In The Indictment . . . . . . . 10

    II.    The Motions To Dismiss For Lack Of Venue Should Be Denied . . . . . . . . . . . 21

        A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    III.    The Motions To Transfer Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    IV.    The Court Should Deny Nissenbaum's Motion To Sever . . . . . . . . . . . . . . . . . 48

        A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        B.    Applicable Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        C.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

1.    The Tradehill Counts Relate To Conduct Alleged As Part
Of The Conspiracy And Are Properly Joined . . . . . . . . . . . . . . . 50

2.    The Conduct Underlying Counts Five Through Eight
Is Integrally Related To The Overall Conspiracy . . . . . . . . . . . 52

3.    Severance Would Necessitate A Duplicative
Second Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

V.    Vaughn Is Not Entitled To Engage In A Fishing Expedition
With Unsupported Allegations And Speculation Regarding Potential
Violations of Section 6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A.    Title 26, United States Code, Section 6103(h)
And Related Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    Neither Dismissal Of An Indictment Nor Suppression Of
Evidence Is Available To Remedy A Violation Of
Section 6103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

C.    Vaughn Has Made No Threshold Showing That Section 6103
Was Violated, And He Is Not Entitled To Discovery To Do So . . . . . . . 63

D.    Vaughn's Suggestion That Prosecutors Improperly
Investigated E&Y's Tax Shelters Prior To A Referral
From The IRS Is Equally Baseless . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

VI.    Defendants Are Not Entitled To A Bill Of Particulars . . . . . . . . . . . . . . . . . . . . . 72

A.    General Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

VII.    The Requests To Strike "Surplusage" Are Frivolous . . . . . . . . . . . . . . . . . . . . . 96

A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

1.    Shapiro's Prior Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

2.    Broadening Language Such As "Other Things"
And "Other Ways" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

3.      The References to "Attorneys and Other Professionals" . . . . . . 103

4.      The Use Of The Word "Purported" In Describing the CDS
        Trading Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - --x

UNITED STATES OF AMERICA       :

           - v. -                :

ROBERT COPLAN,            :         (S1) 07 Cr. 453 (SHS)
MARTIN NISSENBAUM,
RICHARD SHAPIRO,         :
BRIAN VAUGHN,
DAVID L. SMITH, and        :
CHARLES BOLTON,

                :
           Defendants.
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' PRETRIAL MOTIONS

        The Government respectfully submits this Memorandum in Opposition to the

defendants' various pretrial motions.[1]  We address them in the following order:

1.      Motion to dismiss Counts Two through Four and Seven based on the purported

      complexity or vagueness of the tax laws.  (Shapiro Br.).

2.      Motions to dismiss false statement counts (Counts Ten and Eleven) and tax evasion count

      (Count Five) based on lack of venue and lack of jurisdiction by the grand jury.  (Coplan

      Br. and Vaughn Br.)

---

[1]      Each defendant has filed a brief in support of his individual motions.  In addition, Shapiro filed a brief on behalf of all defendants in support of their discovery motions.  The individual briefs are cited herein as: "Shapiro Br.," "Coplan Br.," "Nissenbaum Br.," "Bolton Br.," and "Vaughn Br."  Citation to the discovery motion filed on behalf of all defendants is indicated by "Defendants' Disc. Br."

1

3.      Motions to transfer venue.  (Vaughn Br. and Bolton Br.)

4.      Motion to sever obstruction count and substantive tax evasion counts relating to certain defendants' personal use of tax shelters (Counts Five through Eight). (Nissenbaum Br.).

5.      Motion for disclosure of certain materials in connection with an alleged potential violation of 26 U.S.C. § 6103.  (Vaughn Br.).

6.      Motions for a bill of particulars.  (Defendants' Disc. Br., Nissenbaum Br., Shapiro Br. and Vaughn Br.).

7.      Motion to strike as prejudicial certain language from the Indictment.  (Shapiro Br.).

For the reasons stated below, all of the defendants' motions should be denied.

## THE TAX SHELTER FRAUD SCHEME

This is a case about defendants who lied in order to hide the true nature of various tax shelter transactions from the Internal Revenue Service ("IRS").  Defendants Coplan, Nissenbaum, Shapiro and Vaughn, as partners and employees of Ernst & Young ("E&Y" and collectively the "E&Y defendants"), designed and vigorously marketed the shelters to their wealthiest clients as tax loopholes that would defer, reduce or, in some cases, completely eliminate the taxes owed on millions of dollars in income.  The shelters were described very differently to the IRS.  The defendants knew that the shelters – which were implemented by the E&Y defendants and defendants Bolton and Smith through a variety of complex financial transactions – had significant vulnerabilities that would seriously undermine any legitimate effort to defend the shelters' purported tax benefits if they were challenged by the IRS.  To conceal and obscure the true purpose and nature of these transactions, the conspirators created, and assisted in creating, false documentation to make it appear as though these transactions, or

2

certain aspects of the shelters, had occurred in a manner or for reasons that did not reflect reality. For instance, various aspects of some of the transactions were documented as having a substantial non-tax or investment purpose, when in reality the transactions were motivated simply by the client's desire to obtain the tax losses or other tax benefits promised by the defendants.

The conspirators caused hundreds of E&Y's clients to claim on their tax returns more than a billion dollars of tax losses and other tax benefits purportedly resulting from the shelters. The obvious point of the false and misleading documentation was to substantiate the massive, artificially-generated tax losses and other tax benefits, and to provide a script and props for misrepresenting the transaction and deceiving the IRS if and when the clients were audited. If the IRS questioned or challenged particular tax losses, then the plan, the Indictment alleges, was that the clients would provide this documentation, including fraudulent legal opinion letters, to further deceive the IRS and conceal the true facts, so that the clients could enhance the likelihood of keeping for themselves money they otherwise would have paid in taxes. In this regard, the Indictment alleges that the conspiratorial agreement included within its scope acts of fraud and concealment that were intended to occur years after the filing of the tax returns containing the artificially-generated losses and purported tax benefits of the shelters.

Despite the volume of paper submitted by the defendants along with their motions, and their attempts to cloud the issues and ignore the extensive allegations of lies and concealment that belie any claim of good faith on their parts, there is nothing novel or complex about the proposition that taxes are calculated based on the substance of what occurred — they are based on truth, not lies. Lying to prevent the IRS from unraveling the true facts of a

transaction is a scheme to defraud the United States and obstruct the due administration of the

tax laws, and lying in the same fashion with the intent to evade taxes that are due and owing to

the IRS in an effort to keep for oneself, or for one's client, money that should have been paid in

taxes is tax evasion.

## BACKGROUND

### I.    The Indictment

Indictment S1 07 Cr. 453 (SHS) (the "Indictment") was returned by a Grand Jury

in this District on February 19, 2008.[2]  It charges all of the defendants with one count of

conspiracy (Count One) and three counts of substantive tax evasion in connection with CDS

Add-On tax shelters implemented by three groups of clients (Counts Two through Four).

Defendants Coplan, Nissenbaum and Shapiro are also each charged with one count of tax

evasion based on implementation of their own personal tax shelter (Counts Five through Seven).

The remaining counts charge Nissenbaum and Coplan with obstruction of the IRS (Counts Eight

and Nine), and Vaughn and Coplan with making false statements to the IRS (Counts Ten and

Eleven).[3]

The Indictment sets forth in painstaking detail, over the course of 107 pages, the

nature of the conspiracy and the specifics of the related substantive charges brought against the

defendants.  While the charged conduct spans from 1998 through in or about 2006, the

_____

[2]    The original Indictment was returned by the Grand Jury and filed under seal on May 22, 2007, and named only defendants Coplan, Nissenbaum, Shapiro and Vaughn.  It was unsealed on May 30, 2007.  Defendants Smith and Bolton were added in the superseding Indictment.  Defendant Smith is a fugitive.

[3]    Counts Twelve and Thirteen charge only the fugitive defendant Smith.

defendants are charged with a single core fraud: "designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the shelters were marketed and implemented." Indictment ¶ 13. The defendants carried out their fraudulent scheme through a variety of means including, but not limited to: (1) creating "false and fraudulent factual scenarios" in connection with the design and implementation of the tax shelters so that wealthy clients could minimize the taxes they paid to the IRS (*id.* ¶ 96(a)); (2) designing and implementing the tax shelters in ways that "disguised the fact that the shelters were largely or exclusively tax-motivated and lacked substantial non-tax business purpose" (*id.* ¶ 96(c)); (3) preparing and assisting in preparing various fraudulent documents to deceive the IRS, including "engagement letters, transactional documents, representation letters, and correspondence" (*id.* ¶ 96(e)); and (4) providing false and misleading information to the IRS in connection with the IRS's voluntary disclosure initiative, in response to information requests from the IRS, and during testimony under oath. *Id.* ¶¶ 96(I), (j), (k).

The Indictment contains detailed descriptions of the tax shelters at issue, all of which were designed and executed through a series of pre-planned, pre-determined steps, which were carefully devised with the intent to deceive the IRS. *Id.* ¶¶ 21-59, 68-82. Four of the five tax shelters - CDS, COBRA, CDS Add-On and PICO - were marketed and sold to hundreds of wealthy clients with taxable income typically in excess of $10 or $20 million. *Id.* ¶ 14. The fifth shelter - a single transaction referred to as the "Tradehill Transaction" - was similar in some respects to the COBRA shelter, and was used by defendants Coplan, Nissenbaum and Shapiro (and eight other E&Y partners) to evade their personal taxes. *Id.* ¶ 68. Only CDS Add-On and

the Tradehill Transaction form the basis of substantive tax evasion counts. *See* Counts Two

through Seven. Collectively, the four shelters marketed to clients earned fees for E&Y of more

than $120 million and millions of dollars in fees for Bolton and his companies. *Id.* ¶¶ 21, 27, 35,

54.

The Indictment also contains two obstruction counts. Count Eight charges

Nissenbaum with obstructing the IRS by providing false and misleading information in

connection with a request for information related to the Tradehill Transaction, *id.* ¶ 129, and

Count Nine charges Coplan with obstruction based on an email he sent directing E&Y

professionals to delete COBRA-related materials from their files while an IRS audit was

ongoing. *Id.* ¶ 131. Finally, the Indictment charges Vaughn and Coplan with providing false

and misleading testimony under oath in connection with the IRS's examination of E&Y's tax

shelter activities, commonly referred to as a "promoter penalty audit." *Id.* ¶¶ 133-139 (Counts

Ten and Eleven).

## II.    Discovery

The Government has provided substantial discovery to the defense pursuant to its

obligations under Fed. R. Crim. P. 16(a), and beyond those obligations. In particular, the

defendants have been provided with records obtained by the Government from a variety of

entities including, but not limited to: the IRS, E&Y, Deutsche Bank, UBS, Arnold & Porter,

Locke Liddell & Sapp, Bricolage, various entities controlled by defendant Bolton and Jenkens &

Gilchrist.[4] Although the discovery is voluminous, the overwhelming majority (by the

---

[4]      The Government continues to diligently comply with its discovery obligations
and is continuing to produce discovery. Except to the extent materials are produced to the
Government in the future, the Government expects to have its production to the defendants

Government's estimate, at least 95%, if not more) has been produced electronically in word-searchable databases.  The defense has also been provided with indices to the two largest electronic databases (the E&Y and Deutsche Bank databases).  The Government also produced to the defendants almost a year ago a set of approximately 300 "key" documents it had identified during the investigation, along with an index to the documents.

In addition to the electronic discovery, materials have been provided in hard copy. A large portion of the hard copy documents consist of IRS audit files created during the audits of various clients in connection with the tax shelters at issue in the Indictment.  Because many of these documents were originally generated by E&Y and other entities listed above, and then produced by the clients or by E&Y to the IRS, much of the material in the audit files is duplicative of documents contained in the electronic databases.

## ARGUMENT

### I.    Defendants' Attack On The Substantive Tax Evasion Counts Should Be Rejected

Based on an almost total disregard for the allegations supporting the substantive tax evasion counts in the Indictment, as well as the elements of that offense, and controlling Second Circuit case law, Shapiro argues that his fraudulent conduct cannot be prosecuted criminally, and that the substantive tax evasion charges (Counts Two through Four and Count Seven) should therefore be dismissed.  According to Shapiro, as the caption of Point II of his motion states, "They Fail To Allege The Willful Violation Of A Known Legal Duty And Violate Shapiro's Right to Due Process Of Law."  Shapiro Br. 11.  Because the Indictment properly

completed in the next several weeks.

7

alleges the elements of tax evasion, Shapiro's argument is meritless and the motion should be denied.

### A.    Applicable Legal Standards

#### 1.    Pleading Requirements

Rule 7(c)(1), Fed. R. Crim. P., sets forth the general requirements for the nature and contents of an indictment. The rule provides, in relevant part:

> The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . . A count may incorporate by reference an allegation made in another count. . . . For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

It is well-settled that "[t]o satisfy the pleading requirements of Fed. R. Crim. P. 7(c)(1), 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)) (additional citations and internal quotation marks omitted). Moreover, an indictment "'must be read to include facts which are necessarily implied by the specific allegations made.'" *Stavroulakis*, 952 F.2d at 693 (quoting *United States* v. *Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)). "In short, 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *LaSpina*, 299 F.3d at 177 (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)).

8

The law is well-settled that an indictment, "if valid on its face, is enough to call for trial of the charges on the merits."  *Costello* v. *United States*, 350 U.S. 359, 364 (1956).  If pretrial challenges to the evidence were permitted, "a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury" which would result "in interminable delay but add nothing to the assurance of a fair trial." *Costello*, 350 U.S. at 363; *see also United States* v. *Calandra*, 414 U.S. 338, 345 (1974).

### 2.    Elements Of Tax Evasion

Counts Two through Four and Count Seven charge Shapiro with tax evasion, in violation of 26 U.S.C. § 7201.  That statute provides in relevant part that: "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony."  In order to establish a defendant guilty of the charge of tax evasion, the Government must prove the following elements:

1.    That the individual, defendant, or entity identified in the particular count had a substantial amount of tax due and owing for the year in question;

2.    That the defendant, or a person whose actions are attributable to the defendant (either because the defendant caused the person to act or because the person acting was a co-conspirator whose actions are attributable to a defendant under a *Pinkerton* theory) committed one or more affirmative acts of evasion; and

3.    That the defendant acted willfully.

In the context of this statute, to act "willfully" means to violate a known legal duty.  *See Cheek* v. *United States*, 498 U.S. 192, 201 (1991); *United States* v. *Fletcher*, 928 F.2d 495, 501 (2d Cir. 1991) ("In a prosecution for tax evasion, what counts is the subjective belief of a defendant that

9

his conduct will result in an unlawful evasion of taxes, not the degree to which tax laws are, or should be, objectively comprehensible to that defendant."); *see also Spies* v. *United States*, 317 U.S. 492, 496 (1943) ("willful[ly] . . . is a word of many meanings, its construction often being influenced by its context.").[5]

**B.    Shapiro's Motion Ignores The Allegations In The Indictment**

The charges in Counts Two through Four and Count Seven of the Indictment

---

[5]  Shapiro suggests the Government may be required to prove "willfulness" in order to prove the defendants conspired to defraud the United States and the IRS in connection with the conspiracy charged in Count One.  *See* Shapiro Br. 12, n.4.  However, because a conspiracy to defraud the United States does not include willfulness as an element, the defendants may be convicted of conspiring to defraud the United States even if acquitted of the evasion counts, or even if the Court were somehow to dismiss the evasion counts and the evasion object of the conspiracy.  A conspiracy to defraud under section 371 (commonly known as a "*Klein* conspiracy," after the landmark case *United States* v. *Klein*, 247 F.2d 908 (2d Cir. 1957)) embraces "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government."  *United States* v. *Ballestrea*, 101 F.3d 827, 831 (2d Cir. 1996).  A *Klein* conspiracy and a tax evasion count have significant differences.  For example, while a conspiracy to defraud the IRS by obstructing its lawful function must ordinarily have a tax *motive*, the Government need not prove the existence of an actual tax *deficiency*.  *See Ballestrea*, 101 F.3d at 831 (no requirement to show Government "subjected to property or pecuniary loss by the fraud").  Nor must the Government prove that the defendant acted willfully, as that term is used in *Cheek*, in order to prove a *Klein* conspiracy.  In *Cheek*, the Supreme Court interpreted the term "willfully" as "used in §§ 7201 and 7203" to require the Government to prove the defendant had a specific intent to violate the law.  *Cheek*, 498 U.S. at 193.  Unlike Sections 7201 and 7203 of Title 26, which were at issue in *Cheek*, the "scheme to defraud the United States" prong of 18 U.S.C. § 371 does not contain the word "willfully."  It follows, therefore, that the Government need not prove a specific intent to violate the law in order to prove a § 371 conspiracy.  *See, e.g., United States* v. *Khalife*, 106 F.3d 1300 (6th Cir. 1997) (no requirement to show defendant knew conduct was illegal to show scheme to defraud United States); *Ballastrea*, 101 F.3d at 831 ("the government need only show (1) [that defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy"); *United States* v. *Alston*, 77 F.3d 713, 720 (3d Cir. 1995) ("establishing a true *Klein* conspiracy under the 'defraud' clause does not generally require proof of knowledge of illegality"); *United States* v. *Derezinski*, 945 F.2d 1006, 1011 (8th Cir. 1991) (because "willfulness" is not an express element of section 371, *Cheek* does not apply).

track the language of the statute, and clearly allege the well-established elements of the crime of

tax evasion in connection with the CDS Add-On and Tradehill tax shelters.  *See* Indictment ¶¶

99-127.  Because the allegations are sufficient on their face, Shapiro's motion should be denied.

Curiously, while Shapiro labels his claim as one of a failure by the Government to

"[a]llege" the element of willfulness, Shapiro Br. 11 (caption of argument), his actual argument

is not based on this assertion (because it clearly has no merit), but rather on the claim that the

"government will not be able *to prove* that Shapiro violated a known legal duty."  Shapiro Br. 11

(emphasis added).  Challenges such as this one to the evidence that will be presented at trial are

not permitted at this stage.

The Court need not delve further into Shapiro's argument in order to deny his

motion because it constitutes a premature challenge to the Government's proof, rather than a

challenge to the sufficiency of the allegations.  However, because a more in-depth examination

of his argument suggests that Shapiro may be seeking purposely to confuse the Court regarding

the matters at the heart of this case, and because he might well seek to do the same when arguing

to the jury, it is appropriate here to clarify what the Indictment does and does not charge, and

what the Government must therefore prove at trial.

In essence, Shapiro attempts to confuse the issues and elements by arguing that

various civil tax principles were so unsettled and complicated at the time of the events at issue

that the "legal duties" were unknowable.  Therefore, according to Shapiro, the Government will

not be able to prove the defendants willfully violated a known legal duty in connection with the

shelters described in the tax evasion counts.  *See* Shapiro Br. 11.  Shapiro's argument fails not

only because it prematurely seeks to test the Government's proof, but also on the merits, because

regardless of any lack of clarity that might have existed in particular areas of the law, the duty to report and assess taxes based on reality, not lies and shams, is and always has been clearly established.  Indeed, one need look no further than the face of a tax return to know that the information provided on the return must be true, rather than false.[6]  Here, the known legal duties that Shapiro and the other defendants willfully violated include the duty truthfully to report and pay taxes known to be due and owing to the IRS, the duty to respond truthfully to inquiries from the IRS, and the duty not to submit false and fraudulent documentation to the IRS which was created to deceive the IRS into believing that a tax shelter transaction with no reasonable possibility of generating a profit was undertaken for investment reasons.

In arguing that the law was so "uncertain" during the relevant time period, Shapiro claims that a "lack of clarity in the economic substance and business purpose doctrines," Shapiro Br. 17, two doctrines routinely considered by courts in evaluating whether a transaction is a "sham that should not be recognized for income tax purposes," *Compaq Computer Corp.* v. *Commissioner of IRS*, 277 F.3d 778, 781 (5th Cir. 2001), will prevent the Government from being able to prove willfulness on his part.  His claim – which again is improper at this stage because it goes to the sufficiency of the evidence – is baseless.

In *United States* v. *Ingredient Technology*, 698 F.2d 88 (2d Cir. 1983), a case in which a corporation and its former president were convicted of tax fraud, the Second Circuit Court rejected an argument identical to Shapiro's, that "the convictions must be reversed because

---

[6]     Returns state above the signature line: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.  Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge."

the applicable tax law was at least in such dispute that it was not sufficiently clear at the time of

the transactions . . . thereby negating the element of willfulness or scienter." *Ingredient*

*Technology*, 698 F.2d at 96.  In *Ingredient Technology*, the defendants were convicted of

> tax fraud by means of year-end . . . inventory overstatement.  The
> principal arguments of both defendants before the jury . . . were
> that the inventory was not overstated because the corporation in
> fact had legal title on the year-end date to the [inventory] in
> question — raw sugar — even though it had previously agreed to
> resell it to its seller, and that in any event the element of
> willfulness was negated because the tax laws were too unclear for
> the defendants to have known they had committed a crime.

*Id.* at 89.[7]  In other words, the defendants in *Ingredient Technology*, with the paid assistance of

an accommodation party, had created phony documentation making it appear that they had

purchased sugar, when in reality they executed the "purchase" and simultaneously and secretly

agreed to "sell" the sugar back to the accommodation party not long after year-end.  The Second

Circuit responded:

> Here surely the defendants knew they were committing a wrongful
> act.  The resale component of the deal was concealed.  The
> auditors were lied to, as were the attorneys.  The secret letter
> sealed with wax was hidden in a safe and then destroyed.

