# EXHIBIT A

Westlaw.

6/20/02 NYT A1

NewsRoom

Page 1

6/20/02 N.Y. Times A1
2002 WLNR 4093129

New York Times (NY)
Copyright (c) 2002 The New York Times. All rights reserved.

June 20, 2002

Section: A

# Big Accounting Firm's Tax Plans Help the Wealthy Conceal Income

### DAVID CAY JOHNSTON

Some experts say some of techniques Ernst & Young accounting firm sells to wealthy Americans and their financial advisers to eliminate or sharply cut income taxes should not pass muster in audit and may amount to illegal tax evasion, not legal aggressive tax avoidance, because they hide transactions from Internal Revenue Service; techniques bring huge fees to firm and smaller amounts to lawyers who approve them and banks and currency traders who help execute them; other big accounting firms sell own tax avoidance techniques, including some shut down by Treasury as improper; table outlining technique; photo (M)

In private meetings with wealthy Americans and their financial advisers, the accounting firm Ernst & Young has for months been selling four techniques to eliminate or sharply reduce income taxes.

Ernst & Young says the techniques are legal and proper. But some experts on tax shelters say that at least one of them should not pass muster in an audit and that because the techniques hide transactions from the Internal Revenue Service, they may amount to tax evasion, which is illegal, rather than aggressive tax avoidance, which is legal.

Without these deals, the money would be taxed at rates from 18 to 38.6 percent. The savings are significant, and so are the profits for Ernst & Young and the law firms, banks and currency traders participating in the arrangements.

To use one of the firm's examples, someone selling a business for a $100 million profit on which there could be $20 million in federal capital gains taxes alone could instead pay only about $5 million.

And that money would go not to the government but to Ernst & Young, as a fee. Much smaller amounts would go to lawyers who blessed the techniques and to banks and currency traders who helped execute them.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In another example used by the firm, someone with a $20 million paycheck on which he would owe $7.7 million in federal income taxes -- typically, an executive, professional athlete or entertainer -- would delay the tax for 20 years, effectively reducing the tax to $1.4 million. The fee charged by Ernst & Young would be $1.2 million.

The other surviving Big Four accounting firms -- Deloitte & Touche, KPMG and PricewaterhouseCoopers -- sell their own techniques to reduce taxes for the wealthiest Americans. Some of the methods they sold in recent years have been identified by the Treasury as improper and were ordered shut down.

Rarely are the terms of such techniques made public. In this case, they were disclosed to The New York Times by a financial adviser whom Ernst & Young briefed on the techniques. The adviser declined to be identified because he had signed a confidentiality agreement with Ernst & Young.

The adviser said he was violating the agreement by giving the document to The Times because he was outraged about methods that were at best morally indefensible, in that they were designed to hide the transactions from I.R.S. auditors. The adviser said keeping the deals secret caused him trouble sleeping.

Essential to the Ernst & Young techniques are strategies that have the effect of hiding them from the I.R.S. They use different layers of partnerships, charitable trusts and a kind of business known as an S corporation so that nothing of the techniques shows up on the tax return of the individual who uses them.

This layering makes it highly unlikely that an I.R.S. audit, which is itself unlikely, would discover the deals, said Jerry Curnutt, a retired I.R.S. partnership expert. Only one in 142 tax returns of people making $100,000 or more is audited, but the audit rate for partnerships is just one in 400.

"Using partnerships is brilliant," said the financial adviser who attended a meeting this year where Ernst & Young explained the deal to his firm, whose clients include wealthy business owners.

"All the individual tax return would show is routine income and gain or loss from a partnership," he said. "You would have to have the most suspicious and thorough and intelligent auditor in the world to find this, and he would have to peel back several layers to find the real stuff."

In defending the techniques, Ernst & Young says at least one of them has been disclosed to the government and the government has not challenged it. Kenneth Kerrigan, a spokesman for the firm, said neither the Treasury nor the I.R.S., which it oversees, has moved to shut down that technique, which he cited as evidence of its validity.

Just because the Treasury has not acted is no reason for investors to take any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

comfort in the deal, said Pamela F. Olson, the administration's senior tax policy official. She said the Treasury was overwhelmed reviewing tax shelters that were disclosed in a brief amnesty earlier this year and has not come around to many of those like Ernst & Young's.

Sheldon Cohen, a former I.R.S. commissioner, said that if the transactions "depend on keeping them several steps away from the individual's tax return so they aren't discovered in an audit, then it's fraud."

It is impossible to determine how many people use or plan to use the techniques. Ernst & Young would not say.

The financial adviser who provided the Ernst & Young document said he had often been presented with financial products in three-ring binders or glossy brochures. But in this case the four deals were outlined on a single sheet of plain paper without the firm's logo.

Mr. Kerrigan of Ernst & Young said the techniques were on a photocopied sheet, rather than in a brochure, only as a cost-saving measure. He said financial advisers were required to sign confidentiality agreements because otherwise they could take the techniques and sell them on their own.

The document describes the four deals, the level of income needed for each, the value to the wealthy individual and Ernst & Young's fees or "pricing policy."

Ernst & Young's fee for arranging the deals amounts to 3 percent to 6 percent of the amount subject to tax, plus a fee of up to $50,000 for an opinion letter from a lawyer. These letters are used, if a deal is discovered in an audit and ruled impermissible, to win waiver of penalties that can equal 75 percent of the tax due.

The opinion letter for one of these deals asserts that it "should" pass muster in an audit, while the other three argue the much weaker case that, "more likely than not," the deals would survive an audit. In one case Ernst & Young's own lawyers provide the "more likely than not" opinion on the firm's own deal. Normally, a legal opinion is sought from someone with no financial interest in the transaction.