*Id.* at 96 (citations omitted).  The Court hardly paused in *Ingredient Technology* in approving the

use of tax doctrines such as economic substance and substance over form in a criminal case, and

noted that parsing the exact distinctions among them was unimportant.  *Ingredient Technology*,

698 F.2d at 94.  Similarly, in *United States* v. *Atkins*, 869 F.2d 135 (2d Cir. 1989), the Second

---

[7]     The defendants in *Ingredient Technology* were not convicted of substantive tax
evasion charges.  Rather, they were convicted of conspiring to defraud the United States and
conspiring to evade taxes, in violation of 18 U.S.C. § 371, and subscribing to false tax returns
and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206.  Section
7206 includes the same "willfullness" requirement that is present in § 7201.

Circuit stated that the defendants' arguments about the meaning of economic substance versus sham transactions "demonstrates a lack of understanding of what, for tax purposes, a sham transaction is.  A fictitious transaction may be treated as a sham; however, so also may a transaction that 'has no business purpose or economic effect other than the creation of tax deductions.'"  *Atkins*, 869 F.2d at 139-40 (quoting *DeMartino* v. *Commissioner* 862 F.2d 400, 406 (2d Cir. 1988)); *see id.* ("[t]he doctrine of substance versus form is well ensconced in tax law"; "[a]ppellants further contention that the district court's charge on lack of substance has no place in a criminal prosecution is without merit."); *Long Term Capital Holdings* v. *United States*, 330 F. Supp. 2d 122, 171 (D.Conn. 2004) ("economic substance doctrine is flexible"; "[t]he terminology used, whether sham, profit motivation, or economic substance, is not critical").

This issue was raised recently in *United States* v. *Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) (the "KPMG case").  In that case, Judge Kaplan also rejected defendants' argument that the challenged tax shelters were "governed by uncertain law and . . . that the government will be unable to prove that the defendants acted with the requisite intent."  *Stein*, 429 F. Supp. 2d at 637.  Accordingly, he denied defendants' motions to dismiss both the conspiracy charge and the substantive tax evasion charges.

Here, in making his argument regarding the "lack of clarity" in the law, Shapiro bases his conclusion that "the government will not be able to prove . . . that Shapiro actually knew that he was violating a known legal duty," Shapiro Br. 17, on "the fact that the investors in *COBRA* transactions had some chance of earning a profit . . . and, thus, the government cannot establish that Shapiro had the intent necessary to violate any provision of the tax laws."  Shapiro Br. 17 (emphasis added).  Indeed, virtually all of Shapiro's argument to dismiss Counts Two

14

through Four and Seven – which are *not* COBRA counts – is based on references to COBRA, rather than CDS Add-On and the facts regarding the Tradehill transaction, the shelters that actually form the basis of the tax evasion counts. *See*, *e.g.*, Shapiro Br. 17 ("the government concedes that in COBRA, 'the options had some chance of earning the clients a profit after the fees were paid'") (quoting Indictment ¶ 29); *id.* at 18 ("Indictment alleges that the E&Y Defendants concluded that each COBRA investor could claim that his tax basis in the partnership interest was equal to the cost of the long option," a conclusion "supported by the principle announced by the Tax Court in *Helmer* v. *Commissioner*"); *id.* at 19 ("[g]iven the substantial authority supporting COBRA from a technical tax perspective, criminal liability cannot possibly ensue"). Thus, Shapiro's argument appears to boil down to this:  because the Indictment alleges that COBRA investors could have earned some profit on the foreign currency options, and because, he contends, various aspects of the COBRA shelter could be supported from a "technical" perspective, COBRA could be recognized as a valid transaction for tax purposes, and therefore Shapiro cannot be found guilty of tax evasion in connection with CDS Add-On or Tradehill, two entirely different tax shelters.

        This argument is absurd.  Regardless of whether Shapiro is correct in suggesting that COBRA had sufficient economic substance to make it difficult to premise a tax evasion count on that transaction, that issue is not presented by the charges in this case, and it has absolutely no bearing on the tax evasion charges involving CDS Add-On and Tradehill.  The reasoning behind Shapiro's attempted slight of hand - and why he focuses on COBRA rather than the tax shelters that are actually relevant to the charges he seeks to have dismissed - appears entirely obvious.  Whatever possible uncertainty may exist in the law with respect to precisely

15

how much economic substance is "enough" to defeat a sham transaction argument, or whether the test for economic substance is an objective or subjective one, one thing is crystal clear under the law: even according to cases cited by Shapiro, a transaction with "no reasonable possibility of a profit," has *no* economic substance, and such a transaction will be disallowed.[8]  *See, e.g.*, *Coltec Indus., Inc.* v. *United States*, 454 F.3d 1340, 1355, 1360 (Fed. Cir. 2006) (noting that "a lack of economic substance is sufficient to disqualify the transaction," and rejecting taxpayer's argument where the transaction did not provide "any real opportunity to make a profit"); *Black & Decker Corp.* v. *United States*, 436 F.3d 431, 441 (4th Cir. 2006) (economic substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed"); *see also BB&T Corp.* v. *United States*, 523 F.3d 461, 471 (4th Cir. 2008) (transaction may be disregarded as a sham if "the transaction has no economic substance because no reasonable possibility of a profit exists") (internal quotations omitted).  While Shapiro correctly points out that the Indictment alleges that the investors had a chance of earning some profits after the fees were paid in a COBRA shelter, *see* Indictment ¶ 29, that is a critical fact that distinguishes COBRA from CDS Add-On and Tradehill, and which Shapiro *completely* ignores in his motion.

In connection with CDS Add-On, paragraph 41 of the Indictment alleges as follows:

---

[8]      As discussed in greater detail below, the Government does not have the burden in this case of proving there were taxes due and owing in connection with COBRA, CDS or PICO. In other words, the jury will not be required to pass upon the ultimate merits of COBRA, CDS or PICO, or whether these shelters had sufficient economic substance to survive IRS scrutiny.  *See infra.*

16

> In reality, there was no way the Add-On transaction could "enhance performance" in the CDS trading accounts. Unlike the COBRA transaction, which entailed a foreign currency bet that could actually result in a profit for the client if the client's option pair ended up "in the money," no such possibility existed for the Add-On transaction. This was because the Add-On client was required to contribute only about 0.5% of the desired loss amount to the Add-On transaction (as opposed to 5% contributed by the COBRA client). Although the payout on a successful Add-On bet was 2:1, any profit potential on such a payout was far exceeded by the amount the client was required to pay in fees to E&Y, the Bolton companies, Law Firm A and the financial institution involved. Thus, the Add-On transaction carried no reasonable possibility of profit; it served no purpose other than to defer the client's tax liability indefinitely, and to generate fees for the other participants.

Similarly, the Indictment specifically alleges that the Tradehill transaction "had no reasonable possibility of generating a profit." Indictment ¶ 127(a). This critical distinction, that there was no reasonable possibility of earning a profit from either CDS Add-On or Tradehill, makes Shapiro's entire discussion regarding the "lack of clarity in the economic substance and business purpose doctrines," Shapiro Br. 17, and whether COBRA could be justified "from a technical tax perspective," *id.* at 19, completely irrelevant. Shapiro's discussion regarding various aspects of the CDS tax shelter and the noneconomic loss doctrine, *see* Shapiro Br. 20-23, is also completely irrelevant to the evasion charges, and is undoubtedly included solely as part of Shapiro's calculated effort to distract the Court from what is actually at issue.

Shapiro's suggestion that the "uncertainty" surrounding various tax principles renders the tax evasion charges a violation of due process is also without merit. In *United States* v. *Atkins*, the defendants were convicted of conspiracy and filing, and aiding and assisting in the filing, of false tax returns relating to "creat[ing], purchas[ing], and [selling] millions of dollars in fraudulent tax losses for [Atkins'] companies and his customers." *Atkins*, 869 F.2d. at 137.

17

"[Defendants] used two basic schemes in creating the fraudulent losses," which involved

"rigged" and "artificial transactions in treasury bills or notes" that were "self-reversing" and

"that could be done without any transactions actually having to exist or be delivered." *Id.* In the

rigged straddle transactions, defendant Atkins' company "found accomplices" who would enter

into "paper transactions" "for a fee." *Id.* "As one witness described the process, 'the entire

transaction from start to finish would be arranged, we'd know the end result going into it, and

the only economic risk would be the fee paid for the loss.'" *Id.* "[Defendants] also falsified

other documents that were needed to carry out their schemes, such as disguising kickback

payments as trading losses; and they lied to their lawyers, their accountants, and their customers

concerning the true nature of their machinations." *Id.* at 139.

　　　　　Given these facts, the Second Circuit in *Atkins* was understandably unimpressed

with the defendants' argument — identical to the argument made by Shapiro here, *see* Shapiro

Br. 11-12 — that they "were deprived of due process because they did not know in advance that

their conduct was unlawful." *Atkins*, 869 F.2d at 139; *see also id.* (rejecting defendants'

technical arguments regarding various provisions of the Tax Code, stating that, "[a]s former

Judge Weinfeld correctly held in denying [defendants'] pretrial motion to dismiss, . . . none of

these statutes has been applied to sham transactions such as are involved herein."); *Ingredient

Technology*, 698 F.2d at 96 (rejecting argument that tax charges violated due process; due

process requires only that "the law give sufficient warnings that men may conduct themselves so

as to avoid that which is forbidden").

　　　　　In the transactions at issue in the tax evasion counts, just as in *Atkins*, Shapiro and

his coconspirators engaged in rigged transactions that were arranged from start to finish to create

artificial tax losses and eliminate risk through a series of pre-determined, pre-planned steps. The

defendants did so using option transactions that could not possibly earn the clients any profit net

of the attendant fees, and loans that had no non-tax purpose whatsoever. They helped arrange

for legal opinions which disguised these facts, and which provided false explanations for the

motivation behind the transactions. In addition, Shapiro and his co-conspirators found

accomplices "willing to enter into 'paper' . . . transactions," and lied about "the true nature of

their machinations." *Atkins*, 869 F.2d at 139. In these circumstances, there has been no due

process violation.

        Shapiro cites *United States* v. *Pirro*, 212 F.3d 86 (2d Cir. 2000); *United States* v.

*Mallas*, 762 F.2d 361, 364 (4th Cir. 1985); and *United States* v. *Dahlstrom*, 713 F.2d 1423 (9th

Cir. 1983), claiming that these cases somehow support his position. They do not.[9]

        The Second Circuit's *Pirro* decision and the Fourth Circuit's *Mallas* decision

provide no support for Shapiro here because they are wholly distinguishable from this case. In

*Pirro*, the Second Circuit affirmed the dismissal of part of one count of a tax fraud indictment

that charged the defendant with filing a false S corporation information tax return on the basis of

his failure to disclose in that return the "ownership interest" of another individual in the S

corporation. The Court did so based on its holding that failing to disclose an "ownership

interest" might or might not result in a false return — if it were stock ownership, yes, but if it

---

[9]     *Dahlstrom*, which is not law in the Second Circuit, has been essentially limited to
its facts in the Ninth Circuit. *See United States* v. *Solomon*, 825 F.2d 1292, 1297 (9th Cir. 1987)
(stating that *Dahlstrom* has been narrowed to "situations involving the prosecution for *advocacy*
of a tax shelter program . . . . In sum, because defendants were closely involved in the creation
and operation of the tax shelters they can draw no support from *Dahlstrom* or the first
amendment." (internal quotation marks omitted, emphasis in original)).

were some other type of ownership interest, no. *Pirro*, 212 F.3d at 91. The Court distinguished *Ingredient Technology* and *United States* v. *Biaggi*, 909 F.2d 662, 680-81 (2d Cir. 1990), because "neither addressed the duty of a defendant to report another's alleged ownership interest in an S corporation." *Id.* The allegations in the substantive tax evasion counts in this case are by comparison straightforward — the defendants made various false and misleading statements in creating and executing sham tax shelter transactions which had no reasonable possibility of earning a profit — and fall squarely within *Ingredient Technology, Stein* and other cases cited above. *See, e.g., United States* v. *Schulman*, 817 F.2d 1355, 1359 (9th Cir. 1987) ("There is no dispute in this case that the law is well settled that sham transactions are illegal.").

Moreover, in support of his motion, Shapiro fails to do here what the defendants did in *Pirro* and *Mallas*: accept the Indictment's allegations as true. *Mallas*, 762 F.2d at 362. Shapiro does the opposite: completely ignore the allegations that the CDS Add-On and Tradehill transactions had no reasonable possibility of earning a profit, as well as the detailed and numerous allegations regarding defendants' repeated lies, false statements and material omissions in connection with the shelters. The type of argument advanced by Shapiro would not even be appropriate in the context of a civil motion for summary judgment, where the facts are viewed in the light most favorable to the non-movant. It is even less so in the context of a criminal case, where a properly returned indictment, if it meets the threshold requirements of sufficient pleading, is presumptively valid, is not amenable to a challenge for evidentiary sufficiency, and calls for a trial on the merits. *See Calandra*, 414 U.S. at 345; *Costello*, 350 U.S. at 363. There is no summary judgment procedure in a criminal case. *See United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ("To the extent that the district court looked beyond

20

the face of the indictment and drew inferences . . . such an inquiry into the sufficiency of the evidence was premature.").

For the reasons stated above, the Court should deny Shapiro's motion to dismiss the tax evasion charges contained in Counts Two through Four and Count Seven.

## II.    The Motions To Dismiss For Lack Of Venue Should Be Denied

Defendants Vaughn and Coplan move to dismiss Counts Five, Ten and Eleven on the ground that venue does not lie in this District.[10]  Count Five alleges that Coplan evaded taxes owed by him for calendar year 2000 through the Tradehill tax shelter transaction.  Count Ten alleges that Vaughn made false statements during a June 12, 2002 deposition conducted by the IRS in connection with an examination of E&Y's involvement with the tax shelters described in the Count One conspiracy.  Count Eleven makes the same allegation against Coplan with respect to a deposition he gave on June 20, 2002.

Defendants' motions should be denied because: (I) at this stage of the proceedings, the Court need only examine the facial sufficiency of the Indictment's charging language, which properly pleads venue; and (ii) the evidence at trial will demonstrate a legally sufficient nexus between the challenged counts and this District.

---

[10]    Vaughn styles his motion somewhat peculiarly in terms of both a conventional venue argument (*see* Vaughn Br. 9-19) and a challenge to the Grand Jury's "authority" to return a charge for which venue does not lie in this District.  (*See* Vaughn Br. 2-9).  These alternative formulations appear duplicative, as they seek the same remedy (dismissal of the count) for the same alleged defect (lack of venue).  Accordingly, the Government addresses Vaughn's two arguments as a single motion to dismiss for lack of venue.

### A.    Applicable Law

The Sixth Amendment to the Constitution provides that a defendant has the right to trial in the "district wherein the crime shall have been committed." U.S. Const., Amend. VI; *see United States* v. *Rowe*, 414 F.3d 271, 277 (2d Cir. 2005); *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).  When the defendant is charged with more than one count, venue must be proper with respect to each count. *Beech-Nut*, 871 F.2d at 1188. The Government has the burden of proving *at trial* that venue is proper by a preponderance of the evidence.  *United States* v. *Rosa*, 17 F.3d 1531, 1541-42 (2d Cir. 1994); *United States* v. *Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990).

On a pre-trial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), "a court must accept all factual allegations in the indictment as true."  *United States* v. *Martinez*, 1995 WL 10849, at *2 (S.D.N.Y. Jan. 12, 1995) (citing *Costello* v. *United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits.")  (citation omitted)); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Where a pre-trial motion to dismiss is based upon a challenge to venue, the Government's burden is limited to showing that the indictment on its face alleges venue.  *See*, *e.g.*, *United States* v. *Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) ("[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied."); *United States* v. *Martino*, 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) ("Prior to trial, it suffices for the government to allege with specificity that the charged acts support venue in the district.); *United States* v. *Long*, 697 F. Supp. 651, 655 (S.D.N.Y.

22

1988); *United States* v. *Castellano*, 610 F. Supp. 1359, 1388 (S.D.N.Y. 1985). Thus, resolution of a motion to dismiss an indictment on venue grounds is properly deferred until the close of the Government's case, so long as venue is properly alleged in the indictment. *See*, *e.g.*, *United States* v. *Fama*, 1996 WL 438165 (S.D.N.Y. Aug. 5, 1996); *United States* v. *Korolkov*, 870 F. Supp. 60, 63-64 (S.D.N.Y. 1994) (where indictment alleges venue, objection to venue is fact issue properly reserved for trial); *United States* v. *Rogers*, 1991 WL 90797 (S.D.N.Y. May 21, 1991) (allegation that offense took place in the Southern District of New York sufficient; pretrial determination of factual basis for allegation premature); *United States* v. *Rodriguez*, 734 F. Supp. 116, 127-28 (S.D.N.Y. 1990) (denying motion to dismiss indictment which contained allegations that, if established at trial, would suffice to establish venue); *United States* v. *Wheaton*, 463 F. Supp. 1073, 1076 (S.D.N.Y. 1979).

Venue for a particular crime may properly lie in more than one district. *United States* v. *Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) ("[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.") (citation omitted). Moreover, where "the acts constituting the crime and the nature of the crime charged implicate more than one location, the Constitution does not command a single exclusive venue." *United States* v. *Reed*, 773 F.2d 477, 480 (2d Cir. 1985). Indeed, 18 U.S.C. § 3237(a) expressly provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Accordingly, a defendant accused of a crime may be prosecuted in any district where any part of such a "continuing offense" occurred. *United States* v. *Chalarca*, 95 F.3d 239 (2d Cir. 1996);

23

*United States* v. *Gonzalez*, 922 F.2d 1044, 1054 (2d Cir. 1991); *see generally United States* v. *Johnson*, 323 U.S. 273, 275 (1944) (continuing offense doctrine applies "over the whole area through which force propelled by an offender operates"); *United States* v. *Rowe*, 414 F.3d at 278-79 (re-affirming *Johnson*'s "propelled force" formulation).

   Venue for tax evasion, in violation of 26 U.S.C. § 7201, lies in any district where an "affirmative act of evasion" or attempted evasion was committed.  In *Spies* v. *United States*, 317 U.S. 492 (1943), the Supreme Court explained the "affirmative act" requirement of an evasion charge should be read broadly: "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its efforts to do so result in some unexpected limitation." *Spies*, 317 U.S. at 499.  The Court provided examples of conduct from which an "attempt to evade" could be inferred:

> By way of illustration and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, *and any conduct, the likely effect of which would be to mislead or to conceal*.  If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

*Spies*, 317 U.S. at 499 (emphasis added); *see United States* v. *Strawberry*, 892 F. Supp. 519, 521-22 (S.D.N.Y. 1995); *cf. Martino*, 2000 WL 1843233, at *3.

   Thus, preparing or filing a tax return clearly would be an affirmative act of evasion satisfying venue.  *See, e.g.*, *United States* v. *Rooney*, 866 F.2d 28, 32 (2d Cir. 1989).  However, venue is by no means limited to the district of preparation or filing.  Rather, *any* act of

evasion in the district is enough.  *See Stein*, 429 F. Supp. 2d at 645 (venue proper in Southern District of New York, even though some relevant tax returns were prepared and filed elsewhere, where Government alleged "preparation of fraudulent supporting documents, the creation of financial entities and the implementing of tax shelter transactions through those entities, and the concealment of the tax shelters from regulators" in this District); *Strawberry*, 892 F. Supp. at 521, 524 (venue proper where the Government alleged that defendant's attempts at tax evasion included receipt of cash in this District); *see also Martino*, 2000 WL 1843233, at *3 (use of New York bank account to receive unreported income "would seem to suggest" that venue is proper in Southern District of New York); *United States* v. *DeFabritus*, 605 F. Supp. 1538, 1543-44 (S.D.N.Y. 1985) (venue proper in Southern District of New York, even though returns were not prepared, signed or filed here, where some of the underlying false vouchers were created in this district).

Venue for the crime of making false statements, in violation of 18 U.S.C. § 1001, lies not only in the district where such statements initially were made, but also in the district or districts to which the statements subsequently were transmitted and acted upon.  *See United States* v. *Ramirez*, 420 F.3d 134, 143 (2d Cir. 2005) ("venue was properly laid in the Southern District of New York because [defendant]'s 'statements continued to be false and continued to be within the jurisdiction of the United States when they finally reached Manhattan") (quoting *United States* v. *Candella*, 487 F.2d 1223, 1228 (2d Cir. 1973)); *United States* v. *Salinas*, 373 F.3d 161, 167 (1st Cir. 2004) (observing that "it makes perfect sense to consider the [§ 1001] crime as continuing into the district in which the effects of the false statement are felt"); *United States* v. *Angotti*, 105 F.3d 539, 544 (9th Cir. 1997) ("[E]ven though a crime may have been

25

completed earlier, 'it does not follow that the crime then terminated, and that what transpired in [the district where officials acted upon the false statement] was irrelevant for venue purposes.'") (quoting *Candella*, 487 F.2d at 1228).

### B.     Discussion

As an initial matter, Counts Five, Ten and Eleven plainly and clearly allege that the conduct took place in the Southern District of New York and elsewhere. Indictment ¶¶ 127, 133, 135. These venue allegations, as a pleading matter, are sufficient. *See Stein*, 429 F. Supp. 2d at 643-44; *Fama*, 1996 WL at 438165; *Korolkov*, 870 F. Supp. at 64; *Rogers*, 1991 WL 90797, at *3; *Rodriguez*, 734 F. Supp. at 127-28. Because the defendants' motion has raised the issue of venue, it is preserved for resolution at trial, and they are free to revisit this issue on a motion for acquittal under Federal Rule of Criminal Procedure 29. *See United States* v. *Kham*, 821 F.2d 90, 93 (2d Cir. 1987). Accordingly, to the extent that defendants' motions seek to go beyond the clearly sufficient allegations in the Indictment, the motions are premature and should be denied at this stage.