The techniques allow individuals to delay payment of taxes for years; turn salary income into capital gains, which are taxed at a lower rate; or take capital gains tax free.

One of the four Ernst & Young deals -- used by people who want to sell their businesses without paying taxes on the gain -- works this way:

The business owner contributes his company to an S corporation owned with another business, perhaps a bank that has losses from its credit card operations that are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

6/20/02 NYT A1                                                                                  Page 4

greater than it otherwise could use to offset profits.

For several years the business owner receives income from the S corporation instead of his business, and a report known as a K-1 showing this income is sent to the I.R.S., Mr. Kerrigan confirmed.

A related partnership, meanwhile, executes foreign currency transactions to generate a gain of $100 million and a loss of the same amount. The two foreign currency trades are then closed out, offsetting each other, so no money is gained or lost, but accounting records are created.

The bank takes this paper gain while the business owner takes the paper loss. The bank pays no taxes on this gain from the currency transactions because it has losses to offset the deal. The bank is compensated for its role in the technique.

The business owner takes the $100 million loss from currency trading, which, again, is only a bookkeeping entry because the currency trades canceled each other. But this artificial $100 million loss offsets the real $100 million gain that the business owner had on the sale of his company, which he had placed in the S corporation.

Showing these huge offsetting gains and losses on an individual income tax return would invite an audit, but these transactions are not reported there. Instead the currency trades are reported on a partnership return and only the final results appear on the business owner's personal tax return.

The business owner is issued a K-1 report showing no gain, even though he sold his business at a $100 million profit because the artificial loss in the currency trade offsets -- for bookkeeping purposes -- the actual gain on the sale of the business.

When the S corporation is closed, decades from now, the business owner then takes back in cash and securities the $100 million he contributed to the partnership in the form of his business. (The executive had access to that money long before this, principally through dividends and interest payments, on which he would owe taxes.)

On his personal tax return he reports not a taxable capital gain, the way he would have in an ordinary sale of his business, but instead a return of his capital from the S corporation, which is not taxable.

The firm provides a law firm's opinion that the deal is "more likely than not" to survive an audit. But a similar deal was examined last year by Lee Sheppard, a lawyer who critiques tax shelters in the weekly journal Tax Notes. Ms. Sheppard said she thought this technique failed on a number of grounds and would be rejected by the I.R.S. "assuming they can find it in an audit."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The second technique allows someone with a large profit from an investment, especially a single stock, to buy a diversified portfolio of securities and to delay payment of the tax for up to 20 years. Ernst & Young charges fees amounting to $900,000 on a $50 million profit.

A third technique is aimed at executives with stock options that produce a profit of at least $5 million. On a $5 million stock option profit an executive would owe $1.9 million in taxes, but if the tax is delayed for three decades, as this technique provides, it is the equivalent of paying about 8 cents on the tax dollar owed.

The fourth technique, requiring at least $20 million of income, allows an individual to have his salary taxed at capital gains rates, reducing the federal tax bill on $20 million, to $4 million from $7.7 million.

Photo: Jerry Curnutt, a retired I.R.S. partnership expert, said the technique of layering deals made it unlikely that an I.R.S. audit would discover them. (Jerry W. Hoefer for The New York Times)(pg. C8)

Chart: "'Solution No. 3'"
Following is one of four tax plans that Ernst & Young presented to wealthy clients:

DESCRIPTION
Defers ordinary income on the exercise of nonqualified stock options for up to 30 years through the sale of the options to (and subsequent exercise by) a family member or entity

CLIENT PROFILE
* Individual
* Minimum unrealized ordinary income spread/value of $5 million
* Transfer of options by sale permitted under the company's plan
* Long-term investment horizon

VALUE/BENEFIT
* Eliminates need for current payment of ordinary income tax on the option exercise
* Post-sale appreciation is taxed as capital gain
* Incorporates wealth transfer opportunity
* "More likely than not" opinion is provided by law firm

PRICING POLICY
Total fee is 3% of the transaction amount, with a minimum fee of $150,000, plus separate fee to law firm of $50,000 for tax opinion
(pg. C8)

---- INDEX REFERENCES ----

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

6/20/02 NYT A1                                                                  Page 6