Even if the motions were ripe for adjudication, however, they would fail because the proof at trial will show that venue for Counts Five, Ten and Eleven appropriately lies in the Southern District of New York. This District played a central and critical role in the conspiracy alleged in Count One and in the substantive acts that form the basis of the challenged counts. First, with respect to the tax evasion charged against defendant Coplan in Count Five, the proof at trial will show many of the steps taken as part of the design, implementation and defense of the fraudulent tax shelter transaction. The proof will reveal numerous specific affirmative acts of evasion in this District, including, among others: (I) the creation of entities in Manhattan for

use in carrying out the various steps of the fraudulent tax shelter transaction; (ii) the issuance of

a false and fraudulent legal opinion by a Manhattan law firm to support a claim that the shelter

was valid; and (iii) the preparation of false and fraudulent IDR responses by the same Manhattan

law firm for submission to the IRS.  Each one of these Southern District-based acts, standing

alone, supports venue on the tax evasion count because each constitutes an "affirmative act of

evasion" under *Spies*.

Judge Kaplan's opinion in the *Stein* case, 429 F. Supp. 2d 633, is directly on

point.  The court in *Stein* correctly observed that a pretrial motion to dismiss on venue grounds

must be denied where the indictment sufficiently alleges venue.  *Id*. at 643-44.  Judge Kaplan

also concluded, however, that a variety of conduct alleged in the indictment, including "the

preparation of fraudulent supporting documents, the creation of financial entities and the

implementing of tax shelter transactions through those entities, and the concealment of the tax

shelters from regulators," constituted "affirmative acts of tax evasion under *Spies* because their

likely effect would be to mislead or to conceal."  *Id*. at 644.  Because some of these affirmative

acts allegedly were committed in this District, venue existed over the tax evasion counts despite

the fact that the underlying tax returns were prepared and filed outside the District.  *Id*.  As set

forth above, the same is true here.

Second, the false statements alleged in Counts Ten and Eleven also meet the

relevant venue test because they were made in connection with an IRS examination conducted

by the Manhattan office of the IRS.  The proof will show that the IRS was conducting a promoter

penalty audit of E&Y, which has its U.S. headquarters in New York City.  Both Vaughn and

Coplan were employed by E&Y at the time and were deposed pursuant to a summons issued to

E&Y's office in Manhattan.  *See* Tucker Aff. Exh. C (E&Y summons); Tucker Aff. ¶ 4 (attesting

that Vaughn and Coplan testified "pursuant to the summons").  The summons directed the firm

to appear at an IRS office in Manhattan.  Tucker Aff. Exh. C.  The depositions of Coplan and

Vaughn were eventually taken in Washington, D.C. and Nashville (respectively), but nearly all

of the IRS officials who attended those depositions traveled from New York to do so, as

evidenced by the addresses that appear for those officials in the deposition transcripts.  *See*

Tucker Aff. Exh. D at 1 (Vaughn deposition appearances); Junghans Aff. Exh. A at 2 (Coplan

deposition appearances).  Finally, and critically, because the promoter penalty audit was being

conducted by the New York office of the IRS, the force and effect of Vaughn's and Coplan's

statements during the depositions were felt primarily in New York.[11]  At trial, this proof easily

will suffice to establish venue.

        The Second Circuit twice has considered analogous facts and affirmed findings of

venue in each case.  In *Candella*, 487 F.2d 1223, the defendants filed fraudulent bills of lading

and affidavits with a city agency in Brooklyn in order to obtain federally-funded

reimbursements.  *Id.* at 1224.  These documents were then forwarded to the agency's central

office in Manhattan, where they were processed.  *Id*. at 1227.  The defendants argued that

because the crime initially was committed in Brooklyn, venue could not lie in this District.  The

Court of Appeals rejected this argument: "Although enough was done in the Eastern District to

constitute a crime there . . . it does not follow that the crime then terminated, and that what

---

[11]    The locus of the examination is hardly surprising – it related to shelters at issue in the Count One conspiracy, which had a primary nexus with the Southern District of New York. Indeed, the false statements charged against Coplan and Vaughn are alleged as *overt acts* in furtherance of the Count One conspiracy in addition to being charged in discrete substantive counts.  *See* Indictment ¶ 97 (eee) and (fff).

transpired in Manhattan was irrelevant for venue purposes." *Id*. at 1228 (internal citations omitted). Rather, "[t]he statements continued to be false and continued to be within the jurisdiction of the United States not only when initially presented but also upon arrival in Manhattan, where the decision was reached to make the funds available." *Id*.

The Second Circuit affirmed and expanded this reasoning in *Ramirez*, 420 F.3d 134. There, the defendant filed fraudulent immigration documents in New Jersey, which were later forwarded to a federal agency in Manhattan. The defendant argued that the case was unlike *Candella*, where the Brooklyn office acted as a "mere conduit" in passing false documents into Manhattan; rather, according to the defendant, the New Jersey agency had the authority to independently review and act on the documents, and the crime thus terminated in New Jersey. *Id*. at 142. The Court of Appeals rejected this theory, holding that venue was proper because, "[w]hether or not the New Jersey agency reviewed the applications . . . the fact is that it forwarded them to the U.S. [Department of Labor] in the Southern District of New York." *Id*. at 142-43. Although the conduct in New Jersey constituted a crime, venue was also proper in this District because the defendant's "'statements continued to be false and continued to be within the jurisdiction of the United States' when they finally reached Manhattan." *Id*. at 143 (quoting *Candella*, 487 F.2d at 1228).

Defendants' reliance on *United States* v. *Bin Laden*, 146 F. Supp. 2d 373 (S.D.N.Y. 2001), is misplaced. As an initial matter, *Bin Laden* was a post-trial ruling; the court did not prejudge the Government's proof at trial, as defendants ask this Court to do here. Moreover, and remarkably, neither Vaughn nor Coplan acknowledges that the trial court's ruling in *Bin Laden* predated and was effectively overruled by the Second Circuit's subsequent decision

29

in *Ramirez*. *Bin Laden* involved false statements made in Texas to FBI agents who interviewed

the defendant in connection with a terrorism investigation based in the Southern District of New

York. 146 F. Supp. 2d at 377 n.6. The trial judge concluded that the § 1001 crime was

"completed" when the agents received the statements in Texas, and thus that venue did not lie in

this District. *Id*. at 377. The court distinguished *Candella*, reasoning that because the agents in

*Bin Laden* were not mere conduits of information, acting essentially like "the post office," but

rather representatives of the federal agency receiving the statements, venue properly lay only in

Texas. *See id*. at 376. This was precisely the distinction rejected by the Second Circuit in

*Ramirez*. Judge Glasser recently elucidated this point:

> In light of the expansive interpretation of *Candella* offered in *Ramirez*, the district
> court in *Bin Laden* might have ruled differently. Whereas *Bin Laden* holds
> dispositive the determination of whether a geographic discontinuity exists
> between the making and receipt of the statement, highlighting the facts in
> *Candella* and the conduit-like transfer of the statement from the Eastern District
> to the City's Southern District central office, *Ramirez* holds paramount the
> broader language of *Candella* that "[a]lthough enough was done in the Eastern
> District [of New York] to constitute a crime there . . . it does not follow that the
> crime then terminated, and that what transpired in Manhattan was irrelevant for
> venue purposes," emphasizing that even if the intermediary agency has an
> independent obligation to review the statement and the power to act upon it, it is
> the fact that the false statement actually makes its way into another district that
> establishes venue. *Ramirez*, 420 F.3d at 143 (citing *Candella*, 487 F.2d at 1228).
> Assuming that the FBI agents in *Bin Laden* were part and parcel of the Southern
> District of New York investigation, and that there was thus no "transfer" between
> any receiving agency in Texas and the prosecuting attorneys in the Southern
> District of New York, *Ramirez* nonetheless implies that the absence of a transfer
> need not undermine an application of the continuing offense doctrine.

*United States* v. *Mahaffy*, 2006 WL 2224518, at *9 (E.D.N.Y. Aug. 2, 2006) (venue

proper in Eastern District of New York for counts charging false statements made to SEC

investigators in Southern District of New York because statements were forwarded to

prosecutors in Eastern District). Other circuits have articulated similar venue rules. *See*

*Salinas*, 373 F.3d at 167; *Angotti*, 105 F.3d at 544.

For the reasons discussed above, the Court is respectfully requested to deny defendants' motions to dismiss for lack of venue as premature and without substantive merit.

## III.    The Motions To Transfer Should Be Denied

Defendants Vaughn and Bolton ask that the Court transfer the charges against them pursuant to Federal Rule of Criminal Procedure 21(b).  Vaughn seeks a transfer to the Middle District of Tennessee; Bolton seeks a transfer to the Western District of Tennessee.  Each claims that a trial in New York would be inconvenient for himself and his family, that many of the integral witnesses reside in the districts to which they seek transfer, and that most of the events relating to their particular involvement in the conspiracy count and the substantive counts took place in those districts.

Each defendant's request to transfer his case – which, if granted, would necessarily require that they be severed from other defendants and would thereby necessitate multiple trials of the massive conspiracy in which they are charged – should be denied.  These defendants have failed to meet the heavy burden that would justify a transfer from the district that has the strongest factual connection with the case – the Southern District of New York.  As detailed below, any inconvenience to the defendants from a trial in New York would be substantially outweighed by the expense and inconvenience to all the other participants – including witnesses, courts, prosecutors, and law enforcement agents – that would be generated by multiple trials in multiple districts.  Moreover, this Court is in a position to try this complex case much sooner than any court in Tennessee.  Accordingly, defendants' motions for transfer

should be denied.

### A.    Applicable Law

Rule 21(b) of the Federal Rules of Criminal Procedure provides that "[f]or the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district."  The decision whether to grant a motion for change of venue is "vested in the sound discretion of the district court."  *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990).

Factors the district court weighs in a decision on transfer are:  (1) the location of the defendant, (2) the location of possible witnesses, (3) the location of events likely to be in issue, (4)  the location of relevant documents and records, (5) the potential for disruption of the defendants' businesses if transfer is denied, (6) the expenses to be incurred by the parties if the transfer is denied, (7) the location of counsel, (8) the relative accessibility of the place of trial, (9) the docket conditions of each potential district, and (10) any other special circumstance that might bear on the desirability of the transfer.  *See Platt* v. *Minnesota Mining Co.*, 376 U.S. 240, 244-45 (1964); *Maldonado-Rivera*, 922 F.2d at 966.  None of these factors is dispositive, and it is up to the district court to "strike a balance and determine which factors are of greatest importance."  *Id.*

In weighing these factors, the "general rule" is that "a criminal prosecution should be retained in the original district in which it was filed." *United States* v. *Thomas*, 2006 WL 2283772, at *2 (S.D.N.Y. Aug. 9, 2006); *accord United States* v. *Valdes*, 2006 WL 738403, at *3 (S.D.N.Y. March 21, 2006); *United States* v. *Guastella*, 90 F. Supp. 2d 335, 338 (S.D.N.Y.

2000); *United States* v. *U.S. Steel Corp.*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964).  This is

especially true in large, multi-defendant cases, where a transfer of fewer than all defendants

would effect a severance and thereby countervail the "preference in the federal system for joint

trials of defendants who are indicted together."  *Zafiro* v. *United States*, 506 U.S. 534, 537

(1993).  This preference is particularly strong where duplicative trials would be required because

"defendants are alleged to have participated in a common plan or scheme," *United States* v.

*Salameh*, 152 F.3d 88, 115 (2d Cir. 1998), and courts have thus denied transfer motions in such

cases.  *See, e.g.*, *United States* v. *Morrison*, 946 F.2d 484, 489 (7th Cir. 1991) (affirming denial

of transfer motion where transfer of only one defendant "would have given rise to a

'multiplication of litigation' resulting in great inconvenience to the witnesses involved as well as

considerable expense to the government") (quoting *United States* v. *Zylstra*, 713 F.2d 1332,

1336 (7th Cir. 1983)); *Stein*, 429 F. Supp. 2d at 646 (denying transfers in multi-defendant tax

evasion and *Klein* conspiracy case in part because transfers would have resulted in "great

inconvenience to witnesses, considerable additional expense to the government, duplication of

court time and effort, and the risk of inconsistent results").

       The "burden is on the moving defendant to justify a transfer under Rule 21(b),"

*Spy Factory*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997), and any defendant seeking transfer must

provide "factual substantiation" for his contentions that a transfer is in the interests of justice.

*United States* v. *Williams*, 437 F. Supp. 1047, 1051 (W.D.N.Y. 1977); *see also Spy Factory*, 951

F. Supp. at 456 ("the court must rely on 'concrete demonstrations'"); *United States* v. *Persico*,

621 F. Supp. 842, 858 (S.D.N.Y. 1985) ("The burden of setting forth facts sufficient to warrant

transfer is . . . on the moving party").

### B.    Discussion

#### 1.    Location Of Defendants

Vaughn's complaint about a trial in New York rings particularly hollow given that he lives in Louisiana, some 400 miles from the Tennessee district to which he seeks transfer. *See* Vaughn Br. 28.  The fact that it may be cheaper for Vaughn to travel by car to Nashville than by air to New York City simply does not render the former a home district and the latter a foreign venue for purposes of the Court's analysis.

Bolton does reside in the district to which he seeks transfer, but that fact is not determinative.  Indeed, the Supreme Court has held that a defendant has no constitutional right to be tried in his or her home district, and that a defendant's residence "has no independent significance in determining whether transfer to that district would be 'in the interest of justice.'" *Platt*, 376 U.S. at 245-46; *see also Maldonado-Rivera*, 922 F.2d at 965; *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("It is important not to overlook the Supreme Court's statement in *Platt* that a defendant is not entitled to defend his case in his or her home district.").  In fact, the presumption is just the opposite: "[A]s a general rule a criminal prosecution should be retained in the original district."  *Spy Factory*, 951 F. Supp. at 464 ("to the extent that there is a 'policy' favoring the trial of defendants where they reside, this 'policy' is in tension with the more general presumption that 'a criminal prosecution should be retained in the original district.'"); *see also U.S. Steel Corp.*, 233 F. Supp. at 157 (noting presumption in favor of district where charges are brought); *Jones* v. *Gasch*, 404 F.2d 1231, 1240 (D.C. Cir. 1967) (defendant's residence "not the controlling factor," and its significance derives "solely from its relationship to the convenience of witnesses, records, and counsel").

34

Although Vaughn and Bolton both contend that they will endure personal

hardships if required to stand trial in New York with their co-conspirators, this is true in any case

where a defendant who resides elsewhere is on trial.  As Judge Weinfeld aptly observed:

> [m]ere inconvenience, interference with one's routine occupational
> and personal activities, and other incidental burdens which
> normally follow when one is called upon to resist a serious charge
> do not ipso facto make the necessary showing that a transfer is
> required in the interest of justice.

*U. S. Steel Corp.*, 233 F. Supp. at 157;  *accord Stein*, 429 F. Supp. at 645 (citing *United States* v.

*Wilson*, 2001 WL 798018, at *3 (S.D.N.Y. July 13, 2001)).

**REDACTED**

**REDACTED**

Having availed themselves extensively of this forum in the course of the charged conduct, the moving defendants simply cannot now complain of venue in this District. *See United States* v. *Aronson*, 319 F.2d 48, 52 (2d Cir. 1963) ("The ultimate object of the scheme was to sell . . . stock to the public. These defendants [residents of California] chose to accomplish this by utilizing a New York distributor. Having made this choice, they can scarcely

36

complain of a New York venue."); *Aronoff*, 463 F. Supp. at 457 ("It would appear . . . that where a colonist had gone to England and while there engaged in criminal conduct, even our forefathers would not have considered it unfair to transport him there for trial.").  As the proof at trial will show, Vaughn and Bolton knowingly joined a conspiracy that was specifically designed to be national in scope.  Both interacted regularly with co-conspirators in New York and elsewhere.  During the course of the conspiracy, Vaughn traveled to New York on numerous occasions for meetings with his co-conspirators.  He also traveled throughout the U.S. to market the subject tax shelters, including to clients in New York.  In connection with the implementation and management of the 2000 and 2001 CDS transactions, as well as the CDS Add-On transactions, Bolton and his subordinates interacted routinely with co-conspirators in New York and conducted a huge amount of trading integral to those transactions through New York-based financial services companies.  Such conduct makes a trial in this District eminently reasonable.

### 2.    Location Of The Witnesses

A defendant claiming that the location of witnesses requires transfer bears the burden of offering the Court "specific examples of witnesses' testimony and their inability to testify because of the location of trial."  *Spy Factory*, 951 F. Supp. at 456.  The "naked allegation that witnesses will be inconvenienced by a trial in a distant forum will not suffice for transfer." *Id.*; *see also United States* v. *Juncal*, 1998 WL 473949, at *5 (S.D.N.Y. Aug. 7, 1998) ("there is no basis to grant the motion to transfer" where defendant fails to make "a specific proffer of testimony from specific witnesses to allow the court to make an informed decision about the importance of these witnesses to [the defendant's] case").  The rule applies equally to character witnesses.  *United States* v. *Bankas*, 2005 WL 2205340, at *3 (W.D.Wis. Sep 08, 2005) (weight

37

of this factor undermined by vague nature of defendant's proffer of "many" purported character witnesses who were not identified).

Vaughn and Bolton have not even attempted to meet this burden. While the Government intends to call some witnesses who live in Tennessee, most of the witnesses in this case reside outside the districts to which the defendants seek transfer, and, consequently, are at least equally accessible to New York and either Memphis or Nashville.[12] Again, the scheme concocted by the defendants was one that was designed to be national in scope and their execution of this scheme resulted in witnesses located throughout the country. The Government also intends to call a number of witnesses who reside in or around New York, including employees at New York financial institutions that Bolton in particular elected to employ in connection with the CDS and CDS Add-On transactions, as well as law enforcement officers and other government employees. As a result, the overwhelming majority of witnesses in the case will come from outside Tennessee.

Moreover, while defendants claim that most of their potential witnesses reside and/or work in the districts to which they seek transfer, they have failed to identify a single witness who would be unable to testify at trial as a result of the trial taking place in New York. Bolton alludes to potential character witnesses with limited means, but says only that there is a "danger" that some witnesses "could not afford to come to New York." Bolton Br. 14-15. Notably, Bolton does not suggest that *he* cannot afford to bring the witnesses to New York, thereby ensuring their testimony, nor does he specify the substance of their likely testimony.

---

[12]    Given that the Government's witnesses are located across the country, New York, with three metropolitan airports, is likely far more convenient for many witnesses.

Vaughn makes no effort at all to identify witnesses who would be able to testify in Nashville but unable to testify in New York.  (*See* Vaughn Br. 30-31).  The defendants' failure to meet their burden in this regard weighs heavily against transfer.

### 3.    Location Of Events At Issue

While the defendants suggest that the preponderance of events at issue in the case took place in the districts to which they seek transfer, the actions underlying the Count One conspiracy were plainly national in scope, with the overwhelming preponderance of events occurring outside of Tennessee.

As noted above in the venue discussion, many of the most significant events in this case took place in New York:  (I) the defendants carried out the tax shelter transactions through several New York financial institutions, including firms that implemented the CDS, CDS Add-On, COBRA, PICO and Tradehill transactions; (ii) the defendants regularly interacted by phone and in person with co-conspirators in New York, including defendants Nissenbaum and Shapiro, and New York law firms that issued the PICO and Tradehill opinions; (iii) Vaughn traveled to New York for meetings with co-conspirators; (iv) New York-based tax shelter clients were pitched in New York, including by defendant Vaughn; and (v) false and misleading documents were prepared in New York.  *Cf. Stein*, 429 F. Supp. 2d at 646 (fact that meetings and conference calls regarding tax shelters and sales pitches were alleged to have taken place in New York weighs against transfer).  Thus, while some subset of the events underlying the charges against the moving defendants did take place in Tennessee, the overwhelming majority of events relating to the charges took place elsewhere.

Because the events at issue in this case were national in scope, and involve

significantly more contacts (particularly contacts that are central to the charged conspiracy) with the Southern District of New York than with either of the two districts to which transfer is sought, this factor weighs against transfer.

### 4.    Location Of Documents And Records

While much of the evidence in this case has been produced in electronic form, a large volume of documents has been produced in hardcopy.  Virtually all of those documents are located in New York.  *Cf. Stein*, 429 F. Supp. 2d at 646 ("The vast bulk of the government's paper document production is in New York and would be difficult to access from other cities."). Although many of these documents are duplicative of some of the electronic discovery, on balance, this factor favors a unified trial in this District.