COMPANY: PRICEWATERHOUSECOOPERS (ARGENTINA); PRICEWATERHOUSECOOPERS; DELOITTE AND TOUCHE (KENYA); DELOITTE AND TOUCHE (BAHRAIN); PRICEWATERHOUSECOOPERS (NICARAGUA); INTERNAL REVENUE SERVICE (IRS); DELOITTE AND TOUCHE (SOUTH AFRICA); PRICEWATER-HOUSECOOPERS (ROMANIA); PRICEWATERHOUSECOOPERS INC (NAMIBIA); PRICEWATERHOUSE-COOPERS (THAILAND); DELOITTE AND TOUCHE UGANDA; PRICEWATERHOUSECOOPERS LLP; KPMG (PANAMA); DELOITTE TOUCHE TOHMATSU; DELOITTE TOUCHE (CHILE); PRICEWATERHOUSE-COOPERS (BRAZIL); WHINNEY MURRAY AND CO; PRICEWATERHOUSECOOPERS (CROATIA); DE-LOITTE AND TOUCHE (LEBANON); PRICEWATERHOUSECOOPERS (EL SALVADOR); PRICEWATER-HOUSECOOPERS INTERNATIONAL LIMITED (CAMBODIA); PRICEWATERHOUSECOOPERS (DENMARK); PRICEWATERHOUSECOOPERS (COSTA RICA); PRICEWATERHOUSECOOPERS (MALTA); ERNST AND YOUNG (JORDAN); PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED (CYPRUS); PRICEWATER-HOUSECOOPERS (COLOMBIA); KPMG (VIETNAM); PRICEWATERHOUSECOOPERS (HUNGARY); PRICE-WATERHOUSECOOPERS (ARUBA); DELOITTE AND TOUCHE (BULGARIA); ERNST AND YOUNG (KENYA); ERNST AND YOUNG (PALESTINIAN TERRITORY); PRICEWATERHOUSECOOPERS (IVORY COAST); ERNST AND YOUNG (MALTA); ERNST AND YOUNG (ZIMBABWE); KPMG (IRELAND); DE-LOITTE AND TOUCHE (UKRAINE); PRICEWATERHOUSECOOPERS (HONG KONG); DELOITTE AND TOUCHE (GHANA); PRICEWATERHOUSECOOPERS (BULGARIA); DELOITTE AND TOUCHE (CYPRUS); PRICEWATERHOUSECOOPERS (BRUNEI); PRICEWATERHOUSECOOPERS (CAMEROON); KPMG (GAMBIA); PRICEWATERHOUSECOOPERS (BARBADOS); DELOITTE TOUCHE (PANAMA); DELOITTE TOUCHE (COSTA RICA); ERNST ET YOUNG (BELGIUM); DELOITTE AND TOUCHE (MALTA); KPMG (SIERRA LEONE); PRICEWATERHOUSECOOPERS (INDONESIA); PRICEWATERHOUSECOOPERS (MALAYSIA); ERNST AND YOUNG (BARBADOS); ERNST AND YOUNG (CHINA); ERNST YOUNG (COLOMBIA); PRICEWATERHOUSECOOPERS (CONGO DEMOCRATIC REPUBLIC); DELOITTE AND TOUCHE TANZANIA; PRICEWATERHOUSECOOPERS (SWITZERLAND); ERNST AND YOUNG (SYRIA); DELOITTE AND TOUCHE GAMBIA; DELOITTE; KPMG (TANZANIA); PRICEWATERHOUSECOOPERS (UKRAINE); PRICEWATER-HOUSECOOPERS (CHAD); PRICEWATERHOUSECOOPERS INC (SWAZILAND); PRICEWATERHOUSE-COOPERS INC (ZAMBIA); PRICEWATERHOUSECOOPERS (CONGO); DELOITTE AND TOUCHE (NETHERLANDS); PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED (TANZANIA); DELOITTE AND TOUCHE; DELOITTE AND TOUCHE (ZIMBABWE); DELOITTE AND TOUCHE (MALAWI); PRICEWA-TERHOUSECOOPERS INC (MAURITIUS); PRICEWATERHOUSECOOPERS INC (MALAWI); PRICEWATER-HOUSECOOPERS (TRINIDAD AND TOBAGO); PRICEWATERHOUSECOOPERS INC (BOTSWANA); PRICE-WATERHOUSECOOPERS (URUGUAY); PRICEWATERHOUSECOOPERS (SOUTH AFRICA); ERNST AND YOUNG (BERMUDA); PRICEWATERHOUSECOOPERS (PANAMA); ERNST AND YOUNG (LEBANON); ERNST AND YOUNG (BAHRAIN); PRICEWATERHOUSECOOPERS (GUATEMALA); PRICEWATERHOUSECOOPERS (CAPE VERDE); PRICEWATERHOUSECOOPERS INC (ZIMBABWE); ERNST AND YOUNG; KPMG; DE-LOITTE AND TOUCHE (BELIZE); ERNST ET YOUNG (IVORY COAST); PRICEWATERHOUSECOOPERS INC (UGANDA); KPMG (CHILE); PRICEWATERHOUSECOOPERS (JAMAICA); ERNST AND YOUNG SL; KPMG (COLOMBIA); PRICEWATERHOUSECOOPERS (PHILIPPINES); DELOITTE AND TOUCHE (RUSSIA); KPMG (BAHAMAS); PRICEWATERHOUSECOOPERS AUDIT (RUSSIA); PRICEWATERHOUSE-COOPERS SA; KPMG (COSTA RICA); DELOITTE AND TOUCHE (NAMIBIA); PRICEWATERHOUSE-COOPERS (SAINT LUCIA); KPMG (BOLIVIA); DELOITTE AND TOUCHE (BOTSWANA); PRICEWATER-HOUSECOOPERS (BELGIUM); ERNST YOUNG (ARGENTINA); DELOITTE AND TOUCHE (ZAMBIA); ERNST AND YOUNG LLP; MEADE MALONE AND CO

NEWS SUBJECT:   (Taxation (1TA10); Government (1GO80); Economics & Trade (1EC26))

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

6/20/02 NYT A1                                                                Page 7

```
INDUSTRY:  (Consulting Services (1CO47); Management Consulting (1MA79); Account-
ing, Consulting & Legal Services (1AC73); Business Services (1BU80); Accounting
Regulatory (1AC62); Accounting (1AC78))

Language:  EN

OTHER INDEXING:  (Johnston, David Cay)  (BIG ACCOUNTING FIRM; DELOITTE TOUCHE;
ERNST YOUNG; INTERNAL REVENUE SERVICE; KPMG; PRICEWATERHOUSECOOPERS; TREASURY)
(Essential; I.R.S.; Jerry Curnutt; Jerry W. Hoefer; Kenneth Kerrigan; Kerrigan;
Lee Sheppard; Pamela F. Olson; Rarely; Sheldon Cohen; Sheppard)  (Taxation; Tax
Evasion; Accounting and Accountants; Taxation)

COMPANY TERMS: ERNST AND YOUNG; INTERNAL REVENUE SERVICE

EDITION: Late Edition - Final

Word Count: 2174
6/20/02 NYT A1
END OF DOCUMENT
```

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                          NewsRoom

2/12/03 NYT C1                                                    Page 1

2/12/03 N.Y. Times C1
2003 WLNR 5228724

New York Times (NY)
Copyright (c) 2003 The New York Times. All rights reserved.