### 5.    Disruption Of Defendants' Businesses

There is no question that the moving defendants' presence at a lengthy trial in New York will disrupt and impair their ability to conduct their business activities, but, as noted above, inconvenience and interference with normal occupational and personal activities occur whenever a defendant is facing serious charges.  *See U.S. Steel Corp.*, 233 F. Supp. at 157; *see also United States* v. *Antia*, 1999 WL 294788, at *2 (E.D.N.Y. Mar. 22, 1999) ("inconvenience of the defendant or his business is not, by itself, a sufficient basis for a transfer of venue") (citing *United States* v. *Wheaton*, 463 F. Supp. 1073, 1078 (S.D.N.Y. 1979), *aff'd*, 614 F.2d 1293 (2d Cir. 1980)).  Indeed, as Judge Cote observed in *Wilson*, 2001 WL 798018, denying a Rule 21 transfer requested by two San Francisco residents charged in New York for conduct that occurred principally in San Francisco, Ohio, and Missouri, for what the Government estimated to be a six- to eight-week trial:  "Every life is significantly disrupted during a trial wherever it is

40

held. Besides the need to be in court every day, the evenings and weekends are usually consumed analyzing the evidence that has been admitted and preparing for the remainder of the trial." *Id.* at \*3, *quoted in Stein*, 429 F. Supp. at 645. Accordingly, a trial in Tennessee rather than New York would result in only a marginally greater ability, if any at all, to carry out the defendants' regular business activities. Moreover, "modern methods of communication [should help to] minimize the impact" of the defendants' absence from their home districts, particularly with respect to their ability to conduct their businesses. *See Spy Factory*, 951 F. Supp. at 459.

### 6. Expense To Parties

Defendants have failed to carry their burden of proving that the relative expense to the parties weighs in favor of transfer. The Government has expended considerable resources centralizing the evidence in this case in New York. The prosecutors and the federal case agents are located in New York. If two additional trials were scheduled in different parts of Tennessee, the Government would be put to great expense to relocate its entire prosecution team to one or more additional districts. *See Spy Factory*, 951 F. Supp. at 459 (transfer denied where expense to Government outweighs expense to defendants); *see also Washington*, 813 F. Supp. 269, 275 (D. Vt. 1993) (transfer denied as "unduly burdensome and expensive" where defense counsel and prosecutors were located in district where case was brought).

In addition to the additional expense and inconvenience that accompanies relocating a team of prosecutors and agents, the Government would incur substantial additional expenses in having to pay for travel and expenses for witnesses to testify in multiple trials. The inconvenience to those witnesses in terms of disrupting their ability to conduct their business and daily activities from having to testify possibly as many as three times would also be significant.

41

In considering the expense to a defendant, neither the size nor existence of the expense is dispositive. Rather, courts are concerned with a defendant's ability to bear the expense. *See United States* v. *Culoso*, 461 F. Supp. 128, 136 n.12 (S.D.N.Y. 1978). Although the expenses of a two- or three-month trial in New York would be significant, defendants Bolton and Vaughn do not maintain that they cannot afford the expense. Thus, this factor does not support transfer.

### 7. Location Of Counsel

This factor weighs against transfer. As noted above, the prosecutors and agents are in New York. *See United States* v. *Keuylian*, 602 F.2d 1033, 1038 (2d Cir. 1979) (transfer properly denied where "although defendant and his attorney were located in California, the Government attorney and the ATF case agent were in New York"). Bolton is represented by New York-based attorneys, while Vaughn is represented by attorneys in New York and Jackson, Mississippi (hundreds of miles from the district to which Vaughn seeks transfer). These facts further support a denial of transfer. *Spy Factory*, 951 F. Supp. at 959 (location of counsel weighs against transfer where both Government attorneys and the attorney for one of the two defendants located in original district).

### 8. Relative Accessibility Of Place Of Trial

New York and the cities in which the proposed transferee districts are located — Memphis and Nashville — are easily reachable by air transportation. Accordingly, this factor does not favor transfer. *Posner*, 549 F. Supp. at 478-479 ("[r]elative accessibility of place of trial is a neutral factor; both New York and [the transferee district] are well served by air and other public transport").

42

9.    **Docket Condition Of Each District**

This factor weighs overwhelmingly against transfer, because this Court has already set aside time and scheduled a trial date in this case for March 2, 2009, and, moreover, is familiar with the background of the case.  *See Stein*, 429 F. Supp. 2d at 645 ("[T]his Court already has scheduled trial in this case, ensuring that defendants will receive ample attention regardless of docket conditions."); *United States* v. *Plott*, 345 F. Supp. 1229, 1233 (S.D.N.Y. 1972) (fact that transferor court is "far busier" than proposed transferee court is "irrelevant" because trial date already set).

Even assuming, hypothetically, that the dockets of the Middle and Western Districts of Tennessee would allow for such lengthy and complex trials in the relatively near future, granting the moving defendants a severance in conjunction with a change of venue would undoubtedly cause a significant additional delay in the trial of those defendants.  The transferee courts would need time to familiarize themselves with the case, and the trials in Tennessee would in no event proceed until at least the summer of 2009 — particularly given that the prosecutors and agents will be involved in the trial of the non-moving defendants beginning in March.  "Such delay in the disposition of a major criminal case [is] far from being 'in the interest of justice' [and is] squarely contrary to settled policy of our Court . . . regarding the prompt disposition of criminal cases." *United States* v. *Griesa*, 481 F.2d 276, 283 (2d Cir. 1973) (Timbers, J., concurring in part and dissenting in part).

10.     **Special Circumstances**

a.     **Multi-Defendant Case With Integrally Interrelated Charge**

One significant overarching factor that must be considered by the Court is the joinder of the moving defendants in a multi-defendant Indictment charging them with engaging in a massive, years-long criminal conspiracy.  Because of the number of defendants involved, transfer of any single defendant's case out of the Southern District of New York (let alone more than one defendant to two *different* districts) — effectively granting a severance — would give rise to a "multiplication of litigation" that would result in "great inconvenience to the witnesses involved as well as considerable expense to the government."  *Morrison*, 946 F.2d at 489 (denying transfer because it would result in multiple trials, notwithstanding that most of the criminal acts took place in district to which transfer was sought); *see United States* v. *Matos*, 1990 U.S. Dist. LEXIS 11285, *2 (S.D.N.Y. Aug. 29, 1990) (refusing to grant transfer where transfer would require two trials of the same action; "[s]uch a transfer would be an abuse of discretion and a squandering of limited judicial resources."); *United States* v. *Karen Bags, Inc.*, 592 F. Supp. 734, 751 (S.D.N.Y. 1984) (court is entitled to "weigh the duplication of effort and court time, as well as additional expense that would be incurred" by a partial transfer); *Wheaton*, 463 F. Supp. at 1079 ("It is obvious that the resultant duplication would impose substantial extra expense on the government as well as a double burden on the judiciary.").  As the Seventh Circuit observed in *Zylstra*, 713 F.2d at 1336, "[c]ourts must be mindful of these difficulties as well as the actual expense and waste of court time in our severely burdened and overtaxed federal judicial system."

The Court should give significant consideration to the multiplication of litigation,

44

with its attendant expenses, when ruling on the moving defendants' transfer motions. For

example, because all of the defendants are charged in the conspiracy count, all, or almost all, of

the witnesses who will testify to the origin and functioning of E&Y's VIPER/SISG group, which

was responsible for the development and marketing of the tax shelters at issue, would have to

testify two or three times. The witnesses who will testify about CDS and CDS Add-On will also

be required to testify in each trial because all of the defendants participated in those shelters.

Although Bolton was not involved in COBRA or PICO, the witnesses relevant to these shelters

would be needed for Vaughn's trial as well as the trial in this District, and because COBRA

forms a backdrop to CDS Add-On and the cover story alleged to have been invented to justify it,

a number of witnesses whose testimony relate to COBRA would likely have to be called in

Bolton's separate trial as well as Vaughn's. Moreover, removing Bolton and/or Vaughn will not

significantly shorten the trial in this District.

        In other words, the activities of all the defendants and all the tax shelters are

integrally inter-related, and transferring either Vaughn or Bolton, let alone both of them, would

result in an almost complete repetition of the main trial. The Government suggests that, given

the proper joinder of all the defendants, and the fact that neither Bolton nor Vaughn has made a

persuasive, much less compelling, case for discretionary transfer based on the first nine *Platt*

factors, this factor merits paramount consideration.

### b.   <u>Prejudice Of Joint Trial</u>

        Bolton separately argues that a joint trial would prejudice him because much of

the evidence at such a trial "likely would not be admissible against him." Bolton Br. 24. This is

simply and plainly wrong. Count One charges all the defendants with participating in a single

conspiracy to defraud and deceive the IRS.  At a trial of any defendant alone, the Government

would be required to prove the existence of the conspiracy as an element of the conspiracy

charge.  Evidence of most, if not all, of the various activities of the co-conspirators will be highly

relevant to establishing the existence, scope, and objects of the charged conspiracy, regardless of

whether Bolton directly participated in, or was even aware of, all of those acts.  *See, e.g.*, *Stein*,

428 F. Supp. 2d at 144 ("Because all defendants are charged with the same conspiracy, much of

the evidence would be admissible against each defendant, even in a separate trial."); *United*

*States* v. *Finkelstein*, 526 F.2d 517, 522 (2d Cir. 1976) (in prosecution for conspiracy to violate

securities laws, arising out of scheme to sell thousands of shares of worthless stock, evidence of

all conspirators' conduct was admissible against all defendants, even if two defendants engaged

in subsidiary scheme to cheat other two defendants for larger portion of the spoils).  Such

evidence is "'neither spillover nor prejudicial.'" *Stein*, 428 F. Supp. 2d at 144 (quoting *United*

*States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1994)); *see also Salameh*, 152 F.3d at 116 (same).

          Bolton's argument that "much of the trial" will have "nothing to do with him,"

Bolton Br. 25, is remarkably wishful thinking, and it is untrue.  Bolton is alleged to have been

integrally involved with - indeed, indispensable to - the implementation of the CDS and CDS

Add-On transactions.  Those are two of the four widely-used tax shelters at issue in this case.

Moreover, proof that Bolton played a key role in implementing only two of the four most

widely-used tax shelters at issue in this case will not, as Bolton seems to suggest (Bolton Br. 25),

render the Count One conspiracy charge susceptible to a meritorious "multiple conspiracies"

challenge under Rule 29.  *See, e.g.*, *Maldonado-Rivera*, 922 F.2d at 963 ("[A] single conspiracy

is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two

or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance."); *United States* v. *Williams*, 205 F.3d 23, 33 (2d Cir. 2000) ("'A single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations.'") (quoting *United States* v. *Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979)); *United States* v. *Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (member of conspiracy need not "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member") (citations omitted).  Bolton is alleged to have joined and shared in alleged objects of the Count One conspiracy - principally, to deceive and defraud the IRS - and it is irrelevant whether he was aware of all of the tax shelters about which his co-conspirators misled the IRS.

Finally, if necessary, a limiting instruction will be sufficient to cure any prejudice that might result from proof relating to tax shelters and conduct with which Bolton was not directly involved.  Even in extreme circumstances involving egregious acts by co-defendants presented as proof on entirely separate counts of the indictment (a situation by no means present here), the Second Circuit has held that proper limiting instructions can cure or sufficiently limit any prejudice from evidence related to co-defendants.  *See Rosa*, 11 F.3d at 342 (despite evidence of violent acts, including murder, committed by non-moving defendants, joinder was proper where "[t]he trial court instructed the jury that it should consider the evidence as to each count of the indictment separately and advised it that the fact that it found any one defendant guilty on a given count 'should not control your verdict as to any other offenses charged'").  Bolton's claim that irremediable prejudice will result from his standing trial in this District thus does not square with the caselaw and should not be weighed in favor of transfer.

\*     \*     \*

In sum, the interests of justice — including trial where the conspiracy count predominantly occurred and has been charged, conservation of judicial and prosecutorial resources, the avoidance of unnecessary delay, the protection of the public's right to a speedy trial, and the convenience of witnesses and other trial participants — are all served by denying the defendants' motions to transfer their cases to two other districts.

## IV.     The Court Should Deny Nissenbaum's Motion To Sever

Defendant Nissenbaum urges the Court to sever Counts Five through Eight of the Indictment, which relate to the "Tradehill" tax shelter transaction.  According to Nissenbaum, these substantive counts are misjoined with the Count One conspiracy under Rule 8 of the Federal Rules of Criminal Procedure.  Nissenbaum is wrong.  The Indictment alleges that the Tradehill conduct was undertaken *as part of* the Count One conspiracy.  Substantive counts relating to that conduct are thus properly joined, as a matter of law, to the conspiracy count. Moreover, the Tradehill conduct was part and parcel of the overall tax shelter conspiracy.  The severance sought by Nissenbaum, which would require a costly and duplicative second trial, should therefore be denied.

### A.     Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part, as follows:

> **(a) Joinder of Offenses.**  Two or more offenses may be charged in the same indictment . . . if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
> **(b) Joinder of Defendants.**  Two or more defendants may be

48

> charged in the same indictment . . . if they are alleged to have
> participated in the same act or transaction or in the same series of
> acts or transactions constituting an offense or offenses.  Such
> defendants may be charged in one or more counts together or
> separately and all of the defendants need not be charged in each
> count.

When a defendant in a multi-defendant case challenges joinder of offenses, the validity of

joinder is measured by Rule 8(b).  *United States* v. *Turoff,* 853 F.2d 1037, 1043 (2d Cir. 1988).

In this context, Rule 8(b) is interpreted "broad[ly], . . . in the interests of more efficient

administration of criminal trials." *Haggard* v. *United States*, 369 F.2d 968, 973 (8th Cir. 1966).

Rule 8(b) allows joinder of offenses and defendants where two or more persons' criminal acts

are "'unified by some substantial identity of facts or participants' or 'arise out of a common plan

or scheme.'"  *United States* v. *Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States* v.

*Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)) (upholding denial of motion to sever two

conspiracy counts, although neither defendant was charged in the conspiracy count of the other);

*see also United States* v. *Cervone*, 907 F.2d 332 (2d Cir. 1990) (proper joinder of eighteen

defendants in a 102-count indictment with a variety of labor racketeering charges, as well as

related charges of obstruction of justice, bribery, and making false statements); *United States* v.

*Weisman*, 624 F.2d 1118 (2d Cir. 1980) (proper joinder of charges and defendants where ten

defendants charged with a variety of offenses relating to creation, operation, and bankruptcy of a

theater).  Thus, "Rule 8(b) does not require . . . that each defendant have participated in the same

act or acts."  *United States* v. *Krenning*, 93 F.3d 1257, 1266 (5th Cir. 1996)); *see United States* v.

*Teitler*, 802 F.2d 606, 615 (2d Cir. 1986) (participation in a series of transactions does not

require participation in each transaction).

    **B.**    **Applicable Facts**

The "Tradehill" tax shelter transaction involved the personal use of a "short option" strategy by defendants Coplan, Nissenbaum and Shapiro, and eight of their then-colleagues at E&Y, to avoid taxes that these eleven individuals owed for calendar year 2000. The conduct is charged not only as a part and object of the overall conspiracy (*see, e.g.*, Indictment ¶¶ 68-82; 94; 97 (gg), (kk), (ll)) but in the form of substantive tax evasion counts against Coplan, Nissenbaum and Shapiro (*id.* at ¶¶ 126-27) and a substantive count of obstructing the IRS against Nissenbaum.  *Id.* at ¶ 128.

C.    **Discussion**

1.    **The Tradehill Counts Relate To Conduct Alleged As Part Of The Conspiracy And Are Properly Joined**

As a threshold matter, it is well settled that substantive counts are properly joined with a conspiracy charge where the substantive conduct is alleged to have been part of the conspiracy.  *See, e.g., United States* v. *Henry*, 861 F. Supp. 1190, 1200 n.5 (S.D.N.Y.1994) ("a conspiracy charge 'provides a common link and demonstrates the existence of a common plan' for purposes of Rule 8(b)") (quoting *United States* v. *Bernstein*, 533 F.2d 775, 789 (2d Cir. 1976)); *United States* v. *Lam Lek Chong*, 544 F.2d 58, 64 n.7 (2d Cir. 1976) ("Our conclusion that the conspiracy charged encompassed the May 30 transaction disposes of the arguments that Count Two, charging [the defendant] with substantive involvement in that transaction, was improperly joined in the indictment [under] Fed. R. Crim. P. 8(b)."); *see also Schaffer* v. *United States*, 326 U.S. 511, 513-514 (1960) (holding that Rule 8 joinder is satisfied by the facial sufficiency of the allegations in the indictment).  This principle alone disposes of Nissenbaum's motion, because conduct relating to the Tradehill transaction expressly is alleged to have been a part and an object of the Count One conspiracy.  (*See, e.g.*, Indictment ¶¶ 68-82; 94; 97 (gg),

(kk), (ll)).

   Nissenbaum attempts to circumvent this basic rule of law by arguing that the acts

charged in Counts Five through Eight are *not* actually part of the conspiracy charged in Count

One, despite plain allegations to the contrary.  In other words, he asks the Court to find, before

any evidence is introduced, that Count One is impermissibly duplicitous because it charges

multiple conspiracies in a single count.  (*See* Nissenbaum Br. 8-11; 10 ("it is plain that count one

of the instant indictment combines at least two separate conspiracies").  This argument, to the

extent it has any merit whatsoever, is not a basis for dismissal or pre-trial severance on a

misjoinder theory under Rule 8 and should be rejected.

   "An indictment is impermissibly duplicitous where (1) it combines two or more

distinct crimes into one count in contravention of [Rule] 8(a)'s requirement that there be a

separate count for each offense, and (2) the defendant is prejudiced thereby."  *United States* v.

*Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  However, the Second Circuit has repeatedly and

consistently held that the issue of whether the Government has proved the existence of the single

conspiracy charged in the indictment and each defendant's membership in it, or instead has

proven "multiple other independent conspiracies is a question of fact for a properly instructed

jury."  *United States* v. *Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (quoting *United States* v. *Alessi*,

638 F.2d 466, 472 (2d. Cir. 1980)); *accord United States* v. *Trippe*, 171 F. Supp. 2d 230, 238

(S.D.N.Y. 2001); *see also United States* v. *Feola*, 651 F. Supp. 1068, 1125 (S.D.N.Y. 1987)

("even if the Government were to fail to meet that burden [of demonstrating a single over-

arching conspiracy], the proper remedy would [not be] dismissal of the count but an election by

the Government of the charge on which it will rely").  Because the conduct that is charged in

Counts Five through Eight is also charged as part of the Count One conspiracy, defendant's motion should be denied.[13]

> ### 2.    The Conduct Underlying Counts Five Through Eight Is Integrally Related To The Overall Conspiracy

Even if the conduct underlying the substantive counts were *not* charged as part of the conspiracy, the Tradehill counts still would be properly joined under Rule 8(b). Two schemes that are interrelated or that flow from each other may properly be joined in a single indictment under Rule 8(b). For example, "tax counts can properly be joined with non-tax counts" where "funds derived from non-tax violations either are or produce the unreported income." *United States* v. *Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1987); s*ee United States* v. *McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977) (joinder of extortion counts with tax counts that charged the failure to report the extortion payments, as well as other unrelated income, was entirely proper). This joinder rule permits an underlying scheme or conspiracy to be joined with tax counts even where some of the defendants are charged only with the underlying conspiracy or scheme and are not alleged to have participated in the substantive tax counts. *See United*

---

[13]      Even if this issue were ripe for decision at this time (which it is not), the allegations of the Indictment, when proved, will suffice to show a single conspiracy. *See Williams*, 205 F.3d at 33 ("single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations") (internal quotation marks omitted); *Maldonado-Rivera*, 922 F.2d at 963 (single conspiracy not transformed into multiple conspiracies "merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance."); *United States* v. *Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977) (rejecting multiple conspiracies claim and noting that "[A]ppellants confuse separate acts at separate times with separate conspiracies. Almost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal. The standard for determining the existence of a single conspiracy, however, is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy[.]") (internal quotation marks omitted).

*States* v. *Hundley*, 2003 WL 21537774 (S.D.N.Y. 2003) (separate substantive tax evasion

charges in different counts against two defendants in five-defendant case properly joined with

three separate counts charging a conspiracy to commit bank fraud, defraud creditors, and defraud

the IRS, as well as two separate conspiracies to defraud the IRS, reasoning that the indictment

alleged a broad scheme by defendants to enrich themselves by "any fraudulent means required");

*United States* v. *Gordon*, 990 F. Supp. 171, 174-76 (E.D.N.Y. 1998) (denying motion of

defendants charged only with mail fraud seeking severance of tax evasion counts related to fraud

proceeds against organizer of fraud and his accountant).

        Indeed, two (or more) schemes are properly joined under Rule 8(b) where

"[p]roof of one scheme" is "helpful to a full understanding of the other," *Biaggi*, 909 F.2d at 676,

or where one was committed to advance the other.  *See United States* v. *Joyner*, 201 F.3d 61 (2d

Cir. 2000) (arson and narcotics trafficking charges properly joined where arson was ordered to

"eliminate drug competition"); *United States* v. *Berger*, 22 F. Supp. 2d 145, 155 (S.D.N.Y. 1998)

(tax fraud that facilitated government program fraud properly joined under Rule 8(b)).

Similarly, where the commission of one crime created the circumstances that made possible the

commission of a subsequent crime, the two are sufficiently interrelated to satisfy the demands of

Rule 8(b).  *See*, *e.g.*, *United States* v. *Estrella*, 2002 WL 655202 (S.D.N.Y. 2002) (illegal re-

entry and narcotics offense committed after re-entry properly joined, because narcotics offense

could not have been committed but for illegal re-entry); *United States* v. *Gotti*, 42 F. Supp. 2d

252, 289 (S.D.N.Y. 1999) (proper to join count charging defendant with loaning money to

narcotics traffickers to promote drug transaction with other counts charging subsequent extortion

and robbery aimed at inducing repayment of loan).  So, too, crimes committed with a common

purpose may be joined together.  *See*, *e.g.*, *United States* v. *Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (two separate conspiracies to defraud United States properly joined, where both schemes "shared a common purpose: to conceal and launder [the loanshark's] income," and there was "an overlap of participants and acts"); *United States* v. *Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998) (joinder proper under Rule 8(b) of various bankruptcy fraud and wire fraud schemes carried out by various combinations of defendants where each fraud had a common purpose).