February 12, 2003

Section: C

For Sprint Chief, a Hard Fall From Grace

SIMON ROMERO

Critics say Sprint Corp's financial performance in recent years provides justification for board's decision to force ouster of chief executive William T Esrey and president Ronald LeMay, even if their tax shelters had not become targets of Internal Revenue Service inquiry; Sprint spokesman Bill White says Esrey will continue in his position until company succeeds in hiring Gary Forsee, vice chairman of BellSouth and chairman of its Cingular Wireless joint venture with SBC Communications; Esrey's career at Sprint discussed; chart; photos (M)

To hear the Sprint Corporation's board tell it, the fall from grace of its longtime chief executive, William T. Esrey, is the consequence of his having followed bad tax advice in handling stock options that Mr. Esrey and his No. 2, Ronald LeMay, received in 1999 and 2000.

But critics say that a look at Sprint's financial performance in recent years would provide enough justification for the board's forced ouster of Mr. Esrey and Mr. LeMay -- even if their tax shelters had not become the targets of an Internal Revenue Service inquiry.

Just last year, Sprint was able to dodge a liquidity crisis only by cutting 17,000 jobs, selling its cash-cow telephone-book publishing business and rolling its short-term debt into longer-maturing obligations. Those panicky moves, critics note, came after the company poured $2 billion into a high-speed Internet project, ION, only to scrap it in 2001, and after pulling out of Global One, its failed international venture with Deutsche Telekom and France Telecom.

"The results of Sprint's overall strategy have been very discouraging," said Drake Johnstone, a telecommunications analyst at Davenport & Company. "It's still hard to see where any significant growth at Sprint will come from."

Mr. Esrey declined requests for an interview.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2/12/03 NYT C1                                                                                              Page 2

Bill White, a spokesman for Sprint, which is based in Overland Park, Kan., said yesterday that Mr. Esrey would continue in his position until the company succeeds in hiring Gary Forsee, the vice chairman of BellSouth and chairman of its Cingular Wireless joint venture with SBC Communications. Lawsuits by BellSouth and Cingular seeking to block Mr. Forsee's move to Sprint were sent into arbitration this week by an Atlanta judge.

Mr. Esrey's downfall stands out from the epic descents of some other noted telecommunications executives who rode the industry boom of the late 1990's, only to leave under financial clouds -- most notably Gary Winnick of Global Crossing and Bernard J. Ebbers of WorldCom. Unlike them, Mr. Esrey was no telephone industry upstart; he is the longest serving chief executive of any major telecommunications company.

Indeed, telecommunications was in the very genes of Mr. Esrey, who grew up in Greenwich, Conn., and Kansas City, Mo., as the son of a high-ranking AT&T executive. His first job after graduating from Harvard Business School in 1964 was working as a manager for AT&T, heading his own unit in New York by age 28.

And after a run as an investment banker during the 1970's, Mr. Esrey returned to the telephone industry in 1980 as an executive vice president of Sprint's predecessor company, United Telecommunications, in Westwood, Kan.

United Telecommunications was a relatively staid Midwestern utility with 19th-century Kansas roots. But Mr. Esrey set out to transform it into a global communications powerhouse with operations in the local and long-distance telephone businesses and, eventually, the wireless industry, as well.

Sprint has never risen beyond a distant No. 3 in the long-distance market and has never turned a profit in wireless service, where it currently ranks in fourth place. Still, during the telecommunications boom of the late 1990's it did look as if Mr. Esrey's leadership might pay off when he announced a plan in 1999 to merge Sprint with WorldCom, potentially creating one of the world's largest telecommunications companies.

But that merger plan foundered on regulatory opposition. And it now appears that the attempted WorldCom deal was the beginning of a decline for both Mr. Esrey and his company.

Mr. Esrey, 62, is embroiled in a dispute with the I.R.S. over a tax shelter he purchased from Ernst & Young to avoid paying taxes on more than $100 million in gains on stock options that the board granted him when it still looked as if the WorldCom deal would be completed.

Since the WorldCom deal unraveled nearly three years ago, Mr. Esrey has repeatedly tried to convince investors of Sprint's potential to succeed as a unified standalone company. But these efforts have largely stalled as Sprint struggled with the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

industrywide malaise and also the company's own apparent lack of a true recovery plan. Before the sale of the company's telephone directory business last summer to R. H. Donnelly for $2.2 billion, it seemed plausible that Sprint might lose the creditworthiness it had attained during its ascent.

Even Mr. Esrey's critics acknowledge that his recent rounds of chemotherapy for lymphoma -- a disease he says is now in remission -- have probably forced him to rely largely on Mr. LeMay to run Sprint since last fall. But they nonetheless fault Mr. Esrey for corporate problems that they say were years in the making, and for failed ambitions that they say give his current crisis almost Shakespearean overtones.

"Lear's mistake, as I recall, was to divide the kingdom in three parts," said Reed E. Hundt, a former chairman of the Federal Communications Commission who is now senior adviser on information technologies at McKinsey & Company. "Bill Esrey, on the other hand, was wrong not to have divided local, long distance and wireless a long time ago. That's a strategy issue."

In a memo to Sprint's 72,000 employees last week, Mr. Esrey alluded to his I.R.S. problems and said that an unfavorable ruling by the government could wipe him out financially, because the current value of his Sprint stock would not cover his tax liability.