As the proof at trial will show, the Tradehill transaction entered into by Nissenbaum, Shapiro and Coplan was a personal variation of the COBRA transaction, which these same defendants had developed and marketed to E&Y's clients.  The defendants' conduct in developing and marketing COBRA in 1999, and E&Y's decision in 2000 to stop the defendants from marketing COBRA to its clients – all of which is central to the Count One conspiracy – will constitute relevant evidence of the defendants' knowledge and intent when they engaged in a similar tax shelter of their own.  Moreover, the three defendants' experience with COBRA and other tax shelters leading up to the Tradehill transaction provides important context to Nissenbaum's fraudulent responses to the IDRs referenced in Count Eight.  The proof is likely to be even more tightly interwoven than that: at trial, the Government expects to show that the law firm enlisted by the defendants to issue the legal opinion in connection with the Tradehill transaction did so for free, and was shortly thereafter selected by Nissenbaum and his E&Y co-defendants to write legal opinions for E&Y's PICO clients.  As charged in the Indictment, when Coplan, Shapiro and Nissenbaum were asked whether there was any referral of business to that law firm following the Tradehill transaction, they falsely answered that there was not.  Indictment ¶ 82.

Nissenbaum's heavy reliance on *United States* v. *Rojas*, 2001 WL 1568789 (S.D.N.Y. Dec. 7, 2001), is thus remarkably misplaced.  That case involved allegations of two "separate and distinct conspiracies" – one count alleged that members of a drug trafficking organization conspired to distribute narcotics, while a second count alleged that a different group of defendants conspired to rob that organization of the same drugs.  *Id*., at *16-17.  The two counts had only one defendant in common, and they not only lacked a common purpose, but had demonstrably antagonistic purposes: to succeed, the second group of conspirators had to harm the first.  *Id*., at *17.  The court severed the counts for precisely that reason.  *Id*.  Rather than supporting Nissenbaum's position, *Rojas* illustrates by contrast the propriety of joining the conspiracy and substantive counts here, where there is substantial overlap in participation[14] and a common (and complementary) purpose.  The allegations in Count One relating to the Tradehill tax shelter detail various acts of co-conspirators that furthered the single, overarching plot in which all the defendants participated.  The substantive tax evasion charges and the obstruction charge in Counts Five through Eight are based on the same conduct and are thus properly joined under Rule 8(b).

### 3.    Severance Would Necessitate A Duplicative Second Trial

---

[14]    The fact that some of the co-conspirators charged in the conspiracy count may have been unaware of the Tradehill transaction is immaterial, as it is hornbook law that conspirators need not be aware of all the identities of the co-conspirators or all the acts taken in furtherance of the conspiracy.  *See United States* v. *Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (member need not "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member") (citations omitted); *United States* v. *Finkelstein*, 526 F.2d 517, 522 (2d Cir. 1976) (in prosecution for conspiracy to violate securities laws, arising out of scheme to sell thousands of shares of worthless stock, evidence of all conspirators' conduct was admissible against all defendants, even if two defendants engaged in subsidiary scheme to cheat other two defendants for larger portion of the spoils); *United States* v. *Cirillo*, 468 F.2d 1233 (2d Cir. 1972).

Nissenbaum's motion should be denied for the added reason that it would necessitate a costly and wholly duplicative additional trial. In multi-defendant cases, Rule 8(b) is broadly interpreted "in the interests of more efficient administration of criminal trials." *Haggard*, 369 F.2d at 973. Because the Tradehill conduct is part of the Count One conspiracy, proof of that conduct will be a part of the trial on the conspiracy count whether or not Counts Five through Eight are severed. Moreover, because the Tradehill transaction was a successor to and variation of the earlier COBRA tax shelter, proof of the COBRA transaction, and the reasons E&Y discontinued it, would likely be admissible in the additional trial as well. The additional trial envisioned by Nissenbaum would thus be entirely repetitive of the first trial and a truly inefficient use of limited court and Government resources.

*     *     *

Counts Five through Eight are alleged to be part of the Count One conspiracy, they are integrally related to it, and a separate trial of those counts would be wholly duplicative of proof presented in a trial as to Count One. Defendant Nissenbaum's motion to sever should therefore be denied.

## V.    Vaughn Is Not Entitled To Engage In A Fishing Expedition With Unsupported Allegations And Speculation Regarding Potential Violations Of Section 6103

Vaughn seeks an order requiring the Government to produce various materials including internal communications relating to the referral of this criminal matter by the IRS to the Department of Justice ("DOJ").[15] Vaughn contends that he must have these communications

---

[15]    Among other things, Vaughn seeks the date IRS referred this case to DOJ and a copy of the referral, the date DOJ made any written request to the IRS (and a copy), and "all communications between DOJ attorneys . . .and IRS personnel . . . involved in the investigation of the so-called Ernst & Young tax shelters prior to the earliest of [those two dates]." Tucker

in order to ascertain whether anyone within the Government violated Title 26, United States Code, Section 6103(h), which governs when the IRS may disclose tax returns and tax return information to DOJ for its use in criminal tax investigations and prosecutions. According to Vaughn, § 6103 *may* have been violated during discussions between a representative of DOJ and the IRS during the period from 2002 to 2004, and if such a breach did occur, it would constitute a violation of due process for which dismissal of the Indictment or suppression of evidence would be appropriate. *See* Vaughn Br. 41. Vaughn also contends that he requires access to internal Government communications in order to determine whether DOJ impermissibly commenced a grand jury investigation of E&Y before any formal referral was made by the IRS. Tucker Aff. ¶¶ 33, 37.

Vaughn's motion is based on the rankest of speculation. He offers no evidence to support his position, he fails to cite a single case on point, and he ignores a wealth of contrary authority, including well-established Second Circuit authority. For the reasons detailed below, Vaughn's motion should be rejected in its entirety.

### A.   Title 26, United States Code, Section 6103(h) and Related Provisions

Section 6103 of Title 26 provides, with certain important exceptions, that tax returns and return information must be kept confidential.[16] Section 6103(h)(2), which governs disclosure of such information to DOJ, provides in relevant part that "a [tax] return or return

---

Aff. ¶ 29.

[16]   Section 6103 states, in relevant part: "(a) General rule. Returns and return information shall be confidential, and except as authorized by this title - (1) no officer or employee of the United states ... shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee[.]"

information shall be open to inspection by or disclosure to officers and employees of the

Department of Justice . . . personally and directly engaged in, and solely for their use in, any

proceeding before a Federal grand jury or preparation for any proceeding (or investigation which

may result in such a proceeding) before a Federal grand jury or any Federal or state court[.]"

Under 26 U.S.C. § 6103(h)(2), this disclosure is permitted, among other circumstances, if: "(A)

. . . the proceeding arose out of, or in connection with, determining the taxpayer's civil or

criminal liability . . .; (B) the treatment of an item reflected on such return is or may be related to

the resolution of an issue in the proceeding or investigation; or (C) such return or return

information relates or may relate to a transactional relationship between a person who is or may

be a party to the proceeding and the taxpayer which affects, or may affect, the resolution of an

issue in such proceeding or investigation."

Disclosure may be made under § 6103 "if the Secretary [of the Treasury, or his

designee] has referred the case to the Department of Justice[.]"   26 U.S.C. § 6103(h)(3)(A).

The "referral" of a matter is determined by 26 U.S.C. § 7602(d)(2)(A), which provides, in

pertinent part, as follows: "A Justice Department referral is in effect with respect to any person if

(I) the Secretary has recommended to the Attorney General a grand jury investigation of, or the

criminal prosecution of, such person for any offense connected with the administration or

enforcement of the internal revenue laws."[17]

The tax code imposes civil and criminal penalties for violations of § 6103.

Section 7431 of Title 26 allows a taxpayer to bring civil suit for a knowing or negligent violation

---

[17]    The IRS can make a criminal referral to the Tax Division of DOJ on its own initiative, or alternatively, a United States Attorney may ask the IRS to refer a tax investigation to DOJ's Tax Division for its approval.   Neiman Aff. ¶ 3 (Tucker Aff., Exh. R).

of § 6103, and section 7213(a) of Title 26 makes it a five-year felony "for any officer or employee of the United States, . . . wilfully to disclose to any person, except as authorized in this title, any return or return information."

> **B.**    **Neither Dismissal of An Indictment Nor Suppression of Evidence Is Available To Remedy A Violation of Section 6103**

Assuming *arguendo* that Vaughn had provided some basis for his suggestion that a violation of § 6103 might have occurred here – and as discussed below, he has provided precisely none – the case law in this area establishes that he nonetheless would not be entitled to either dismissal of the Indictment or suppression of any evidence, the very remedies he appears to seek. *See* Vaughn Br. 41. As far as the Government has been able to determine, no federal court in any reported case has ever dismissed an indictment or suppressed evidence for a violation of § 6103, nor has a federal court ever held that dismissal or suppression would be an appropriate remedy for such a violation. To the contrary, courts have consistently and repeatedly held that neither dismissal of an indictment nor suppression of evidence would be appropriate to remedy a § 6103 violation. For this reason, many of the courts presented with these questions have declined even to reach the issue of whether a violation occurred.

Among the cases cited frequently in this area is the Second Circuit's decision in *United States* v. *Barnes*, 604 F.2d 121 (2d Cir. 1979). Like the instant case, *Barnes* involved efforts by defendants to obtain discovery of documents that might yield evidence of Government misconduct. Specifically, in connection with the Government's plan to introduce the defendants' tax returns in evidence, the defendants sought disclosure of the *ex parte* submission that had been made by the Government to the court in support of its application, pursuant to 26 U.S.C. §

59

6103(i)(1), to obtain those returns from the IRS.[18]   The defendants also sought a hearing, "so

that they might inquire as to the papers on which, and the manner by which, the Government

obtained these returns." *Barnes*, 604 F.2d at 145.  The district court denied the application, and

the defendants appealed, arguing for the imposition of a disclosure procedure similar to that used

with wiretaps and search warrants, which would enable them to attack the Government's

showing.  After examining the relevant portions of § 6103, the Second Circuit observed, first,

that the statute provided for no notice to the taxpayer, and no hearing on the Government's

application.  *Id.* at 146.   The Court then rejected the notion that suppression would be

appropriate were a violation to have occurred:

> [T]here is nothing in the Tax Reform Act indicative of
> congressional intent to subject a judge to examination by defense
> counsel as to the facts on which he based an order to disclose tax
> returns, or his rationale therefor.   The courts should be loath to
> imply an exclusionary sanction in this context, especially since
> none appears in the Tax Reform Act itself and since civil and
> criminal penalties have been expressly provided.

*Id.*  Although *Barnes* involved tax return information obtained pursuant to § 6103(i), which

applies in non-tax cases,[19] it nonetheless stands squarely for the proposition that defendants in a

criminal case are not permitted to conduct discovery to determine whether the Government

behaved appropriately in obtaining tax returns or return information from the IRS under § 6103,

---

[18]     Section 6103(i)(1) enables the Government, upon *ex parte* application to a district
court, to obtain tax returns and tax return information for use in non-tax-related criminal
investigations.

[19]     Although it was not part of the argument in *Barnes* because the issue argued by
the defendants related to the possible suppression of the tax returns at trial, section 6103(i) also
provides that the "admission into evidence of any return or return information contrary to the
provisions of this paragraph shall not, as such, constitute reversible error upon appeal of a
judgment in the proceeding."  26 U.S.C. § 6103(i)(4)(E).

and that in any event, existing civil and criminal penalties are adequate to address any possible violation of that statute.

In another commonly-cited case, *United States* v. *Michaelian*, 803 F.2d 1042 (9th Cir. 1986), the Ninth Circuit addressed an argument very similar to that made by Vaughn here. *Michaelian* involved a defendant charged with tax offenses who sought dismissal of the indictment, as well as suppression of evidence, on the ground that the IRS allegedly violated § 6103(h) by disclosing his tax return to DOJ before a grand jury investigation was formally authorized under 26 U.S.C. § 7602. Citing various cases including *Barnes*, the Ninth Circuit rejected this claim, observing that "no court has held that a § 6103 violation warrants dismissal or suppression," *Michaelian*, 803 F.2d at 1049, and concluding that where Congress had specifically provided criminal and civil penalties for such conduct, the courts should not imply judicial remedies as well. *Id.* Because dismissal of the indictment and suppression of the evidence were not warranted, the court found it unnecessary to reach the issue whether any violation of § 6103 had occurred. *Id.* at 1050.

Every other circuit to address the question of an appropriate remedy for an alleged violation of § 6103 has agreed with the results and the reasoning of *Barnes* and *Michaelian*. *See, e.g.*, *United States* v. *Orlando*, 281 F.3d 586, 595-96 (6th Cir. 2002) ("We need not decide whether a violation of § 6103 occurred, because even assuming [the IRS agent] obtained [the defendant's] tax files without following the procedures set forth in § 6103, suppression of the evidence is not the appropriate remedy. . . . Where Congress has provided a particular remedy for the violation of a statute, that remedy, and not judicially imposed remedies, should apply in the absence of a constitutional violation. . . . The exclusionary rule is . . .

61

inapplicable . . . because any purported violation of § 6103 did not infringe upon [the defendant's] constitutional rights."); *Nowicki* v. *Comm'r of Internal Revenue*, 262 F.3d 1162, 1163 (11th Cir. 2001) (a violation of § 6103 does not require the application of the exclusionary rule); *Marvin* v. *United States*, 732 F.2d 669, 673 (8th Cir. 1984) (assuming that a violation of § 6103 occurred, suppression would be inappropriate where Congress specifically provided civil and criminal remedies); *see also United States* v. *DiLorenzo*, 1995 WL 169003, at *8-9 (S.D.N.Y. Apr. 10, 1995) (citing *Barnes* and denying a motion pursuant to § 6103 for disclosure of the Government's *ex parte* application for production of tax returns and information, as well as a motion to suppress); *United States* v. *McLaughlin*, 910 F. Supp. 1054, 1061-62 (E.D. Pa. 1995) (dismissal of indictment not an appropriate remedy for alleged violation of § 6103, because both "Congress and the IRS have already provided other remedies" and because "the sanction of dismissal of an indictment would thwart Congress' and the IRS' respective wills.").

The only authority cited by Vaughn in support of his claim that suppression of evidence would be an appropriate remedy for a violation of § 6103 is *United States* v. *Chemical Bank*, 593 F.2d 451 (2d Cir. 1979). *See* Vaughn Br. 41. In *Chemical Bank* – which was decided before *Barnes* – the Second Circuit suggested in dictum that suppression *might* be available for such a violation. In light of *Barnes*, however, *Chemical Bank*'s dictum has specifically been rejected as the basis for either dismissal or suppression. *See, e.g.*, *Michaelian*, 803 F.2d at 1049; *United States* v. *Sumpter*, 133 F.R.D. 580, 584-85 (D. Neb. 1990).

Vaughn cites *United States* v. *King*, 200 F.3d 1207 (9th Cir. 1999) – a case not involving any alleged violation of § 6103 – for the general proposition that dismissal of an indictment may be appropriate where investigators or prosecutors violate Due Process. Vaughn

Br. 41.  However, in doing so, he omits the language from *King* establishing that for such a Due Process violation to be found, the Government's conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *King*, 200 F.3d at 1213 (quotation omitted).  Vaughn cites no case, and there is no case, holding that a violation of § 6103 could come even close to meeting that very high standard.

In an effort to raise this issue into the realm of constitutional significance, Vaughn invokes *Brady* v. *Maryland*, 373 U.S. 83 (1963) and *Kyles* v. *Whitley*, 514 U.S. 419 (1995), suggesting that a violation of § 6103 might deny him a fair trial, or might deprive him of relevant material with which to impeach witnesses.  Vaughn Br. 42.  This argument is patently frivolous. Assuming, hypothetically, that some person at the IRS violated § 6103 by prematurely disclosing return information to DOJ, it is inconceivable that such violation would have the potential to affect Vaughn's guilt or innocence, as required under *Brady*.   And if such an IRS employee testifies as a Government witness at trial, then the Government will be called upon in due time to determine – as it must in every case – whether such violation reflects upon the credibility of the witness, and thus requires disclosure to the defense.   Neither *Brady* nor any of its progeny gives a criminal defendant a right to sift through the Government's files hoping he might find some evidence of potential misconduct.

**C.    Vaughn Has Made No Threshold Showing That Section 6103 Was Violated, And He Is Not Entitled To Discovery In Order To Do So**

Because Vaughn would not be entitled to either dismissal of the Indictment or suppression of evidence even if a violation of § 6103 occurred, the Court need not – and should not – reach the issue whether Vaughn has made a sufficient showing to justify the discovery he now seeks from the Government.  Should the Court nonetheless choose to reach that issue,

however, the law makes plain that Vaughn is not entitled to disclosure of the Government's communications relating to an IRS referral of this matter to DOJ, or any of the other information he seeks.

It is important to observe, as an initial matter, that Vaughn asserts no claim that the Government violated § 6103. Rather, he contends that "substantial evidence exists *suggesting it is appropriate to ascertain if*" a violation of § 6103 occurred. Vaughn Br. 42 (emphasis added). The "substantial evidence" upon which he relies is an affidavit submitted by Assistant United States Attorney Shirah Neiman in connection with the KPMG case, which involves tax shelters marketed by KPMG. In that affidavit – which was submitted in response to a claim of an alleged § 6103 violation related to the KPMG matter – AUSA Neiman stated that she is the United States Attorney's Office's primary liaison with the Internal Revenue Service, Criminal Investigation Division ("IRS CI") with respect to criminal tax matters, and that during 2002, 2003 and 2004, she was involved in efforts to obtain an IRS referral, and DOJ Tax Division approval, of a tax grand jury investigation into the development and marketing of a tax shelter by a promoter that was *not* KPMG. Neiman Aff. ¶¶ 1, 4 (Ex. R to Tucker Aff.). She explained that during that process, the United States Attorney made written requests to IRS CI and to DOJ's Tax Division to approve a tax grand jury investigation, and that she "had conversations" with individuals at DOJ Tax Division's Criminal Enforcement Section and at the IRS about those requests. *Id.* ¶ 4. AUSA Neiman's affidavit further stated that a tax grand jury investigation into the matter was eventually authorized (after the KPMG matter was referred), and that *prior* to the approval of the tax grand jury investigation, the U.S. Attorney's Office conducted no tax investigation relating to this tax shelter, or to the individuals or entities

involved in promoting it.  *Id.*

Vaughn infers, first, that the promoter referred to in AUSA Neiman's affidavit is E&Y, and that she was referring to the investigation that yielded the instant Indictment.  For purposes of this motion, the Government assumes, without conceding, that Vaughn's inference is correct.  Vaughn's position, essentially, is that one can infer, based on the simple fact that "conversations" occurred between DOJ and the IRS before the matter was officially referred, that the participants in those communications might have violated § 6103, despite AUSA Neiman's sworn statement that *prior* to the approval of the grand jury investigation, the U.S. Attorney's Office conducted no tax investigation relating to this tax shelter, or to the individuals or entities involved.  That inference, in his view, is sufficient to justify this Court in ordering the Government to disclose its internal files to him – including "all communications between DOJ attorneys . . . and IRS personnel," Tucker Aff. ¶ 29,  so that he may launch his own investigation into whether there is any substance to the violation he imagines.[20]

Vaughn's logic is absurd.   First, there is nothing even arguably nefarious about a representative of the U.S. Attorney's Office having conversations with the IRS and with DOJ's Tax Division about a possible criminal referral, and once having made the request, to discuss the

---

[20]     Judge Kaplan has not ruled on the pending § 6103 motion in the KPMG case, and has not required the Government to produce any documents or records relating to this issue to the defense.  Rather, he simply stated that the court would treat as a separate motion defendants' claim regarding an alleged § 6103 violation, which was first raised in a reply brief and which according to the Government was baseless.  Judge Kaplan then established a briefing schedule for that motion.  *See United States* v. *Stein*, 495 F. Supp. 2d 390, 410 n.85 (S.D.N.Y. 2007). Thus, Vaughn's suggestion that the Court should grant the disclosure he seeks in order to put him in the same position as the defense in *Stein* (Vaughn Br. 42) is utterly specious.

status of the request.[21]  In fact, it would be perfectly logical and even an expected course of

action for this Office to take.  Second, before he is entitled to any relief, Vaughn – as the moving

party – must make at least a threshold showing by coming forward with evidence to support his

claim, as opposed to mere conjecture and innuendo.  He cannot rest, as he seeks to do here, upon

an argument that he needs the requested materials in order to establish a possible basis for his

claim.  This principle is illustrated in *United States v. Schneider*, 395 F.3d 78 (2d Cir. 2005).  In

*Schneider*, an acquitted defendant brought an action pursuant to the Hyde Amendment, which

permits an award of attorney's fees and expenses against the Government where the

Government's position was vexatious, frivolous or in bad faith.  The defendant claimed that the

decision to prosecute him had been based upon the personal animus of the prosecutor, as

supposedly evidenced by a contentious series of discussions during and after an aborted proffer

attempt.  To find support for his claim, the defendant asked the trial court to require the

Government to produce for *in camera* inspection an internal memorandum prepared by the

prosecutors involved, and to hold a hearing so that he could cross-examine those prosecutors.