Many investors could probably understand his pain. Since reaching a high of $75.50 in November 1999, Sprint's shares have fallen to a closing price yesterday of $12.39, up 9 cents for the day. Shares of the separate stock for Sprint PCS, which track performance of the company's wireless operations, have fallen from a high of $65.50 in March 2000 to a closing price yesterday of $3.80, down 20 cents for the day.

Like other large telephone companies, Sprint faces an array of challenges, like the growing market share of Internet-based calling systems and the cannibalization of fixed-line local and long-distance services by wireless networks -- which in Sprint's case includes its own Sprint PCS unit. The company's local access lines declined by 1.7 percent in 2002. And total sales at Sprint's nonwireless local and long-distance operations fell 7.3 percent last year, to $15.2 billion, compared with $16.4 billion the previous year.

The decline is particularly acute in long distance, where competition has stiffened with the entry of large local phone companies like BellSouth. The nation's biggest local phone company, Verizon Communications, said last month that its fledgling long-distance business had surpassed Sprint to become the nation's third-largest provider of long-distance service as measured by the number of households served.

But it is the problems of Sprint's own making that analysts see as the most potentially troubling. The decision to spin off the shares of Sprint PCS in 1998 as a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

separate tracking stock has come under particularly heavy criticism, because the shares have fared no better than Sprint's main stock. The wireless business continues to lose money, even as competitors like Verizon Wireless and AT&T Wireless have recently reported stronger results and have added more customers than Sprint PCS.

Although analysts see few prospects for strong growth at Sprint, the company insists that it is poised for a rebound whenever the telecommunications industry pulls out of its recession.

"We've taken the steps we needed to take to stabilize our business in the view of our investors," said Kurt Fawkes, Sprint's vice president for investor relations. "Last year at this time we were perceived by some to have a liquidity problem on our hands. That perception isn't there anymore."

Mr. Fawkes also said Sprint expected its wireless unit to become profitable in 2004 after the operation's new management addresses problems with late-paying customers and service quality.

For Mr. Esrey, ending his Sprint career under the current circumstances will be a gloomy final chapter in what had long seemed an executive success story.

By 1985, Mr. Esrey had risen to become United Telecommunication's chief executive at a time when the breakup of AT&T had stimulated new competition and new technologies like cellphones, digital switching system and the fiber optic transmission of voice and data calls.

Mr. Esrey led the company through a series of mergers and spinoffs that eventually formed Sprint, as the company was renamed in 1992. As it grew, Sprint became a powerful symbol of the close-knit and conservative business community of Kansas City. Overland Park is a suburb of Kansas City.

Its board counts among its members Irvine O. Hockaday, the former chief executive of Hallmark Cards, another large Kansas City company. Mr. Esrey, who is a neighbor of Mr. Hockaday in Mission Hills, Kan., appeared to relish the rewards related to his leadership of Sprint.

A competitive executive with a penchant for daily workouts and helicopter skiing, Mr. Esrey acquired a ski house and part of a sizable ranch near Vail, Colo. He has attended Bohemian Grove, the all-male summer retreat for executives and politicians in Sonoma County, Calif.

Respected as he was during his long career at Sprint, it remains to be seen how Mr. Esrey's departure will be register among the people who have worked for him -- many of whom have lost their own jobs and have seen the collapse of their own Sprint shares.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"Bill was an incredibly demanding superior," said Richard P. Nespola, a former Sprint executive who is now chief executive of the Management Network Group, a communications consulting company in Overland Park. "Given what he has done at Sprint, it's a tragedy what has happened to him."

Photos: William T. Esrey, standing, with Paul H. Henson, the chairman of United Telecommunications, in 1984.; Mr. Esrey with Bernard J. Ebbers, chief executive of WorldCom, in 1999. (pg. C1); Bernard J. Ebbers, left, of WorldCom and William T. Esrey of Sprint testified at a Senate hearing in 1999 on their companies' plan to merge. (Associated Press)(pg. C2)

Chart:
Like the company's stock price, William T. Esrey's career at Sprint had a long steady run, a sudden soaring and a dramatic collapse.

1980 -- Mr. Esrey joins United Telecommunications in Westwood, Kan., as executive vice president.

1985 -- Named the chief executive of United Telecommunications.

1985 -- United buys 50 percent of GTE Sprint.

1988 -- United Telecom buys controlling stake in GTE Sprint from GTE.

1992 -- Company changes name to Sprint, emerges as nation's third-largest long-distance carrier after AT&T and MCI.

1999 -- WorldCom, which merged with MCI in 1998, agrees to merge with Sprint.

2000 -- WorldCom's merger with Sprint is overruled by regulators.

2002 -- Sprint sells directories business in September for $2.2 billion, easing credit concerns.

2002 -- Sprint announces in November that Mr. Esrey has cancer of the lymphatic system.

2003 -- Sprint's board asks Mr. Esrey to step down over concerns about a tax shelter he obtained from Ernst & Young. Mr. Esrey says he could be financially ruined.

Graph tracks the monthly closing price of Sprint shares from 1985 to 2002.