After reviewing case law discussing the threshold a defendant must meet before a court will

invade the Government attorney's work product and deliberative process privileges, the trial

---

[21]    During the period from 2002 through 2004, the press regularly reported stories about abusive tax shelters, many of which involved E&Y, and in 2003, the Senate's Permanent Sub-Committee on Investigations ("PSI") held public hearings on the subject.  *See, e.g.*, *Big Accounting Firm's Tax Plans Help the Wealthy Conceal Income*, N.Y. Times, June 20, 2002 (reporting that techniques sold by E&Y to wealthy clients to eliminate or reduce taxes "may amount to illegal tax evasion"); *For Sprint Chief, A Hard Fall From Grace*, N.Y. Times, February 12, 2003 (discussing tax shelters used by Sprint executives which were purchased from E&Y); *Skeptical Hearing For Audit Firm*, N.Y. Times, November 19, 2003 (discussing hearings before Senate committee regarding tax shelters marketed by KPMG and E&Y), copies attached as Exhibit A hereto.

court denied defendant's request, concluding that he had failed to make a sufficient threshold

showing. *See United States* v. *Schneider*, 289 F. Supp. 2d 328, 336-37 (E.D.N.Y. 2003). On

appeal, the Second Circuit questioned whether the Hyde Amendment empowered a court to

order the production of materials in the possession of the Government. *See Schnieder*, 395 F.3d

at 91.[22]  The Court did not reach that issue, but upheld the trial court's ruling that the defendant

failed to make a threshold showing:

> Schneider, lacking evidence that even raised a likelihood of government
> liability, hoped to make his case by requiring the government to disclose
> its confidential materials to the court. We are confident that in such
> circumstances, the Hyde Amendment does not compel such production.

*Id*. at 92.

Vaughn's conjecture about possible Government misconduct is also insufficient

to overcome the presumption of regularity that attaches to the acts of Government officials. *See,*

*e.g., United States* v. *Chemical Foundation*, 272 U.S. 1, 14-15 (1926) ("The presumption of

regularity supports the official acts of public officers and, in the absence of clear evidence to the

contrary, courts presume that they have properly discharged their official duties."). This

presumption formed the basis of the Second Circuit's recent decision in *United States v.*

*Sanchez*, 517 F.3d 651(2d Cir. 2008), where the Court rejected a defendant's claim that he was

denied due process by the Government's failure to explain why it filed a prior felony information

---

[22]    Except for disclosures constitutionally required by *Brady* and its progeny – which
the Government has an affirmative obligation to make – a criminal defendant's access to the
Government's files is generally limited to the materials described in Rule 16(a)(1). Rule 16(b)
provides: "Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery
or inspection of reports, memoranda, or other internal government documents made by an
attorney for the government or other government agent in connection with investigating or
prosecuting this case."

against him but not his co-defendants.  The Court stated:

> [B]ecause the United States Attorneys are charged with taking care that
> the laws are faithfully executed, there is a "presumption of regularity
> support[ing] their prosecutorial decisions and, in the absence of clear
> evidence to the contrary, courts presume that they have properly
> discharged their duties."
>
> * * * *
>
> Generalized allegations of improper motive do not disturb the
> presumption of regularity.  To warrant discovery into the
> government's reasons for pressing a charge against one person
> rather than another, a defendant must present at least "some
> evidence" to show not only that he was singled out but also that he
> was singled out for reasons that are "invidious or in bad faith."

*Id.* at 671 (citations omitted).

In every criminal case, a defendant could plausibly assert that if he were

permitted access to the Government's files, his examination *might* reveal some evidence of

impropriety by a government actor.  Such baseless conjecture has never been sufficient to justify

the type of disclosure Vaughn seeks here.

### D.    Vaughn's Suggestion That Prosecutors Improperly Investigated E&Y's Tax Shelters Prior To a Referral From The IRS Is Equally Baseless

In a last ditch effort to suggest the occurrence of Government misconduct where

none exists, Vaughn speculates that the United States Attorney's Office may have undertaken a

criminal investigation of E&Y's tax shelters even before a referral by the IRS, and the opening

of a grand jury investigation in 2004.  Tucker Aff. ¶ 33.   Vaughn's speculation is directly

contradicted by the affidavit submitted by AUSA Neiman, in which she stated, unequivocally

(referring to the investigation of the tax shelter promoter that was *not* KPMG), "Prior to the Tax

Division's approval and authorization of the tax grand jury investigation, we did not conduct a

tax grand jury investigation or any other investigation relating to this tax shelter or any of the

individuals or entities involved in its promotion."   Neiman Aff. ¶ 4.   Without any factual basis

to support his claim, Vaughn contends, however, that he must be permitted to go beyond this

"conclusory and volunteered" statement, Tucker Aff. ¶ 36,  and require the Government to

provide documentation to support it.

       Vaughn's position is frivolous for many of the same reasons discussed above.

First, he has made no threshold showing of any impropriety.  Second, the Government is entitled

to the presumption of regularity, and "in the absence of clear evidence to the contrary, courts

presume that [Government officials] have properly discharged their official duties." *Chemical*

*Foundation*, 272 U.S. at 14-15.   Third, the affidavit of AUSA Neiman affirmatively rebuts any

suggestion of impropriety by Vaughn, and it stands unanswered.   Idle speculation entitles him to

nothing more.

       Vaughn attempts to justify his suspicion by citing an "apparent anomaly" arising

from the fact that, at least for several months during 2004 and into 2005, parallel civil and

criminal proceedings were ongoing.  Tucker Aff. ¶ 4, n.5; ¶ 37.   According to Vaughn, statutory

requirements and internal IRS policies dictate that the initiation of a criminal investigation mark

the end of parallel civil proceedings.  Tucker Aff. ¶ 30 ("If the IRS is conducting a civil tax

investigation, it is an indication that there has been no 'referral' for criminal tax purpose"); ¶ 37

("If ... a grand jury investigation must be preceded by a referral under Section 6103(h)(2), that

would also mean that the IRS, as a matter of its own internal procedures and statutory

requirements, would have ceased conducting a parallel civil investigation.").  Vaughn concludes,

therefore, that "something is amiss," Tucker Aff. ¶ 38, and that disclosure of the requested

materials would solve the mystery.

69

In reality, nothing at all is amiss, except the factual premise underlying Vaughn's argument. Vaughn is simply wrong in his unsupported assertions that parallel criminal and civil proceedings are barred by statute and internal IRS policy.

The existing statutory framework and applicable IRS policy anticipate that in many situations, criminal investigations and civil proceedings will advance simultaneously. Accordingly, with one narrow limitation,[23] the existence of a criminal referral from the IRS to DOJ does not automatically prohibit ongoing efforts by the IRS to carry out its duty to administer and enforce the tax laws. To the contrary, although IRS policy reflects a recognition that conducting parallel criminal and civil proceedings carries the potential to jeopardize the criminal case, that same policy specifically reflects the need to coordinate criminal and civil proceedings in order to assure that ultimate collection of the civil liability is not jeopardized by the criminal prosecution. "The criminal and civil aspects of a case do not present an 'either/or' proposition. Rather, the criminal and civil aspects of a case should be balanced to the extent possible without prejudicing the criminal prosecution." Chief Counsel's Directive Manual,

---

[23] That limitation is set forth in 26 U.S.C. § 7602(d)(1), which provides in relevant part that a summons may not be issued or enforced if a Justice Department referral is in effect with respect to the person whose liabilities are being investigated. *See also* Treas. Reg. § 301.7602(c)(1) (no summons may issue and no enforcement proceeding may be commenced "with respect to any person whose tax liability is in issue, if a Justice Department referral is in effect with respect to that person for that liability"). There is absolutely no evidence that at the time of the four individual depositions Vaughn cites which took place in or after May 2004 (which were *not* taken in connection with the E&Y promoter penalty audit, but were taken in connection with examination of specific, individual CDS tax shelters), there was a criminal referral in effect which would have prohibited the use or enforcement of those summonses by § 7602(d).

Chapter (31) 610(1)(b), incorporating IRS Policy Statement 4-84, Chapter (31) 610(2),[24] attached

hereto as Exhibit B ("(1) . . . The purpose of criminal and civil tax investigations is to enforce the

tax laws and to encourage voluntary compliance.  Experience has demonstrated that attempts to

pursue both the criminal and the civil aspects of a case concurrently *may* jeopardize the

successful completion of the criminal case. . . . (3) . . . Therefore, the consequences of civil

enforcement actions on the criminal investigation and prosecution case should be carefully

weighed, and in general, only such actions will be taken as Division Chiefs . . . agree should be

taken . . . . [T]here generally should be no suspension of collection action on assessed amounts of

tax liabilities reported on filed returns. . . . (6) Civil actions concerning a case referred . . . for

criminal prosecution should generally be deferred until the criminal aspects are closed.

However, if the District Director . . . determines that such deferral would imperil ultimate

collection of the civil liability, and that the contemplated civil action would not adversely affect

the criminal case, Counsel should be advised of the specific proposed action.").  Thus, Vaughn is

---

[24]      Policy Statement 4-84, which was originally enacted in 1977, was in effect until October 2005, when it was replaced by Policy Statement 4-26.  Policy Statement 4-26, attached hereto as Exhibit C, did not alter the general, long-standing principle that the need to coordinate ongoing criminal and civil proceedings requires balancing the interests of those involved, but was drafted to be more explicit about the coordination of criminal and civil proceedings in cases involving tax shelters.  It provides in part as follows: **(1) Criminal and civil aspects in enforcement:**  . . .  To successfully curtail the spread of abusive tax schemes and the incumbent loss of revenue caused by such schemes, it is also necessary to identify those instances where civil and criminal actions should be coordinated to stop abusive promoters and return preparers. . . . .  **(4) Civil and criminal enforcement actions to stop abusive promoters and return preparers:**  Civil Promoter Penalty examinations and injunctions against promoters or abusive tax avoidance transactions and tax return preparers should not ordinarily be delayed because of the existence of a criminal investigation or proceeding.  . . . . Civil and criminal functions of the IRS should consider appropriate action(s) against the promoter or preparer that will stop the sale or promotion or return preparation quickly.  This may be accomplished by pursuing solely a criminal investigation, solely a civil investigation, or parallel civil and criminal investigations.

simply flat out wrong when he states, without any support, that IRS policy requires the cessation of all civil matters once there is a criminal referral.

Vaughn has failed to make a showing that he is entitled to the discovery he seeks from the Government, and in any event there is no judicial remedy for the various violations of law he imagines. His motion should therefore be denied.

## VI.    Defendants Are Not Entitled To A Bill Of Particulars

Defendants have moved for an order directing the Government to provide a bill of particulars on a variety of subjects. Prior to the filing of their pre-trial motions, the defendants sent letters to the Government requesting a bill of particulars with respect to more than eighty numerated items, seeking a broad array of evidentiary detail about the charges set forth in the Indictment. On April 22, 2008, the Government declined to provide the requested particulars on the ground that the evidentiary detail requested was not required by law and was not the appropriate subject of a bill of particulars.[25]

In the current motions, defendants collectively request three categories of information: (i) identification of the specific transactions the Government intends to prove at trial; (ii) further detail identifying the "other things," "other steps," "other ways," and "other entities" referenced in the Indictment; and (iii) identification of unindicted co-conspirators. *See* Defendants' Disc. Br. 5. In addition to these requests, defendant Vaughn seeks particulars regarding: (i) his conduct that establishes venue in this District for the false statement charge in Count Ten of the Indictment; and (ii) his conduct following the filing of the returns at issue that

---

[25]    During a series of telephone conversations with defense counsel Isabelle Kirshner and Brian Linder, the Government did, however, provide information with respect to a limited number of the defendants' inquiries.

establishes he aided and abetted the substantive evasion counts (Counts Two through Four). *See* Vaughn Br. 40-41. Defendant Nissenbaum seeks particulars regarding various allegations related to the CDS Add-On and PICO tax shelters that are described in the conspiracy count, as well as the CDS Add-On transactions that are the subject of the tax evasion violations charged in Counts Two through Four. Specifically, Nissenbaum moves to compel the Government to answer a series of questions identifying "who" among the defendants (or co-conspirators in general) performed certain acts related to the CDS Add-On and PICO transactions. *See* Nissenbaum Br. 14-16. Finally, defendant Shapiro requests that the Government specify with respect to each of the tax shelters described in the Indictment, whether the Government alleges that the "tax shelter was fraudulent as designed and approved by [E&Y], and if so, in what respects?" Shapiro Br. 8. As set forth in the Government's April 22, 2008 response to the defendants' letter requests for particulars, neither the law nor the circumstances of this case require the production of the particulars requested by defendants here, which are nothing more than thinly-disguised requests for discovery beyond that required by Rule 16, and requests for a preview of the Government's case at trial.

### A.    General Legal Principles

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also United States* v. *Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. Nov. 30, 2005) (Stein, J.). Because a bill of particulars cannot be used as a general investigative tool for the defense or a device to compel discovery, a bill of

particulars is required "only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990). In addition, when considering requests for a bill of particulars, courts "must be cognizant of the fact that a bill of particulars confines the government's evidence at trial to the particulars furnished, [and] [t]hus the court is required to balance restricting the government's proof against protecting defendants from surprise." *United States* v. *Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985); *see also id.* at 817-818 (discussing balancing in context of conspiracy charge).

Due to the nature of criminal proceedings, a defendant has a right to be apprised "'of the *essential facts* of the crime for which he has been indicted.'" *United States* v. *Sturtz*, 648 F. Supp. 817, 820 (S.D.N.Y. 1986) (emphasis added) (quoting *United States* v. *Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973)); *see United States* v. *Guerrerio*, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987) ("The purpose of a bill of particulars is to apprise defendants of the essential elements of the crimes with which they are charged."). If so apprised, a defendant is not entitled to obtain – through a bill of particulars – a listing of each and every act, statement or event that the Government will prove at trial. *See United States* v. *Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (a request for "all acts in which [the defendant] participated" is improper as it "attempts to force the Government to particularize all of its evidence") (citing *United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991)); *United States* v. *Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988).[26]

---

[26] Disclosure of such detail is improper as it allows a defendant to tailor his testimony and/or defense to explain away the Government's case. *See United States* v. *Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962), *aff'd*, 321 F.2d 509 (2d Cir. 1963).

In general, the Government cannot be compelled to provide a bill of particulars disclosing such things as the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or the legal theories it intends to present at trial. *See United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases); *Torres*, 901 F.2d at 234 ("acquisition of evidentiary detail" is not the function of a bill of particulars); *United States* v. *Mason*, 2007 WL 541653, at *5 (S.D.N.Y. Feb. 16, 2007) (bill of particulars is not to be used to give defendant a road map to the Government's case). In particular, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (collecting cases); *see, e.g.*, *Torres*, 901 F.2d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pre-trial discovery); *Remire*, 400 F. Supp. 2d at 633. "That the requested information would be useful to the defendant is not enough; if the defendant has been given adequate notice of the charges against him, the Government need not be required to disclose additional details about its case." *United States* v. *Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). The ultimate test must be "whether the information sought is *necessary*, not whether it is *helpful*." *United States* v. *Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994) (emphasis in original); *see also United States* v. *Leighton*, 265 F. Supp. 27, 35 (S.D.N.Y. 1967). Thus, it has long been settled that the purpose of the bill of particulars "is to inform the defendant as to the crime for which he must stand trial, *not* to compel disclosure of how much the government can prove and how much it cannot or to foreclose the government from using proof it may develop as the trial approaches." *United*

75

*States* v. *Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y. 1956); *see United States* v. *Bellomo*, 263 F.

Supp. 2d 561, 580 (E.D.N.Y. 2003).  As Judge Sand held in the context of conspiracy

allegations:

> As a general rule, the defendant does not 'need' detailed evidence
> about the conspiracy in order to prepare for trial properly.  It is
> well settled that defendants need not know the means by which it
> is claimed they performed acts in furtherance of the conspiracy nor
> the evidence which the Government intends to adduce to prove
> their criminal acts. . .  Details as to how the conspiracy was
> formed, or when each participant entered it, need not be revealed
> before trial.

*United States* v. *Booth*, 1999 WL 1192317, at *9 (S.D.N.Y. Dec. 14, 1999) (quotations omitted).

Under these standards, where an indictment  "describes in careful detail the nature

and goals of the charged conspiracy," it "discloses sufficient information to inform the

defendants adequately of the charges against them" and a bill of particulars is not warranted.

*United States* v. *Ferrarini*, 9 F. Supp. 2d 284, 299 (S.D.N.Y. 1998); *see also United States* v.

*Stein*, 424 F. Supp. 2d 720, 724 (S.D.N.Y. 2006) (bill of particulars not needed for any "proper

purpose," with one limited exception, where indictment described in detail nature and goals of

charged tax fraud conspiracy and "disclose[d] sufficient information generally to inform

defendants of the charges against them"); *United States* v. *Panza*, 750 F.2d 1141, 1148 (2d Cir.

1984) (bill of particulars not required where a reasonably diligent attorney is provided with all

the information necessary to prepare for trial).  The ultimate question is whether the indictment

and/or other information provided is sufficient "to permit the Defendants to conduct a

meaningfully directed investigation of the relevant facts and circumstances and be prepared to

respond to the charges."  *United States* v. *Bin Laden*, 92 F. Supp. 2d 225, 235 (S.D.N.Y. 2000).

   **B.**    **Discussion**

76

In light of these legal principles, the extensively detailed "speaking" Indictment, and the discovery provided to the defense – which is, for the most part, searchable electronically – no bill of particulars is warranted. Here, the Indictment is one hundred and seven pages long. It describes in painstaking detail the defendants' efforts to defraud the United States and to impede and impair the functions of the IRS in ascertaining, evaluating, assessing and collecting hundreds of millions of dollars in taxes, while reaping substantial fees for E&Y and other entities. The allegations describe in detail the conspirators' sustained, multi-year effort to mislead the IRS regarding the true nature of the tax shelter transactions, and to defeat the IRS's efforts to investigate the transactions. In the conspiracy count, where only a single overt act need be alleged, the Indictment identifies sixty-three separate overt acts committed in furtherance of the scheme, and describes numerous means and methods of the conspirators.

Along with the detailed Indictment, the Government has produced voluminous discovery to all defendants, the overwhelming majority of which is contained in electronic databases that are word-searchable. That production goes far beyond the discovery requirements of Rule 16. *See Stein*, 424 F. Supp. 2d at 724 (electronic discovery produced in word-searchable form weighed against granting bill of particulars). In addition to being able to conduct any combination or permutation of word search on the electronic documents, the defendants have also been assisted in their review of the discovery materials in other ways. On June 22, 2007, almost a year ago, in an effort to aid the defense in identifying significant documents, the Government produced to the defendants a set of close to 300 "key" documents it had identified during the investigation, along with a sixteen-page index of the documents.[27] Defendants have

---

[27]    Bolton received the same set of documents shortly after he was charged.

also received detailed indices to the two largest electronic databases produced.

In evaluating requests for particulars, the fact that the defendants have been provided with detailed documentary discovery weighs against granting the request. *See, e.g., United States* v. *Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying request for bill of particulars where "[t]he . . . indictment is detailed in its allegations" and "[the] defendants have had extensive discovery"); *United States* v. *Pacheco*, 902 F. Supp. 469, 475 (S.D.N.Y. 1995) (denying request for bill of particulars because "the charges are adequately set forth in the indictment, the criminal complaint, and in discovery"); *United States* v. *Conesa*, 899 F. Supp. 172, 176 (S.D.N.Y. 1995) (denying request for bill of particulars because "[t]he Indictment sufficiently advises defendants of the specific acts of which they are accused" and "the Government . . . has made available to defense counsel extensive discovery that supplements the information provided in the . . . Indictment").

The level of detail in the Indictment and the volume of discovery, produced in an accessible format, more than satisfy the requirements that defendants have adequate notice of the charges and the evidence to enable them to prepare for trial and avoid unfair surprise.[28] *See, e.g., United States* v. *Sattar*, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) (denying request for "sweeping bill of particulars" in light of "specific factual allegations" in the indictment, "together with the ongoing and voluminous discovery"; finding that request was "an

---

[28]    To the extent defendants contend that a bill of particulars is necessary because too much discovery has been produced, *see* Defendants' Disc. Br. 7, it should be noted that with respect to several of the databases that contain large numbers of documents *unrelated* to the charges here, the Government offered to perform targeted searches in an effort to narrow the discovery to those documents potentially relevant to the matters at issue.  The defendants declined the Government's offer, choosing instead to do their own searches from the complete databases.

impermissible attempt to compel the Government to provide the evidentiary details of its case").

In addition, the "length of time that the defendant has to review the material is also relevant to this analysis." *United States* v. *Carey*, 152 F. Supp. 2d 415, 432 (S.D.N.Y. 2001) (denying motion for particulars where defense counsel would have access to discovery materials for months before trial; distinguishing situation from case where motion for particulars was granted because defense counsel had only four days "to sort through over 4,000 documents"); *see also United States* v. *Nicolo*, 523 F. Supp. 2d 303, 316 (W.D.N.Y. 2007) (denying particulars motion where 179-page indictment described conspiracy in great detail, setting forth dates and amounts of alleged kickbacks, and defendants had at least 6 to 9 months to review voluminous discovery). Here, although the Government has produced discovery on a rolling basis, the defendants, with the exception of defendant Bolton, will have had access to most of the central materials for more than a year and a half by the time the trial begins. Even Bolton will have had access to most of the discovery materials for a year by the time of trial. "This is hardly a situation, then, in which defendants, faced with an indictment that does little more than tracks the language of the statute, have had an undifferentiated mass of documents dumped on them at the eleventh hour, or where the defendants remain in the dark about the specific acts of which they are accused." *Nicolo*, 523 F. Supp. 2d at 317 (citations omitted). The extended period of time the defendants have to review the discovery, coupled with the detailed and specific allegations in the Indictment, weigh against granting any motion for particulars.