(Source: Bloomberg Financial Markets [stock price])(pg. C1)

---- INDEX REFERENCES ----

COMPANY: DIGICEL BERMUDA; VERIZON WIRELESS; INTERNAL REVENUE SERVICE (IRS); CAROLINA TELEPHONE AND TELEGRAPH CO; MANAGEMENT NETWORK GROUP INC (THE); WHINNEY MURRAY AND CO; WORLDCOM; CINGULAR WIRELESS LLC; SPRINT CORP; MOTOR COACH INDUSTRIES

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

INTERNATIONAL INC; ERNST AND YOUNG (BERMUDA); DEUTSCHE TELEKOM ADR; ERNST AND YOUNG (LEBANON); MARSK CONTAINER INDUSTRI AS; ERNST AND YOUNG (BAHRAIN); ERNST AND YOUNG (JORDAN); HARVARD BUSINESS SCHOOL; ERNST AND YOUNG; UNITED TELECOMMUNICATIONS INC; DEUTSCHE TELECOM NETWORK PROJECTS AND SERVICES GMBH; FRANCE TELECOM; ION; ERNST ET YOUNG (IVORY COAST); GLOBAL CROSSING LTD; AT&T INC; ERNST AND YOUNG (KENYA); ERNST AND YOUNG SL; ERNST AND YOUNG (MALTA); ERNST AND YOUNG (ZIMBABWE); CENTRAL TELEPHONE CO OF VIRGINIA; BELLSOUTH CORP; DEUTSCHE TELEKOM AG; CENTEL CORP; HALLMARK CARDS HOLDINGS LTD; ERNST ET YOUNG (BELGIUM); VERIZON COMMUNICATIONS INC; MCI INC; ERNST AND YOUNG (BARBADOS); ERNST AND YOUNG (CHINA); ERNST YOUNG (COLOMBIA); FEDERAL COMMUNICATIONS COMMISSION; VERIZON WIRELESS INC; ERNST YOUNG (ARGENTINA); ERNST AND YOUNG (SYRIA); BELLSOUTH; GLOBAL CROSSING; ERNST AND YOUNG LLP; CELLCO PARTNERSHIP; SPRINT NEXTEL CORP; MCI LLC

NEWS SUBJECT:  (Corporate Financial Data (1XO59); HR & Labor Management (1HR87); Joint Ventures (1JO05); Business Management (1BU42); Taxation (1TA10); Mergers & Acquisitions (1ME39); Major Corporations (1MA93); Corporate Groups & Ownership (1XO09))

INDUSTRY:  (Telecom Carriers & Operators (1TE56); Traditional Media (1TR30); Directories & Yellow Pages (1DI08); Internet (1IN27); Manufacturing (1MA74); Emerging Internet Business Applications (1EM61); Long-Distance Services (1LO42); Telecom (1TE27); Accounting, Consulting & Legal Services (1AC73); Yellow Pages, White Pages & Directory Publishing (1YE19); Publishing (1PU26); Telecom Services (1TE09))

REGION:  (Kansas (1KA13); Americas (1AM92); North America (1NO39); USA (1US73))

Language:  EN

OTHER INDEXING:  (Esrey, William T; Lemay, Ronald T; White, Bill; Forsee, Gary; Romero, Simon)  (BELLSOUTH; CINGULAR; CINGULAR WIRELESS; DAVENPORT CO; DEUTSCHE TELEKOM; ERNST YOUNG; ESREY; FEDERAL COMMUNICATIONS COMMISSION; FRANCE TELECOM; GLOBAL CROSSING; GTE SPRINT; HALLMARK CARDS; HARVARD BUSINESS SCHOOL; INTERNAL REVENUE SERVICE; ION; LEAR; MANAGEMENT NETWORK GROUP; MCI; SBC COMMUNICATIONS; SENATE; SPRINT; SPRINT CHIEF; SPRINT CORP; UNITED; UNITED TELECOM; UNITED TELECOMMUNICATION; UNITED TELECOMMUNICATIONS; VERIZON COMMUNICATIONS; VERIZON WIRELESS; WIRELESS; WORLDCOM)  (1985; Bernard J. Ebbers; Bill; Bill Esrey; Bill White; Bohemian Grove; C1; Drake Johnstone; Esrey; Fawkes; Forsee; Gary Forsee; Gary Winnick; GTE Sprint.; Hockaday; Irvine O. Hockaday; Kurt Fawkes; LeMay; Paul H. Henson; R. H. Donnelly; Reed E. Hundt; Richard P. Nespola; Ronald LeMay; United Telecommunications; William T. Esrey)  (Biographical Information; Suspensions, Dismissals and Resignations; Taxation; Tax Shelters)

COMPANY TERMS: SPRINT CORP; INTERNAL REVENUE SERVICE; BELLSOUTH CORP; SPRINT CORP; CINGULAR WIRELESS; SBC COMMUNICATIONS

EDITION: Late Edition - Final

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

```
Word Count: 2239
2/12/03 NYT C1
END OF DOCUMENT
```

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.                                                                    NewsRoom

11/19/03 NYT C3                                                              Page 1

11/19/03 N.Y. Times C3
2003 WLNR 4643660

New York Times (NY)
Copyright (c) 2003 The New York Times. All rights reserved.

November 19, 2003

Section: C

Skeptical Hearing for Audit Firm

DAVID CAY JOHNSTON

KPMG senior partners tell Senate panel that firm no longer sells aggressive tax shelters, but their answers to questions fail to persuade Sen Carl Levin, who during questioning wondered whether he would 'ever get an honest answer' from firm; KPMG and other often charged multimillion-dollar fees for shelters but risked penalties of no more than $10,000 if Internal Revenue Service uncovered them and determined they were illegal; Senate panel chairman Norm Coleman comments; KPMG collected $124 million in fees from 1997 through 2001 for shelters that cost government at least $1.4 billion in lost revenue; Coleman and Levin appear to accept at face value testimony by PricewaterhouseCoopers and Ernst & Young (M)

WASHINGTON, Nov. 18 Senior partners of the KPMG accounting firm told a Senate panel on Tuesday that the firm no longer sells aggressive tax shelters, but their answers to questions failed to persuade Senator Carl Levin, who during three hours of questioning wondered aloud whether he would "ever get an honest answer" from the firm.