Defendants' reliance on *United States* v. *Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) is misplaced. *See* Defendants' Disc. Br. 7-8  The conspiracies charged in *Bin Laden* differ greatly from the one charged in this Indictment both in their geographical scope and the nature

and breadth of the criminal conduct charged.  In *Bin Laden*, six different charged conspiracies

spanned a period of nearly ten years, and alleged overt acts that occurred in "Afghanistan,

Pakistan, the Sudan, Somalia, Kenya, Tanzania, Malaysia, the Philipines, Yemen, the United

Kingdom, Canada, California, Florida, Texas, and New York."  92 F. Supp. 2d at 234.  The

activity charged ranged from "detonating explosives, to training Somali rebels, to transporting

weapons, to establishing businesses, to lecturing on Islamic law, to writing letters and to

traveling in furtherance of the charged conspiracies."  *Id.*  In granting a request for certain

particulars, the court pointed out that "some of the Defendants participated in the charged

conspiracies by committing overt acts in furtherance thereof which are described only in terms as

general as engaging in 'travel' and conducting 'business.'"  *Id.* at 236.

       The nature of the charges in *Bin Laden* simply does not compare to the single

conspiracy charged in this Indictment, which is narrowly focused on the defendants' efforts to

defraud the IRS through a discrete number of clearly specified and extensively described tax

shelters.  Moreover, unlike in *Bin Laden*, where many of the overt acts which were the subject of

the particulars requested were very general, and referred to "broad categories of conduct," *id.*,

the overt acts alleged in this Indictment are extremely specific, citing relevant dates, references

to specific documents and emails, and quotes from some of those materials.  *See* Indictment ¶ 97;

*see also Bin Laden*, 92 F. Supp. 2d at 238 (distinguishing an overt act alleging generally that

from 1989 to 1999, defendants "engaged in financial and business transactions . . . and traveled

to various places on behalf of al Qaeda," which warranted more particularization, from other

overt acts alleging more specifics, such as "in or about December 1995, the defendant [Hage]

visited the defendant [Mohamed] in Santa Clara, California," which "provide sufficient detail to

permit defense counsel reasonably to focus their investigation" and thus did not warrant a bill of particulars); *id.* at 240 (similarly distinguishing general allegations regarding coded correspondence used "at various times" from allegations where date of correspondence was identified).  Defendants cannot credibly claim, as they attempt to do, that they are worse off than the defendants in *Bin Laden*.  *See* Defendants' Disc. Br. 7.

   Similarly, *United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) and *United States* v. *Savin*, 2001 WL 243533 (S.D.N.Y. March 7, 2001), also relied upon by defendants, *see* Defendants' Disc. Br. 6-7, are easily distinguished.  In both *Nachamie* and *Savin*, the primary basis for the court ordering the Government to provide a bill of particulars was the fact that the Government had produced voluminous discovery about a multitude of transactions, but had failed to identify which of the transactions were the basis of the alleged criminal conduct.  *See*, *e.g.*, *Nachamie*, 91 F. Supp. 2d at 571 (government produced hundreds of boxes and files related to 2,000 Medicare claims but did not advise defendants which of the claims were false); *Savin*, 2001 WL 243533, at *3 (where indictment charged that defendant "pilfered his client's money through an unspecified series of 'intercompany transfers'" but did not identify the amounts, dates, or specific transfers involved, bill of particulars was necessary so that defendant would not have to "guess which of the numerous transactions documented . . . are alleged by the government to have been improper").  Unlike *Nachamie* and *Savin* – where the documents produced related to numerous transactions and insurance claims but the Government did not advise the defendants which of the transactions were part of the charged criminal conduct and which others were legitimate – here there is no similar confusion or uncertainty because the basis of the alleged fraud is that for each of the tax shelters described in the Indictment, *all* of the

clients entered into one of a series of virtually identical transactions, which were pre-planned from inception and which suffered common infirmities.  *See*, *e.g.*, Indictment ¶ 23 ("CDS was designed and implemented as a series of pre-determined steps intended to deceive the IRS"); ¶ 29 ("COBRA was designed, marketed and implemented as a series of pre-planned steps which . . . would generate artificial losses sufficient to offset a client's income or gains completely"); ¶ 53(b) (describing CDS-Add on as "a strategy consisting of a pre-planned series of steps leading to a predetermined tax benefit"); ¶ 55 (same with respect to PICO).  Thus, although the discovery is voluminous, in large part it consists of numerous copies of the same basic documents, which were created, approved and executed by the defendants in order to implement these tax shelters in cookie-cutter fashion.  Accordingly,  the fundamental difference between the cases cited by defendants and this case is that each client who implemented a particular tax shelter entered into a transaction that was the *same* in all material respects as every other client who implemented the same tax shelter.  In simple terms, if the defendants have seen one COBRA, they've basically seen them all.

This critical difference makes a bill of particulars in this case completely unnecessary.  Unlike *Nachamie* and *Savin*, the Government has not produced voluminous discovery about transactions not charged as part of the fraud and then left to the defense the job of determining which ones are the subject of criminal conduct.  Here, every CDS transaction was virtually the same as every other (and the same is true with respect to the other shelters) and is part of the criminal scheme charged.[29]  Thus, there is no mystery about the charges in this case,

---

[29]     The other principal case relied upon by the defendants, *United States* v. *Ganim*, 225 F. Supp. 2d 145 (D. Ct. 2002), simply demonstrates that, under a particular set of circumstances, a judge exercised discretion to order a bill of particulars in a case where the

and there is no need to identify which of the transactions are part of the fraud (like there was in *Nachamie* and *Savin*), because they are all essentially the same and all part of the alleged criminal conduct.[30]

        Nor is there any need for the Government to elaborate beyond the extensive detail in the Indictment and substantial discovery with respect to references in the Indictment to phrases such as "among others" or "other entities."  Defendants have more than adequate information to prepare their defenses and avoid unfair surprise at trial, as the nature of the charges is clear.  Their desire to receive additional information as to every instance in which the Indictment refers generally to "others" is nothing more than the defendants' attempt to learn how the Government is going to prove its case, and to obtain additional "evidentiary detail" to which they are plainly not entitled.  Importantly, a bill of particulars is not warranted because "given the volume of documents in this case, it would be premature to require the Government to limit

---

constitutionality of the statute charged was challenged.  In *Ganim*, the court found that the defendant's claim that the indictment's allegations of an "ill-defined scheme fail to provide him with the notice of what he is alleged to have done that violates the law," *id*. at 147, had some merit.  After some clarification was provided by the Government as to the nature of the scheme, the court nonetheless found it appropriate to direct the Government to provide a bill of particulars on a specific issue - the nature of the benefits the defendant received as kickbacks. Here, there is no uncertainty regarding the constitutionality of the statutes charged or whether the defendants have adequate notice of what they are alleged to have done that violates the law.  A bill of particulars is simply not warranted.

[30]     The Government is not remotely in a position this far in advance of trial to identify precisely which of the "218 transactions" it will seek to offer detailed evidence about at trial (as opposed to a summary chart involving all of the transactions, which it will likely offer). This would essentially entail providing a witness list to the defendants nine months before trial. However, this will not impede the defendants' ability to prepare for trial.  Although the defendants may have to "prepare for trial as if all 218 transactions will be at issue," Defendants' Disc. Br. 8, as discussed above, each of the transactions within a particular category of tax shelter is the same in all material respects as the others in that category, so this preparation will not be burdensome.

itself now to the specified acts of the [Indictment] or any additional acts it might be able to specify in a bill of particulars." *United States* v. *Chalmers*, 410 F. Supp. 2d 278, 285 (S.D.N.Y. 2006) (defendants not entitled to bill of particulars regarding specific transactions, transmissions and false representations or omissions); *see also United States* v. *Washington*, 947 F. Supp. 87, 90 (S.D.N.Y. 1996) (denying request for government to provide particulars with respect to words "by various means, including, among other things," because request was for "evidentiary matter" not the proper subject of a bill of particulars). Accordingly, defendants' requests for particulars regarding the specific individual transactions about which the Government intends to present detailed evidence at trial, and the "other things," "other steps," "other ways," and "other entities" referenced in the Indictment should be denied.

Similarly, Nissenbaum's request for particulars regarding his role in the CDS Add-on and PICO shelters, as well as Vaughn's request for particulars regarding specific conduct that establishes he is guilty of the substantive tax evasion counts and the basis for venue for the false statement charge in Count Ten, should be rejected. These requests seek nothing more than to compel the Government "to disclose the manner in which it will prove the charges or preview its evidence or legal theory." *United States* v. *Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) . As discussed above, the law is clear that a bill of particulars is not appropriate for these purposes. *See*, *e.g.*, *United States* v. *Mason*, 2007 WL 541653, at *5 (S.D.N.Y. Feb. 16, 2007) (where indictment alleged general narcotics conspiracy and listed specific overt acts taken in furtherance of the conspiracy, defendants' requests for particulars regarding the nature of their specific conduct was rejected; "[a]cquisition of evidentiary detail is not the function of the bill of particulars"); *United States* v. *Oskowitz*, 294 F. Supp. 2d 379, 385 (E.D.N.Y. 2003)

84

(denying motion for bill of particulars to further specify "the particular material matters alleged

to have been false and fraudulent," where indictment charging tax evasion adequately notified

defendant of conduct being charged); *Savin*, 2001 WL 243533, at *4 (request for particulars

regarding defendant's "alleged role in the various transactions is denied, as this request seeks

evidentiary detail going beyond identification of the allegedly improper transactions and is not

needed to provide adequate notice of the charges); *United States* v. *Chalmers*, 474 F. Supp. 2d

555, 576-77 (S.D.N.Y. 2007) (denying motion for particulars regarding events giving rise to

venue where venue was sufficiently alleged in the indictment).

Nissenbaum complains that he has "not been informed, from the indictment or

from the discovery materials, of . . . the specific acts of which he is accused." Nissenbaum Br.

13-14.  His complaint is not only baseless because he is not entitled to specification of "the

specific acts" in which he engaged, but also because the Indictment and the discovery do, in fact,

reveal his role.  The Indictment contains repeated references to actions taken by "the E&Y

defendants," a phrase that includes Nissenbaum.  Moreover, Nissenbaum's claim that there is

nothing "in the discovery materials that notif[ies] the defendant of the conduct supporting these

allegations," Nissenbaum Br. 15, can mean only one thing – that Nissenbaum has not looked at

the discovery materials.  Contrary to Nissenbaum's unsupported statement that there is nothing

in the discovery materials relevant to the allegations, appropriate searches reveal the opposite.[31]

Moreover, without even delving into the large volume of electronic discovery, several of the

"key" documents the Government produced to the defendants on June 22, 2007 demonstrate the

---

[31]    A significant advantage of word-searchable electronic discovery is that one can
search for specific names and terms appearing in the same document.

fallacy in Nissenbaum's claim that the discovery materials shed no light on his conduct.  For example, Nissenbaum claims that the Government must provide particulars "with respect to the allegation that he participated in presenting the PICO strategy to clients," Nissenbaum Br. 16, and that he needs the names of the clients to whom the presentations were made.  While he is not entitled to such specification, as discussed above, all Nissenbaum has to do is look at examples of the *self-evaluations* he himself completed (which were included in the "key document" production) to gain some insight.  *See* Nissenbaum 2000 Self-Evaluation, SDNY-00293962 (containing Nissenbaum's own statement that he participated in the "development and sales of a number of SISG solutions including . . . COBRA, CDS and PICO"); Nissenbaum 2001 Self Evaluation, SDNY-00646065 ("I was closely involved in the continued sale and development of PICO . . . I was directly involved in the sale of the PICO product to a number of clients.  As a result of my efforts, we have been engaged to provide this product to a former client . . . for a fee of $700 thousand").[32]  Similarly, a review of some of the "key" documents reveals other examples relevant to Nissenbaum's conduct.  *See*, *e.g.*, June 4, 2000 E-mail from Coplan to Nissenbaum and others, SDNY-00206853 (attaching draft announcement describing creation of the CDS Add-On transaction and asking recipients to review and get back to him with comments); July 1, 2000 E-mail from Coplan to Nissenbaum and others, SDNY-00203180 (attaching revised CDS Add-On announcement letter for their final review); September 4, 2000 E-mail from Shapiro to Nissenbaum and Coplan, SDNY-00205690 (attaching revised PICO engagement letter for "comments and changes"); September 15, 2000 E-mail from Coplan to Nissenbaum and others, SDNY-00286414 (describing how SISG group operates – "[i]f a

---

[32]    The name of the "former client" is indicated in the actual document.

potential tax solution with an investment orientation is created by or brought to the attention of someone in our group – typically Richard, Martin or me, but occasionally someone in an area – the information is shared among the three of us, and we decide if it is worth pursuing"). Clearly, Nissenbaum's assertion that the discovery materials are void of any information regarding his conduct is flatly incorrect.

By seeking additional particulars regarding specific aspects of the CDS Add-On and PICO tax shelters, Nissenbaum is clearly attempting to do just what the law prohibits: "to obtain disclosure of how the government intends to prove its case." *Stein,* 424 F. Supp. 2d at 724. Vaughn attempts to do exactly the same thing by seeking specification of the evidence establishing that he aided and abetted the substantive evasion counts. In other words, Nissenbaum and Vaughn cannot argue that a bill of particulars is necessary to advise them of the "acts [they are] accused of committing," *Remire*, 400 F. Supp. 2d at 633, when the Indictment in this case makes clear the nature of the charges. *See*, *e.g.*, Transcript, *United States* v. *Bongiorno*, et al, 05 Cr. 390 (SHS), February 7, 2006, pp. 33-34 (denying defendants' request for bill of particulars in securities fraud case where conduct alleged in indictment was clear, noting that a bill of particulars is "not for discovery purposes"), attached hereto as Exhibit D. What Nissenbaum and Vaughn really seek is a roadmap of the Government's proof at trial. As discussed above, it would be premature at this point to require the Government to limit its proof to matters specified in a bill of particulars with respect to exactly how it will prove the defendants participated in the charged conduct.

Defendants also seek identification of all co-conspirators. *See* Defendants' Disc. Br. 11. But this Court, among many others, has held such information to be outside the function

of a bill of particulars. *See, e.g.*, Transcript, *United States* v. *Bongiorno*, et al, 05 Cr. 390 (SHS),

February 7, 2006, p. 34 (denying defendants' request for identification of all coconspirators

where coconspirators were people with whom defendants had worked; "[t]he issue is whether or

not the co-conspirators' identity is necessary, not whether it would be helpful"), Exhibit D;

*United States* v. *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars

seeking date defendant joined conspiracy, identity of coconspirators, and precise dates and

locations relating to overt acts); *United States* v. *Mason*, 2007 WL 541653, at *4-5 (S.D.N.Y.

Feb. 16, 2007) (denying motion for particulars identifying all coconspirators in connection with

indictment charging ten defendants in seven-year narcotics conspiracy); *United States* v. *Ma*,

2006 WL 708559, at *14 (S.D.N.Y. March 21, 2006) ("[c]ourts also deny bills of particulars

seeking the names and identities of unindicted co-conspirators where sufficient discovery has

been provided"); *United States* v. *Mahaffy*, 446 F. Supp. 2d 115, 120 (S.D.N.Y. 2006)

("[c]onsidering the specificity of the allegations in the Indictment and the discovery that the

Government has provided, . . . Defendants have received adequate information on which to

prepare their defenses" and request for particulars identifying unindicted co-conspirators is

denied); *United States* v. *Chalmers*, 410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006) (where

Government produced extensive discovery, identification of coconspirators was not necessary

for the preparation of the defense); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292

(S.D.N.Y. 2003) (denying request for identification of unindicted co-conspirators); *United States*

v. *Viertel*, 2002 WL 1560805, at *11 (S.D.N.Y. July 15, 2002) (defendant not entitled to identity

of co-conspirators and witnesses); *United States* v. *Trippe*, 171 F. Supp. 2d at 240 ("demands for

particular information with respect to where, when, and with whom the Government will charge

88

the defendant with conspiring are routinely denied"); *United States* v. *Mitlof*, 165 F. Supp. 2d

558, 569 (S.D.N.Y. 2001) (collecting cases and denying request for bill of particulars seeking

"wheres, whens and with whoms" of charged conspiracy); *United States* v. *Jones*, 2000 WL

1448640, at *2 (S.D.N.Y. Sept. 28, 2000) (denying request for identities of co-conspirators,

dates, times, places, and role of defendant in conspiracy); *United States* v. *Reinhold*, 994 F.

Supp. 194, 200-01 (S.D.N.Y. 1998) (denying defendants' motion for particulars that sought

"identification of alleged co-conspirators who have not been named in the Indictment," and

surveying cases); *United States* v. *Gambino*, 809 F. Supp. 1061, 1071 (S.D.N.Y. 1992) (courts

have repeatedly denied requests for the "when" and "whereas" and "with whoms" concerning the

formation of schemes and conspiracies).

    After examining those cases in which identification of unidentified co-

conspirators was ordered, this Court should still reject the defendants' request.  For example,

even if the Court were to apply the multi-factor test employed by Judge Schiendlin in *United

States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) to determine whether to order

identification of unindicted co-conspirators, as defendants suggest, *see* Defendants' Disc. Br. 11-

12, the defendants' request would be denied.  In *Nachamie*, the court considered the large

number of co-conspirators and a somewhat lengthy conspiracy, both factors that are arguably

present here.  However, the court's explicit rationale for ordering disclosure based on those

factors was avoidance of prejudicial surprise in a case in which the defendant might never have

met the unindicted co-conspirators.  *See Nachamie*, 91 F. Supp. 2d at 572 ("If there are a large

number of co-conspirators and a long-running conspiracy, a defendant is more likely to be

surprised by the identity of other co-conspirators, whom he may never have met.").  Although

there may well be some co-conspirators whom a particular defendant never met or communicated with directly, the extensive discovery materials clearly reveal who played what role, and who communicated with whom on what subject.  Thus, there is little concern here that the identities of unindicted co-conspirators will be revealed to the defendants for the first time at trial.[33]

Moreover, in *Nachamie*, the court cited the inadequate notice of the charges to conclude that the "volume of pre-trial disclosure" supported identification of unindicted co-conspirators.  *See Nachamie*, 91 F. Supp. 2d at 573.  Here, in contrast, through the detailed allegations in the Indictment and the extensive discovery (the majority of which is searchable electronically), the Government has more than adequately identified the conduct constituting the alleged charges and there is no similar need to identify unindicted coconspirators.  Tellingly, the defendants do not provide a single reason why such identification is "necessary," *see Trippe*, 171 F. Supp. 2d at 240 ("the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation")  (emphasis added), relying instead on the unsupported general statement that it is "necessary to permit the defendants adequately to prepare for trial and to avoid undue surprise."  Defendants' Disc. Br. 13.

Another factor to consider in this analysis is that the Government's investigation is continuing, *see Nachamie*, 91 F. Supp. 2d at 571, and the disclosure of the identity of uncharged co-conspirators could endanger that ongoing investigation.

---

[33]    In addition, through the discovery provided by the Government, the defendants already know the identities of all of the clients who participated in the tax shelters at issue in the Indictment.

90

*United States* v. *Bin Laden*, 92 F. Supp. 2d 225, 234-35 (S.D.N.Y. 2000), upon which defendants also rely (*see* Defendants' Disc. Br. 12), undermines, rather than supports the defendants' request for identification of co-conspirators. In *Bin Laden*, several different conspiracies were alleged, in contrast to the single conspiracy alleged here. As mentioned above, the conspiracies charged in *Bin Laden* were disparate in purpose and geography, in contrast to the narrower conspiracy alleged here. In addition, in *Bin Laden*, many co-conspirators used aliases, thus making it difficult for defense counsel to decipher their identities. *See* 92 F. Supp. 2d at 234-35. In contrast, the conspiracy here involved, in large part, the defendants' co-workers. Even more significantly, in *Bin Laden*, Judge Sand ordered identification *solely* of those co-conspirators to whom the Government intended to refer at trial. *See id.* at 241. In contrast, the defendants' broad request here is not similarly tethered, instead seeking identification of all known co-conspirators regardless of whether the Government intends to call those individuals as witnesses or offer their statements as evidence at trial.

The Government respectfully suggests that, for the reasons set forth above, the defendants' request for a bill of particulars identifying unindicted co-conspirators should be denied. Alternatively, at most, the Court should direct the Government to identify, at an appropriate time much closer to trial, those known co-conspirators the Government intends to call as witnesses in its case-in-chief at trial, or whose statements the Government intends to offer into evidence under Fed. R. Evid. 801(d)(2)(E). The defendants are not even arguably entitled to more.

Finally, Shapiro moves for a bill of particulars requiring the Government to answer the following question: "With respect to each of the tax shelters as to which the

government intends to offer proof, does the government allege that the tax shelter was fraudulent as designed and approved by [E&Y], and if so, in what respects?" Shapiro Br. 8. The sole basis for this request is Judge Kaplan's directive in the KPMG case that the Government answer the same question.[34] As discussed below, however, viewed in the context of *this* case, the question is difficult to understand, and to the extent it can be understood, the answer does not carry the significance that it carried in the KPMG case.