KPMG and others often charged multimillion-dollar fees for shelters but risked penalties of no more than $10,000 if the Internal Revenue Service uncovered them and determined they were illegal. Senator Norm Coleman, the Minnesota Republican who is chairman of the panel, the Senate Permanent Subcommittee on Investigations, said that "ethical standards of the legal and accounting profession have been pushed, prodded, bent and, in some cases, broken, for enormous monetary gain."

KPMG collected $124 million in fees from 1997 through 2001 for shelters that cost the government at least $1.4 billion in lost revenue, a report by the subcommittee's minority staff members estimated.

Mr. Coleman and Mr. Levin appeared to accept at face value testimony by two large accounting firms, PricewaterhouseCoopers and Ernst & Young, that they had gotten out of the tax shelter business and regretted their involvement.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

11/19/03 NYT C3  Page 2

But KPMG's assertions that it has changed its culture and stopped selling aggressive tax shelters were met with skepticism by both senators.

Mark Watson, a former KPMG technical tax advice partner, repeatedly wrote e-mail messages denouncing several tax shelters as improper, only to be rebuffed by those above him. One e-mail message in 1999 said KPMG used "stealth reporting" on tax returns to deceive the I.R.S. while another warned that "we are filing misleading, and perhaps false" tax returns for clients.

Jeffrey Eischied, a supervising partner in the tax shelter unit who received the e-mail messages, was asked why KPMG sold products whose sole purpose was to avoid taxes, which makes them invalid.

"I certainly viewed them as investment strategies that" also had tax avoidance properties, Mr. Eischied said, describing the legal standard for a lawful tax shelter.

Mr. Levin, Democrat of Michigan, read from a series of documents that mentioned only tax avoidance, including a memorandum from the Swiss bank UBS that said "the principal design of this scheme is to generate significant capital losses for U.S. taxpayers" so they can earn capital gains tax free. Other documents called any chance of profit "remote" and contingent on earning a 240 percent return in a few months.

Mr. Eischied said he was not responsible for various documents, including a long written presentation by a "champion" seller of KPMG tax shelters titled "generating capital losses."

Mr. Levin then showed Mr. Eischied e-mail messages he had written. One said a KPMG tax shelter was "designed to mitigate an individual's income" and gift and estate taxes. Mr. Eischied also tried to disavow that document.

"Did you write 'designed,' yes or no?" Mr. Levin asked after trying other versions of the question.

"As I previously testified, that is one of the attributes" of the tax shelter products, Mr. Eischied replied, the stress in his voice growing with each answer along with the time he took before answering.

"Do you see anything about investment attributes in your memo?" Mr. Levin asked, adding that "you can't blame this" e-mail message on anyone else. Mr. Eischied then suggested that the senator was reading his memo "somewhat out of context."

Mr. Levin rephrased his question, pressing for an admission that KPMG based its fees on taxes avoided and not investment returns.

The large Senate hearing room fell silent. Finally, Mr. Eischied volunteered that he had not answered immediately because "I don't know how to change my answer."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

11/19/03 NYT C3                                                              Page 3

Mr. Levin suggested that the partner "try an honest answer."

The senator continued to press for admissions and Mr. Eischied testified in various ways that "I don't believe we looked at our fee" as a share of taxes saved.

Another witness, Prof. Calvin Johnson of the University of Texas law school, said that "tax shelters have done real damage to the tax system" and allowed many taxpayers who should pay income taxes of 35 percent to pay 10 percent.

"There is an awful lot of money to be made beating the I.R.S., which is increasingly perceived as a paper tiger," Professor Johnson said. He said the accounting firms "realize the degree of righteous anger of investors" over both tax shelters and manipulated financial statements at some publicly traded companies.

He warned that failure to protect the tax base from predators in the accounting, legal and banking industries could mean the end of the United States. "The tax base is sacred," he said. "Countries decline and disappear when they lose their tax base."

Professor Johnson called for Congress to break up the accounting firms into separate businesses, one to audit companies and another to sell other services and products. "This selling of sleazy tax shelters is utterly irreconcilable with their cop function" as auditors, he said.

The day's final witness, KPMG's vice chairman for tax services, Richard H. Smith Jr., testified that when he took his post in April 2002, he shut down KPMG's two major tax shelter units. Mr. Levin then produced documents that cast doubt on this, including KPMG's own organization chart issued months later. After parrying with Mr. Levin, Mr. Smith said KPMG had not given the committee the most recent documents.

Mr. Levin did extract one acknowledgment from Mr. Smith. It appeared to contradict the company's position in civil suits brought by clients whose tax shelters were demolished by the I.R.S., to whom KPMG has insisted that it never sold anything but advice.

After Mr. Levin asked the question at least six different ways, Mr. Smith admitted that KPMG had sold tax products, as shelters are known in the industry.

The admission came after Mr. Smith was given a stack of paper that was withheld from the public record because KPMG said its contents were proprietary.

Mr. Smith later described them as "a list of ideas" for clients. Mr. Levin's aides said those ideas were the 500 tax products that KPMG continued to sell.