As an initial matter, the Government should not be required to answer Shapiro's question in a bill of particulars because the question is too vague. The phrase "fraudulent as designed" as used by Shapiro has no clear meaning and it is difficult to discern precisely what Shapiro is actually asking. For example, Shapiro could be asking whether, assuming all the facts in the transaction documents and the tax shelter legal opinions were true (which of course the Government disputes), each shelter was nonetheless fraudulent (because it had no expectation of earning a reasonable profit or for some other reason), and would therefore without question have been disallowed by the IRS. Alternatively, Shapiro could be asking whether, assuming all the facts were as the Government describes them in the Indictment (as opposed to how they were described in the transaction documents and the legal opinions), the Government contends that each shelter was a fraud (because it had no expectation of earning a reasonable profit or for some other reason) and would therefore have been disallowed by the IRS. Another possibility is that by using the phrase "fraudulent as designed," Shapiro is asking whether the Government contends that from the beginning, the defendants intended that they, their co-conspirators and

---

[34]    As noted above, Judge Kaplan denied all of the defendants' requests for a bill of particulars with this one exception. *See Stein*, 424 F. Supp. 2d at 724.

E&Y's clients would lie and omit material facts in order to justify the shelters to the IRS.[35]

There are other possible interpretations of Shapiro's question, and the Government should not be

compelled to limit its proof at trial by speculating to answer a question that is vague and one that

it simply does not understand.

Next, the factual context in which this question arises here is significantly

different than the context in which the question arose in the KPMG case.  When the bill of

particulars motion was filed in the KPMG case, there were 18 defendants remaining in the case.

Although all 18 defendants were charged in the same overarching conspiracy count, they fell

into several distinct categories with respect to their roles in carrying out the conspiracy.  For

example, some were KPMG partners and employees who were involved primarily in designing

and approving the tax shelters and the accompanying KPMG opinion letter, but did not

personally market or sell those shelters to clients; some were KPMG partners and employees

who played no design role but were responsible for marketing and selling the tax shelters

directly to clients, working out of KPMG's branch offices throughout the country; some were

principals of Presidio, the purported "investment advisor," who were personally involved in all

stages of the charged tax shelters, including design, marketing, and implementation; and one was

a partner at a law firm who had no interaction with the tax shelter clients, but was involved in the

design of the shelters and issued legal opinion letters.  It was within that context – where there

were multiple groups of defendants, some of whom played quite distinct roles in the

development and execution of the charged shelters – that the defendants asked the Government

---

[35]        If this formulation is the formulation intended by Shapiro, then the Indictment
already clearly answers his question and does so in the affirmative.

to clarify what it intended to argue about the issue.  Specifically, they wanted to know whether in the Government's view, the shelters were designed in a non-criminal fashion by the first group, and later marketed and sold by the salespeople in the field in a way that was fraudulent, or whether the shelters were designed from the beginning to be fraudulent.[36]  In light of the numerous defendants and the different positions they held, Judge Kaplan directed the Government to answer the question.

This case is vastly different.  Unlike in the KPMG case, where there were two groups of defendants who worked for KPMG but played very different roles in the conspiracy – those who primarily designed and approved versus those who primarily marketed and sold – the E&Y defendants had roles in the conspiracy very similar to each other.  All of the E&Y defendants were members of E&Y's "SISG Group" (formerly called the "VIPER Group") "for all or a significant part of the period relevant to the Indictment."  Indictment ¶ 5.  The group was involved in "designing, marketing, and implementing high-fee tax strategies for individual clients."  *Id.* ¶ 4.  Thus, unlike in the KPMG case, where some defendants asserted that there were essentially two factions of defendants from KPMG as to whom there might be different theories of criminality, the E&Y defendants are all similarly situated.

Finally, the bill of particulars requested by Shapiro is not necessary for him to prepare for trial, prevent surprise or plead double jeopardy – the standard Shapiro is required to meet – because the detailed allegations in the Indictment make clear the nature of the alleged conspiracy and the tax fraud.  If, by his question, Shapiro wants to know whether he is accused

---

[36]     Put simply, in KPMG each of the two groups of KPMG defendants was attempting to point the finger at the other group to assign blame for the alleged fraudulent aspects of the tax shelters.

of planning from the outset to conceal true facts from the IRS, the Indictment makes plain that the answer is "yes."  The Indictment charges that the defendants knew that the tax shelters they designed, marketed and implemented had various vulnerabilities, and that the defendants therefore undertook to conceal facts from the IRS.  *See, e.g.*, Indictment ¶¶ 13, 15.  Given these allegations, it is plain that the defendants are charged with acting with fraudulent intent from the outset.  No further explanation is required.

If, by his question, Shapiro asks whether the Government contends that even if the IRS knew all the true facts regarding a particular tax shelter (as opposed to the way the shelters were described in false documents and legal opinions prepared by the defendants and coconspirators), the IRS would nonetheless surely have disallowed it, then the Indictment also answers that question already.  Count One of the Indictment essentially lays out a scheme to defraud the IRS by making false statements, creating false documents, and otherwise concealing material facts from the IRS, in an effort to aid the tax positions of E&Y's clients, and to generate substantial fees for E&Y and the other entities involved in implementing and defending E&Y's tax shelters.  For the most part, although the Indictment details the various vulnerabilities in E&Y's four tax shelter products, it takes no position as to whether, ultimately, the IRS would successfully have disallowed the clients' claimed tax losses, and required the clients to pay the tax, and possibly penalties and interest as well.  Thus, while the Indictment provides more than ample basis to suspect that the IRS would indeed have disallowed the artificial losses generated by CDS, COBRA and PICO if it had been made aware of the true facts surrounding those shelters, and while the Indictment specifically alleges that the defendants made false statements and concealed material facts in order to reduce that likelihood, the trial jury will not ultimately

95

be required to determine whether every CDS or COBRA or PICO transaction constituted a *tax evasion* as well as being part of a conspiracy to defraud the IRS.[37]  In contrast, the Indictment specifically charges that all of the CDS Add-On transactions and the Tradehill transaction employed by Coplan, Shapiro and Nissenbaum resulted in *tax evasions* (Counts Two through Seven).  In other words, with respect to these two shelters and the substantive evasion counts only, the Government has undertaken to prove to the jury beyond a reasonable doubt that there was tax due and owing to the IRS because had it known the truth about the shelters, the losses would certainly have been disallowed.

In sum, the Government's theory here is clearly set forth in the Indictment.  The defendants participated in a scheme to defraud the IRS by deceiving the IRS about the true facts surrounding a series of tax shelters intended to eliminate, reduce or defer the taxes of high net worth clients.  In light of the detailed allegations in the Indictment, which charge that the defendants intended from the beginning that lies would be told to the IRS and facts would be concealed, the Government should not be required to respond to Shapiro's vague inquiry by means of a bill of particulars.

For all of the reasons set forth above, all of the defendants' motions for a bill of particulars should be denied.

## VII.    The Requests To Strike "Surplusage" Are Frivolous

Shapiro moves to strike certain language from the Indictment as "surplusage" under Federal Rule of Criminal Procedure 7(d).  For the reasons set forth below, his motion

---

[37]    As discussed above, to prevail on a charge of tax evasion, the Government would have to prove beyond a reasonable doubt that a significant tax was due and owing to the IRS.

should be denied.

### A.     Applicable Law

Federal Rule of Criminal Procedure 7(d) allows a court to strike "surplusage" from an indictment.  However, "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States* v. *Mulder,* 273 F.3d 91, 99-100 (2d Cir. 2001) (quoting *United States* v. *Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990)).  "'If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Scarpa,* 913 F.2d at 1013 (quoting *United States* v. *DePalma,* 461 F. Supp. 778, 797 (S.D.N.Y.1978)).

Nevertheless, "'it has long been the policy of courts within the Southern District to refrain from tampering with indictments.'" *United States* v. *Sattar,* 314 F. Supp. 2d 279, 320 (S.D.N.Y. 2004) (quoting *United States* v. *Bin Laden,* 91 F. Supp. 2d 600, 621 (S.D.N.Y.2000)). *See, e.g., United States* v. *Chen*, 2007 WL 2244213, at *7 (S.D.N.Y.  Aug. 1, 2007) (same); *United States* v. *Stein*, 429 F. Supp. 2d 633, 646 (S.D.N.Y. 2006); *United States* v. *Jimenez*, 824 F. Supp. 351, 369 (S.D.N.Y. 1993).

### B.     Discussion

Shapiro asks the Court to strike the following items from the Indictment claiming they are "prejudicial and irrelevant," Shapiro Br. 23-24:  (1) a description of Shapiro's employment prior to joining E&Y; (2) numerous instances of "broadening language," for example references to "other things," "other steps," and "other ways";  (3) a reference to "attorneys and professionals" who represented individuals during testimony before the IRS; and

(4) the word "purported" from a description of the CDS trading partnership.   All of these

requests should be denied.

### 1.    Shapiro's Prior Employment

Paragraph nine of the Indictment describes briefly Shapiro's educational

background and his employment with E&Y.  The concluding sentence of the paragraph states:

"Before his employment at E&Y, SHAPIRO had been the Director of Tax for the Financial

Services Industry at another large accounting firm."  Shapiro asks that this sentence be stricken

claiming "it has no bearing on his part in the charged criminal conduct . . . [and] can only be

intended to prejudice him."  Shapiro Br. 25.   Shapiro's argument has no merit.

The notion that a description of the defendant as a "Director of Tax" is somehow

prejudicial is nothing short of laughable.  The description of the defendant carries no connotation

of violence, organized crime, terrorism, or anything else potentially prejudicial.  It is simply a

factual statement regarding his prior employment.  Furthermore, Shapiro's background and

employment in the tax field is clearly relevant to his "knowledge and intent, as it tends to support

his knowledge of the tax laws."  *United States* v. *Willner*, 2007 WL 2963711, at *8 (S.D.N.Y.

Oct. 11, 2007) (denying motion to strike reference to defendant's employment by the IRS in tax

evasion case) (citations omitted); *see also United States* v. *Fletcher*, 928 F.2d 495, 501-02 (2d

Cir. 1991) (defendant's educational background and career experience was relevant to issue of

intent in tax case).  Indeed, to the extent the title "Director" connotes a superior knowledge of, or

level of experience with tax matters, the phrase is even more probative.  Because it is clearly

relevant to the charges at issue, and not the least bit prejudicial, the sentence regarding Shapiro's

employment prior to E&Y should not be stricken.

### 2. Broadening Language Such as "Other Things" and "Other Ways"

Shapiro moves to strike certain broadening language in thirty-three paragraphs of the Indictment. *See* Shapiro Br. 27. His objection to this language is that it "creates a danger that the jury may be misled into inferring that the defendant is accused of crimes beyond those actually charged." *Id.* Because the nature of the charged conspiracy, as well as the other charges in the Indictment, are clear, and in light of the context in which this language is used, Shapiro's motion to strike this language should be denied.

Contrary to Shapiro's argument, the "broadening" language he cites in his motion does not create any risk that the jury will be misled into thinking that he is being charged with crimes other than those set forth in the Indictment. Rather, when viewed in the context of the allegations which contain the challenged language, it is clear that virtually all of the thirty-three instances Shapiro cites are situations where the language was used in order to describe the way the crime was committed, and do not in any way suggest that the defendant is guilty of some other crime.[38]

Courts have recognized this distinction in declining to strike general, broadening language when it is contained in a paragraph that describes how the crime was committed. "When a charging paragraph of an indictment . . . contains surplusage that adds nothing to the

---

[38] Three of the thirty-three instances Shapiro cites should be distinguished from the others. Paragraph 8 contains a general description of defendant *Nissenbaum*'s employment. This is clearly part of the general background discussion in the Indictment and there is no possible way that the use of the language in this paragraph creates a risk that the jury will think *Shapiro* committed some other crime. Shapiro's motion also includes broadening language used in paragraphs 140 and 141. These counts relate solely to fugitive defendant Smith. Accordingly, they are irrelevant for purposes of the upcoming trial.

charges, gives the defendant no further information with respect to them, and creates the danger that the prosecutor at trial may impermissibly enlarge the charges contained in the Indictment returned by the grand jury, the language must be stricken.  But when a means paragraph, which refers to the matter of proof to sustain the charges, contains surplusage, a court should not strike the language."  *United States* v. *Washington*, 947 F. Supp. 87, 90 (S.D.N.Y. 1996) (denying motion to strike the words "by various means, including, among other things" as "they do not [imply] that the defendant is accused of crimes not charged in the Indictment") (citations omitted); *see also United States* v. *Earls*, 2004 WL 350725, at *3 (S.D.N.Y. Feb. 25, 2004) (denying motion to strike broadening language where contested phrases did not have the impact "of raising speculation of uncharged crimes"); *United States* v. *Alvardo*, 2001 WL 1631396, at *9 (S.D.N.Y. Dec. 19, 2001) (denying motion to strike paragraphs which were "relevant to showing how the conspiracy was carried out").

       Applying these principles, the "broadening language" Shapiro cites in the identified paragraphs clearly falls in the category of language that relates to "the matter of proof to sustain the charges."  First, paragraphs 96 and 96(g) are included in the "Means and Methods of the Conspiracy" section.  The language in paragraph 96 refers explicitly to the "means and methods by which . . . [defendants] would and did carry out the objectives of the conspiracy." Paragraph 96(g) also contains broadening language in the context of describing the different means by which the conspiracy was carried out.  The remaining  paragraphs, while not included in the "Means and Methods" section, are clearly part of the description of how the conspiracy and the other charges were carried out and, therefore, should not be stricken.  *See, e.g.*, Indictment ¶ 32 ("Among the ways in which the conspirators sought to conceal the fact that

COBRA was tax-motivated, and was designed and implemented as a pre-planned series of steps, were the following:"); ¶ 58 ("In addition to developing the false cover story, the conspirators took other steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated and that it was designed, marketed and implemented as a pre-planned series of steps. Among other things: . . . "); ¶ 105 (describing the "various means" by which defendants committed, or aided and abetted the commission of, tax evasion).

  *United States* v. *Zeisel*, 1984 WL 502 (S.D.N.Y. June 19, 1984) is instructive on this issue. In that case, defendant was charged with committing mail fraud and moved to strike from the indictment multiple references to broadening language such as "among others," and "among other things." The court denied the motion noting the following:

> [I]t is significant to first note that this is a mail fraud prosecution in which the acts and actors who allegedly perpetrated the scheme to defraud are in a situation analogous to defendants charged with conspiracy. . . . The crime charged is mail fraud; the acts done in furtherance of the fraud include those specified in the indictment but those are not necessarily the only acts done in furtherance of the fraud. . . .The danger in proceeding on an indictment which contains surplusage is that the jury may be misled into inferring that the defendant is accused of crimes beyond those actually charged. There is no such danger in this case. The offenses charged are clear. The alleged acts making up those offenses and the persons who allegedly did those acts are merely summarized by the phrases 'among others,' 'among other things,' and 'known and unknown.' This form of summarization apparently reflects the belief on the part of the Grand Jury that the entire scheme in question was fraudulent.

*Id.,* at *2. Here, too, there is no danger that the jury will think Shapiro is accused of any crimes beyond those alleged in the Indictment. The "broadening language" is clearly used in the context of describing how the conspiracy to defraud the IRS and the substantive tax evasion charges were carried out.

Shapiro relies on *United States* v. *Pope*, 189 F. Supp. 12 (S.D.N.Y. 1960) to support his argument. *See* Shapiro Br. 28. That case is easily distinguished. In *Pope*, the court struck the phrase "among other things" from a number of counts, each of which alleged that defendants made false and misleading statements.[39] The court did so because it was concerned that the jury might think the defendant was being charged with false statements other than those identified by the grand jury and set forth in each of the relevant counts. *See Pope*, 189 F. Supp. at 25. Here, in the context of very different charges – conspiracy and tax evasion – the same concern does not exist. As described above, the challenged language is used to describe the different ways and means by which the defendants conspired to defraud the IRS or how they committed tax evasion.[40] In contrast to a false statement charge, where the specific false statements are typically identified by the grand jury, and any broadening language could possibly suggest that there were other false statements the defendant made, the charges at issue here do not raise the same concern. In that regard, it is important to note that there is no such "broadening language" in Counts Eight through Eleven of the Indictment – the charges of obstruction and false statements.[41]

---

[39]    By granting the motion to strike, the court was not foreclosing the government from presenting any evidence relevant to the charges at trial. *See Pope*, 189 F. Supp. at 26.

[40]    Judge Weinfeld, the judge who decided *Pope*, recognized this distinction. *See United States* v. *Mayo*, 230 F. Supp. 85, 86 (S.D.N.Y. 1964) (distinguishing *Pope,* where the challenged language was in the paragraph setting forth the false statement charge, from the indictment in *Mayo* where the language was in the means paragraph and could be equated "to overt acts in a conspiracy charge where the government is not required to set forth all the acts relied up on to effectuate the conspiracy").

[41]    In *United States* v. *DeFabritus*, 605 F. Supp. 1538 (S.D.N.Y. 1985), the second case cited by Shapiro, the court struck two references to "among other things," concluding without any significant analysis that the references would lead the jury "to draw

102

Because the "broadening language" Shapiro cites in his motion is used in the Indictment only to describe the ways in which the alleged conspiracy and substantive crimes of tax evasion were carried out, it does not create the risk the jury will think that Shapiro is accused of other crimes. Accordingly, the motion to strike the language should be denied.

### 3.    The Reference to "Attorneys and Other Professionals"

Paragraph 65 of the Indictment alleges that tax shelter clients and their advisors gave false and misleading testimony to the IRS and that while doing so, they were "[r]epresented by attorneys and professionals provided by E&Y." Shapiro asks that the reference to representation by attorneys and professionals be stricken asserting that it is irrelevant to the charges and that it is prejudicial because it suggests that the "attorneys and professional knew of or suborned this false testimony." Shapiro Br. 30.

This language is not at all prejudicial to Shapiro and his motion should be denied. The fact that other individuals may have represented clients who gave false testimony in furtherance of the conspiracy does not prejudice Shapiro, nor does it allow a jury to conclude that *Shapiro* was involved in other illegal activity.

In addition, Shapiro incorrectly states that the reference to attorneys and professionals is irrelevant to the charges. To the extent lawyers intentionally coached witnesses to lie during testimony before the IRS, those instructions are co-conspirator statements in

---

improper inferences regarding other crimes not charged in the indictment." *Id.* at 1547. The court based its conclusion on two cases from outside this district - one from the Northern District of Illinois and one from the Fifth Circuit, *see id.* – neither of which contained any analysis of whether the language at issue was part of a description of the "means" by which the crime was carried out, or part of the charge itself. Accordingly, *DeFabritus* is not convincing and should not be followed.

furtherance of the conspiracy and the Government may seek to introduce them at trial. Thus, Shapiro's conclusion regarding the relevance of the language should be rejected.[42]

### 4. The Use Of The Word "Purported" In Describing the CDS Trading Partnership

Finally, Shapiro moves to strike the word "purported" from paragraph 23(b) of the Indictment, which is part of the description of the CDS tax shelter. In describing CDS, the Indictment alleges that "[t]he CDS strategy was implemented through the creation of a limited partnership in which an entity characterized as an investment advisor was the general partner and E&Y's client was the limited partner." Indictment ¶ 23(a). The Indictment also alleges that the "documents created to execute the transaction described each partnership as a 'trading partnership,' and made no mention of the tax benefits, but instead stated that the partnership was 'organized to generate capital appreciation.'" *Id.* It is clear from the allegations in the Indictment that one of the aspects of CDS which contributed to its fraudulent nature is that the defendants and their co-conspirators tried to "make it appear that the 'trading partnership' was genuinely engaged in the 'business of trading for profit'," *id.* ¶ 23(c), but that, in fact, the true objective of the "trading partnership" was to trade only to preserve the client's capital, and not to earn a profit. *Id.*

In light of these allegations, and the obvious relevance of whether the CDS

---

[42] Alternatively, the Court should wait until after the Government's presentation of evidence at trial to see whether such evidence is admitted and, therefore, whether the language is relevant. If no such evidence is admitted, the Court can strike the language at that time. *See*, *e.g.*, *United States* v. *Wilson*, 493 F. Supp. 2d 364, 379 (E.D.N.Y. 2006) ("it is premature to rule on [the motion to strike] before the Government presents its evidence. If the Government furnishes evidence of the allegation that is admissible and relevant, the challenged references cannot be considered prejudicial surplusage.").

limited partnerships were genuine "trading partnerships," or only designed to look as though they were, the use of the term "purported" in describing the trading partnerships is appropriate and the word should not be stricken.   *See*, *e.g.*, *Stein*, 429 F. Supp. 2d at 647 (denying defendants' motion to strike terms such as "phony," "tax haven" and "concoct" used in connection with tax shelter allegations; "[w]hile defendants doubtless wish that the government had employed less colorful and prejudicial language, these terms are relevant to the conspiracy of which they stand accused"); *United States* v. *Ferguson*, 478 F. Supp. 2d 220, 235 (D. Conn. 2007) (in determining whether language is relevant for purposes of deciding whether it is surplusage,"[d]istrict courts within [the Second Circuit] have interpreted relevance to include language that explains the crimes charged"; denying motion to strike terms such as "sham," "fake" and "phony"); *United States* v. *Dolney*, 2005 WL 1076269, at *3-4 (E.D.N.Y. May 3, 2005) (denying motion to strike "thinly capitalized" from description of stocks employed in the conspiracy because the phrase was relevant to explaining how the conspiracy was able to function).

No doubt Shapiro would prefer a different indictment than the one under which he is charged — one that was sanitized perhaps to the point that it did not contain allegations of criminal conduct.  Shapiro's efforts to have the Court rewrite the Indictment should be rejected, and thus the motion to strike "surplusage" should be denied in its entirety.

## CONCLUSION

For the reasons stated above, the defendants' motions should be denied.

Dated:          New York, New York
                June 2, 2008

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney


                        By:    _____/S/_____
                                    LAUREN GOLDBERG
                                    MARSHALL A. CAMP
                                    Assistant United States Attorneys
                                    (212) 637-1040/1035

106