---- INDEX REFERENCES ----

COMPANY: PRICEWATERHOUSECOOPERS (ARGENTINA); PRICEWATERHOUSECOOPERS; PRICEWATER-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

HOUSECOOPERS (UKRAINE); PRICEWATERHOUSECOOPERS (CHAD); PRICEWATERHOUSECOOPERS INC (SWAZILAND); PRICEWATERHOUSECOOPERS INC (ZAMBIA); PRICEWATERHOUSECOOPERS (CONGO); PRICEWATERHOUSECOOPERS (NICARAGUA); PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED (TANZANIA); INTERNAL REVENUE SERVICE (IRS); PRICEWATERHOUSECOOPERS (ROMANIA); PRICEWATERHOUSECOOPERS INC (NAMIBIA); PRICEWATERHOUSECOOPERS (THAILAND); PRICEWATERHOUSECOOPERS INC (MAURITIUS); PRICEWATERHOUSECOOPERS LLP; KPMG (PANAMA); PRICEWATERHOUSECOOPERS INC (MALAWI); WHINNEY MURRAY AND CO; PRICEWATERHOUSECOOPERS (BRAZIL); PRICEWATERHOUSECOOPERS (TRINIDAD AND TOBAGO); PRICEWATERHOUSECOOPERS INC (BOTSWANA); PRICEWATERHOUSECOOPERS (CROATIA); PRICEWATERHOUSECOOPERS (EL SALVADOR); PRICEWATERHOUSECOOPERS (URUGUAY); PRICEWATERHOUSECOOPERS (SOUTH AFRICA); PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED (CAMBODIA); ERNST AND YOUNG (BERMUDA); PRICEWATERHOUSECOOPERS (DENMARK); PRICEWATERHOUSECOOPERS (PANAMA); PRICEWATERHOUSECOOPERS (COSTA RICA); ERNST AND YOUNG (LEBANON); PRICEWATERHOUSECOOPERS (MALTA); ERNST AND YOUNG (BAHRAIN); PRICEWATERHOUSECOOPERS (GUATEMALA); PRICEWATERHOUSECOOPERS (CAPE VERDE); ERNST AND YOUNG (JORDAN); PRICEWATERHOUSECOOPERS INC (ZIMBABWE); PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED (CYPRUS); ERNST AND YOUNG; PRICEWATERHOUSECOOPERS (COLOMBIA); KPMG; KPMG (VIETNAM); ERNST ET YOUNG (IVORY COAST); PRICEWATERHOUSECOOPERS (HUNGARY); PRICEWATERHOUSECOOPERS (ARUBA); PRICEWATERHOUSECOOPERS INC (UGANDA); KPMG (CHILE); PRICEWATERHOUSECOOPERS (JAMAICA); ERNST AND YOUNG SL; ERNST AND YOUNG (KENYA); ERNST AND YOUNG (PALESTINIAN TERRITORY); PRICEWATERHOUSECOOPERS (IVORY COAST); KPMG (COLOMBIA); PRICEWATERHOUSECOOPERS (PHILIPPINES); ERNST AND YOUNG (ZIMBABWE); ERNST AND YOUNG (MALTA); KPMG (IRELAND); KPMG (BAHAMAS); PRICEWATERHOUSECOOPERS (HONG KONG); PRICEWATERHOUSECOOPERS (BULGARIA); PRICEWATERHOUSECOOPERS AUDIT (RUSSIA); PRICEWATERHOUSECOOPERS SA; KPMG (COSTA RICA); WOLVERINE WORLD WIDE INC; PRICEWATERHOUSECOOPERS (BRUNEI); PRICEWATERHOUSECOOPERS (CAMEROON); KPMG (GAMBIA); PRICEWATERHOUSECOOPERS (BARBADOS); PRICEWATERHOUSECOOPERS (SAINT LUCIA); ERNST ET YOUNG (BELGIUM); KPMG (SIERRA LEONE); KPMG (BOLIVIA); PRICEWATERHOUSECOOPERS (INDONESIA); ERNST AND YOUNG (BARBADOS); PRICEWATERHOUSECOOPERS (MALAYSIA); ERNST YOUNG (COLOMBIA); ERNST AND YOUNG (CHINA); PRICEWATERHOUSECOOPERS (BELGIUM); PRICEWATERHOUSECOOPERS (CONGO DEMOCRATIC REPUBLIC); PRICEWATERHOUSECOOPERS (SWITZERLAND); ERNST YOUNG (ARGENTINA); ERNST AND YOUNG (SYRIA); ERNST AND YOUNG LLP; KPMG (TANZANIA); MEADE MALONE AND CO

NEWS SUBJECT:   (Taxation (1TA10); Government (1GO80))

INDUSTRY:  (Consulting Services (1CO47); Management Consulting (1MA79); Accounting, Consulting & Legal Services (1AC73); Business Services (1BU80); Accounting (1AC78))

REGION:   (USA (1US73); Americas (1AM92); North America (1NO39))

Language:   EN

OTHER INDEXING:   (Johnston, David Cay; Levin, Carl (Sen))  (COLEMAN; ERNST YOUNG; INTERNAL REVENUE SERVICE; KPMG; MINNESOTA REPUBLICAN; PRICEWATERHOUSECOOPERS; REV-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

11/19/03 NYT C3                                                                 Page 5


```
ENUE; SENATE; SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; UNIVERSITY OF
TEXAS)  (Calvin Johnson; Carl Levin; Coleman; Countries; Eischied; Jeffrey Eis-
chied; Johnson; Levin; Mark Watson; Norm Coleman; Richard H. Smith Jr.; Sen Carl
Levin; Smith)  (Taxation; Accounting and Accountants; Tax Shelters; Tax Evasion;
Prices (Fares, Fees and Rates); Taxation)

COMPANY TERMS: KPMG; INTERNAL REVENUE SERVICE; PRICEWATERHOUSECOOPERS; ERNST AND
YOUNG

EDITION: Late Edition - Final

Word Count: 1234
11/19/03 NYT C3
END OF DOCUMENT
```

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.