# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 05 Cr. 390 (SHS)

JOSEPH BONGIORNO, et al.,

Defendants.

------------------------------x

February 7, 2006
3:40 p.m.

Before:

HON. SIDNEY H. STEIN,

District Judge

APPEARANCES

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
BY: ANTHONY BARKOW
Assistant United States Attorney

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
Attorneys for Defendant Joseph Bongiorno
BY: BARRY H. BERKE

STILLMAN & FRIEDMAN
Attorneys for Defendant Patrick McGagh
BY: MARJORIE PEERCE
KARIN ORENSTEIN

KRONISH LIEB WEINER & HELLMAN L.L.P.
Attorneys for Defendant Michael Hayward
BY: JONATHAN PAUL BACH

APPEARANCES CONTINUED

CLIFFORD CHANCE US, LLP
Attorneys for Defendant Michael Stern
BY: DAVID MEISTER

SERCARZ & RIOPELLE, L.L.P.
Attorneys for Defendant Richard Volpe
BY: MAURICE H. SERCARZ

ROLAND GUSTAF RIOPELLE

MAYER, BROWN, ROWE & MAW, LLP
Attorneys for Defendant Robert Scavone
BY: ANDREW H. SCHAPIRO

ROPES & GRAY LLP
Attorneys for Defendant Gerard Hayes
BY: JASON BROWN

oOo

(Defendants not present)

THE CLERK: United States v. Joseph Bongiorno, et al., 05 Cr. 390.

Counsel, please state your names for the record.

MR. BARKOW: Good afternoon, your Honor. Anthony Barkow on behalf of the United States.

MR. BERKE: Good afternoon, your Honor. Barry Berke, of Kramer and Levin, on behalf of Mr. Bongiorno.

MR. SCHAPIRO: Andy Schapiro, from Mayer, Brown, for Robert Scavone.

MR. BACH: Jonathan Bach, from Kronish Lieb, for Michael Hayward.

MR. MEISTER: David Meister, Clifford Chance, for Michael Stern.

MR. BROWN: Jason Brown, from Ropes & Gray, for Gerard Hayes.

MR. SERCARZ: Maurice Sercarz and Roland Riopelle for Richard Volpe.

MS. PEERCE: Margie Peerce, from Stillman & Friedman, for Patrick McGagh.

THE COURT: Good afternoon to all of you. Please be seated.

I take it that all of you are waiving your clients' appearances today and that your clients are aware of all of that. Is there anyone who -- rather than all of you saying

yes, yes, yes, yes, yes, is there anyone who disagrees with that?

(Pause)

All right.

I have reviewed the extensive papers filed on the two motions, that is, the Rule 16 motion for discovery filed by the defendants and the subsequent motion for a bill of particulars filed by defendants. I also have been reading the materials that you have been sending me in the past few days in regard to Judge Chin's thinking and Judge Baer and Judge Castel. It is always helpful to see what my colleagues are doing. I am prepared to rule on the outstanding motions. Unless there is anything that any of the parties wanted to tell me that's happened in terms of your discussions with each other, anything else that I should be aware of?

(Pause)

All right. Defendants have moved pursuant to Rule 16 to compel the government to produce four different areas of documents. One is the display book screenshots for every alleged violation from October 1, 2002 as well as for other trades made by defendants. The second group is SEC materials concerning trading ahead and interpositioning. The third are the New York Stock Exchange documents concerning the definition and identification of intentional trading ahead and interpositioning; and the fourth is the number of alleged

trading ahead and interpositioning violations by specialists in similarly busy stocks.

That's on the Rule 16 motion, and as I said, there is a separate motion for a bill of particulars.

Let's do it one by one.

The Stock Exchange has assembled at the government's request screenshots of what appeared on defendants' display books while they engaged in some of the trades at issue. The government asserts that each set of screenshots shows exactly what transpired on a specialist's display book during the course of an allegedly improper trade, and the government has turned over to the defense approximately 30 sets of screenshots per defendant which everyone agrees are a small fraction of the allegedly illegal activity that's charged here.

Pursuant to Rule 16, the defendants seek screenshots for all of the remaining alleged violations charged in the Indictment for which the Stock Exchange still has data. They seek the underlying data used to produce the screenshots, the software used to generate the screenshots, and screenshots for relevant trades material to the defense other than those identified in the Indictment.

Rule 16, you all know, applies to items that are in the possession, custody or control of the government. The screenshots themselves are not in the government's custody or control but, rather, are in the Stock Exchange's.

Specifically, as far as I understand it, the requested screenshots actually don't currently exist but the data that can be used to generate them does, as well as the proprietary software that's needed in order to generate them. All of that is in the custody and control of the New York Stock Exchange.

The question, then, is whether "the government" in Rule 16 can incorporate the New York Stock Exchange. The

Second Circuit has not defined "the government" for purposes of Rule 16. A leading case is United States v. Giffen, 379 F.Supp.2d 337, 343 (S.D.N.Y. 2004). The government asserts that there has to be a joint investigation between the government and the third party here, the New York Stock Exchange, in order for Rule 16 obligations to apply to the government. See United States v. Volpe, 42 F.Supp.2d 204 at 221, and United States v. Upton, 856 F.Supp. 727 at 749-50, United States v. Guerrerio, 670 F.Supp. 1215 (S.D.N.Y. 1987).

The case law supports the defendants' position that Rule 16 applies to more than just joint investigations, and cases outside the Second Circuit also suggest that Rule 16 extends beyond joint investigations. See United States v. Santiago, 46 F.3d 885, 894 (9th Cir. 1995), United States v. Trevino, 556 F.2d 1265 at 1272 (5th Cir. 1977). The case law supports the position that Rule 16 applies to more than joint investigations.

Here we know there was no joint investigation between

the government and the New York Stock Exchange. No Stock Exchange personnel participated in or attended any witness interview conducted by the government. The Stock Exchange was not involved in the government's charging decisions, and the Stock Exchange and the FBI agents did not work together, according to the information. I note that Judges Baer and Chin relied on those facts in determining that there was no joint investigation between the Stock Exchange and the prosecution. See United States v. Foley and United States v. Delaney and United States v. Finnerty and United States v. Murphy.

The question under these cases is whether the government has access to the screenshots. Interpreting "access" as defined in Webster's Third New International Dictionary is "permission, liberty or ability to enter, approach, communicate with or pass to and from." The government doesn't have the permission, liberty or ability to make use of the screenshot data without the compliance and agreement of the New York Stock Exchange. If the government absent a court order went to the Stock Exchange and asked that it produce the numerous screenshots requested by the defendants, the Stock Exchange certainly would be within its rights to refuse to do so. In this way, the relationship between the government and the Stock Exchange is similar to that between the state and federal officials in United States v. Chavez-Vernaza, 844 F.2d 1368 (9th Cir. 1987).

I therefore conclude that the government does not as a legal matter have access to the screenshots. I therefore am denying defendants' first discovery request because under the applicable standard the screenshots do not fall within the parameters of Rule 16.

Now, that leaves the Rule 17 analysis. I have no subpoena before me, and I'm not going to rule on what would have happened if there were any such subpoena. The standards there would be different.

I can say that based on what I know so far, it strikes

me that the burden on the New York Stock Exchange in generating these screenshots, if there were such a Rule 17 subpoena, would be extremely high. Again, I repeat, I don't have a subpoena in front of me, there is no motion to quash the subpoena, but I wanted to give you a heads up on the Rule 17 issue as I see it now.

In addition, the government has offered to provide defendants with access to the software and data that can be used to generate screenshots for any trade that occurred on any of the dates for which the government has already produced screenshots. As I understand that, each defendant would then have the ability to generate sets of screenshots for every one of the trades that they made on any of the days from which the 30 sets of screenshots per defendant that have already been produced were generated. That seems to me to make an awful lot

of sense as a way to cabin this dispute, and it seems to me that the government's proposal to give the underlying data for those -- for all of the trades on the day on which they've already provided one of the 30 screenshots per defendant should be produced, and that is adequate in terms of the required screenshots.

The defendants then can try to test on that basis whether the chosen screenshots are truly representative samples. The defendants have the ability to come back to me if they have reason to believe that they are not truly representative, but at least that data will enable them to, I think, give a sense of whether or not they are truly representative.

Now, let's go to the second area, which is a request by the defendants for all SEC materials concerning trading ahead and interpositioning. This is because the SEC has conducted its own investigation into trading ahead and interpositioning by specialists at the New York Stock Exchange, including the seven defendants.

Indeed, the SEC instituted administrative proceedings against the defendants that closely track the allegations in this Indictment. The defendants seek relevant Rule 16 and Brady materials within the care, custody and control of the SEC pertaining to trading ahead and interpositioning activity during the relevant time period in the Indictment.

As part of these materials, the defendants seek the OCIE report -- that is, the SEC Office of Compliance Inspections and Examinations -- report dated October 10, 2003, which concern the New York Stock Exchange surveillance of specialist trading firms during the relevant period as well as other materials.

The government responds that the documents are not in its custody, care or control and the documents are not material to the defense. The government says the SEC conducted two separate investigations -- sir?

MR. BARKOW: I'm sorry, your Honor. I don't mean to interrupt, but with respect to the OCIE report, before the Court went too far on this, the government is willing to

produce that particular item.

THE COURT: All right. I was about to say that the SEC conducted two separate investigations. You have already produced the first one.

MR. BARKOW: Well --

THE COURT: For one of the specialists.

MR. BARKOW: There are two separate investigations. We have produced all SEC materials relating to the SEC investigation of specialists, and it is our position that we don't have the materials relating to the separate SEC investigation regarding the Stock Exchange except for the OCIE report --

THE COURT: All right.

MR. BARKOW: -- which we will produce.

THE COURT: Turn the OCIE report over.

What about the transcripts and the depositions that are taken in connection with the report?

MR. BARKOW: That still is a live issue because we do not believe that that is something that we should produce at this point.

THE COURT: All right. What is your rationale for turning over the report but not the depositions taken in connection with it because it seems to me that the report, which is going to test the propriety of the timing of the 60 seconds, 10 seconds, 15 seconds, that I do think it is material, is going to be based on the underlying depositions, how can you separate out one from the other? Or what is the theory of separating out one from the other?

MR. BARKOW: Well, first, your Honor, the -- if I could back up a little bit?

The report, as the Court knows, I think was ordered to be produced by Judge Chin, and we are taking the position that once we produce it there, we should also produce it here.

It is still our view that, although the Court disagrees, that the materiality of that is subject to question.

However, with respect to the deposition transcripts, that is not the sole basis for the OC report, that is 3500

material, and people -- if people whose deposition transcripts were taken are going to testify, the government will produce the 3500 material at the appropriate time according to the Court's schedule or with the agreement of the parties in advance of the testimony. But this is classic 3500 material, the deposition transcripts.

The report synthesizes the results of the SEC's investigation from whatever sources. It was the government's view that it shouldn't be produced, but once it was ordered to be produced, we're willing to give it to these defendants as well, but they are distinct products from the deposition transcripts which cover a whole host of subjects and really are classic 3500 material.

THE COURT: I had thought that Judge Chin had ordered the production not only of the report but -- well, his words were, at least in the oral transcript I was given, along with

any Stock Exchange response to the report, any memoranda or correspondence relating to it that are also in the possession, custody or control of the government.

MR. BARKOW: OK. Now I understand the Court's question.

There are two categories of information that these defendants are seeking and one relates to the report and one relates to transcripts. Judge Chin ordered production of the reports and if -- and this is the way the government read it,

and I can represent to the Court, our conversations with defense counsel in the cases before Judge Chin, they did, as well -- if there were additional materials that related -- for example, correspondence about the report between the Stock Exchange and the SEC, that type of thing would have to be produced.

However, the government right now does not have anything in its possession, custody or control regarding the OC report other than the OC report itself, and so we are making inquiries of the Stock Exchange whether there are additional materials. I don't know the answer to that right now. But that's a separate category. The correspondence and report are one category and the deposition transcripts are another, and Judge Chin did not rule -- did not order us to produce the transcripts.

THE COURT: Are you saying you don't have the deposition transcripts?

MR. BARKOW: We do but it is a separate -- the way that the issue was presented and argued before Judge Chin, there are two separate issues. One was the report and one was the transcripts. He ordered the production of the report and additionally said that if there was correspondence --

THE COURT: I understand.

MR. BARKOW: We do have transcripts. We do have transcripts. But that is not subject to Judge Chin's order and

we are not producing it.

THE COURT: I understand now.

Tell me again what your rationale is for, if you are producing one, not producing the other, and I think your response has simply been classic 3500 material, and I don't think that directly addresses the point, because that says at some point we definitely are going to have to turn it over. I don't think it answers why it shouldn't be turned over now.

MR. BARKOW: Because, your Honor, we've given notice to the defendants and given them the names of witnesses who they might wish to speak to, in an abundance of caution, to identify those people who might say something that in our view is material to their defense. So we've identified for them by name those individuals and sent letters to them listing those individuals.

That without, over-generalizing, those individuals are the source of the information that is material to the defendants' defense.

The other individuals who testified in that

investigation, there were a lot of subjects discussed in their testimony, and they are not sources of information, in our view, having reviewed the transcripts and having read them, of information that is remotely material to the defendants' defense, and, therefore, all they really are are prior statements of potential witnesses on subjects that may or may

not be the subject, if they testify, of their testimony at trial.

And because it doesn't have -- because these transcripts don't have information that's material to their defense in the same sense that the OC report does, we view that as just a different category of information just like a grand jury transcript would be --

THE COURT: I understand.

Does anybody on the defense side want to respond on the issue of the transcripts? Because I have directed the OCIE report to be turned over, and, in any event, the government is going to do it based on Judge Chin's ruling and his determination that it should apply here as well.

Sir, Mr. Bach.

MR. BACH: Yes, your Honor.

I understood Mr. Barkow to be saying in the first instance that the government planned to produce these transcripts under Rule 3500.

THE COURT: To the extent they were 3500 material, correct.

MR. BACH: So that leaves open the possibility that there are transcripts that discuss the surveillance parameters that would not be disclosed to the defense pursuant to Rule 3500. We think we are entitled to those now.

Rule 16 applies. Rule 16 is broader than Brady in

this district. Barkow has given us Brady notice. In our view, that only serves to underscore the importance and materiality of these materials. This is a simple call because the government has these documents in its possession, and there is no question about access, there is no question about joint investigation. They have them. They are easy to produce, and we think we are entitled to them.

THE COURT: All right. Sir, did you want to respond?

MR. BARKOW: Your Honor, the simple fact that there is a lot of testimony here, there are a lot of individuals, and the simple fact that the trading ahead or interpositioning might have been mentioned in a transcript does not convert transcript that is classic 3500 material, a detailed prior statement by a potential witness if they testify, into Rule 16 material. Rule 16 contemplates this. Rule 26.2 contemplates this and says that Rule 16 is not an appropriate vehicle for the production of 3500 material.

The OC report is a different animal, and these are prior statements, some of them, of potential witnesses. The government reviewed these statements, and if there was anything in it that we thought that, in an abundance of caution, should be disclosable, we brought the witness's identity to the

attention of the defendants, and we did do that for several people. But this is, in our view --

MR. RIOPELLE: Judge --

THE COURT: Let him finish.

MR. BARKOW: In our view, your Honor, this is an essentially an early request for 3500 material.

THE COURT: Thank you.

MR. RIOPELLE: Roland Riopelle.

They are only required to produce material for witnesses they call. Are they representing now on the record that they are going to call every person who was associated in some way with the preparation of this report? If not, what will happen is they have given us the names of witnesses who they believe have information that is material to our defense who have now refused to speak to us. They will not produce the material that they have in their hands that will tell us whether we should call those witnesses. They will not call those witnesses. They will therefore not produce that material, because it is not 3500 material, because they didn't call the witness, and we will never have access to it.

Your Honor, you know, the Assistant U.S. Attorney, most respectfully, has stood up and told us that he has decided that some of this stuff is just not material to the defense. I am not sure he's tried a lot of defense cases. I hadn't when I was an Assistant U.S. Attorney, and I don't think it is fair to let him make that judgment for us.

We ought to get this material. We ought to be able to review it and decide who we are going to call. Giving us

somebody's name whose lawyer tells us goodbye and hangs up the phone on us is no substitute.

THE COURT: Yes, but you are only entitled to what Rule 16 entitles you to. You are not entitled to everything that exists in the government's files.

MR. RIOPELLE: Let me also add, your Honor, that with respect to this report, we may want to cross-examine a witness or two about it, and knowing what was said about it by all the people in the room when it was prepared is going to be material to that cross-examination, and that is squarely within Rule 16.

THE COURT: Go ahead.

MS. PEERCE: Your Honor, if I might just add? If your Honor has concluded that the report is material, I am a little bit confused as to how the government's position can be that the material that went into creating the report is not material.

THE COURT: That's why I was addressing my question to Mr. Barkow, and I think what he is saying is that the depositions may have touched simply briefly on this issue and, in fact, may contain a lot of material, a lot of information that is not part of the report.

Is that essentially correct?

MR. BARKOW: That is essentially correct, Judge.

MS. PEERCE: Then, your Honor, if there are parts in there that deal with the issues that are material to this case,

are we not entitled to it now?

MR. BARKOW: Your Honor, to draw an analogy, if we have a grand jury transcript of a witness who we don't call who talks about the subject matter of a defense, if what they say is not exculpatory, not material and doesn't get into detail in any way that is material to the preparation of the defense, it is not something that needs to be produced.

THE COURT: It is a traditional issue that the defense is arguing: Why should the adversary be deciding what is material?

MR. BARKOW: Well, your Honor, I think with respect to transcripts in particular, and it is not just tradition and the practice of the courts in this district, it is the law because it is a prior statement by a potential witness, and the law is that that transcript doesn't need to be turned over, the prior statement, until after the direct testimony.

We are not taking the position that we will wait until then, but that is a classic kind of impeachment --

THE COURT: Mr. Riopelle is conceding that, but he is raising the issue of people who you may not call --

MR. BARKOW: That is correct, your Honor.

THE COURT: -- who have given material information. That is his point.

MR. RIOPELLE: That is exactly correct.

MR. BARKOW: That is correct, your Honor.





And we have reviewed those transcripts, and I can represent to the Court, in our view, and I understand that, you know, this is just inherent to the situation, but in our view, we erred on the side of disclosure and we, in an abundance of caution, identified witnesses that the defendants might wish to speak to. That is a separate issue, then.

THE COURT: I understand.

Mr. Shapiro, go ahead. Last round.

MR. SCHAPIRO: Just one final note, your Honor, and that is I think that the circumstance that Mr. Barkow is referring to when he talks about classic 3500, analogizing it to grand jury transcript, is quite different from what we have here today, because what we have today is transcripts that form the basis of a report that has already been determined to be material and that is being turned over to the defense. So we are not asking for grand jury transcripts. Grand jury is a very different situation governed by very different rules. We are not seeking those.

These transcripts, the only thing they have in common with grand jury transcripts is that they are transcripts. Other than that, they are quite distinguishable.

THE COURT: All right. I am going to --

MR. BARKOW: Your Honor, if I may make two more points?

THE COURT: Yes.

MR. BARKOW: One is the fact that the grand jury status is irrelevant, it could have been deposition transcript. But moreover, I submit to the Court, if the Court is inclined at this point to order disclosure of these, I would ask the Court to allow us to review them again, to submit something to the Court perhaps ex parte detailing what these witnesses said about these subjects, so that the Court can make a fully informed decision on this. Because in our view what we would be doing is giving to the defendants transcripts that we view as classic 3500 far in advance of trial, and we would ask the Court --

THE COURT: I understand. I actually was about to rule that they didn't have to be turned over, but I will take that government offer. All right? So why don't you make that submission to me and I will take a look at it. I guess you would want to do it ex parte.

MR. BARKOW: Yes, your Honor.

THE COURT: You certainly can. But what I was going to say is, on the representation that had been made about the fact that it is either 3500 material or it is not material, I was going to accept that representation. But I certainly will accept the additional information that the government so kindly offered.

MR. RIOPELLE: Can Mr. Barkow, your Honor, please state on the record whether he is actually going to call all of

the people who are identified in the letters --

THE COURT: No, I am not going to ask the government to make that determination now. Let's move on.

The third area of documents requested is the New York Stock Exchange documents regarding the surveillance and monitoring practices.

MR. BACH: Judge, before we move on, if I could briefly address the existence of related correspondence and memoranda?

THE COURT: Go ahead.

MR. BACH: I think Mr. Barkow described two categories about that.

Within the possession of the SEC, we believe there is a wealth of correspondence and materials relating to some of the subjects addressed in the OCIE report that the government has acknowledged to be material. The OCIE report, we believe, was the culmination of a long back-and-forth between the SEC and the New York Stock Exchange. The inspection grew out of a series of discussions and the issues that had been addressed over a period of months and years, and we believe that there are documents in the government's possession and in the SEC's possession that talk about the surveillance parameters, whether they can be meaningfully produced without generating false positives, whether they can be --

THE COURT: Apparently the defense, which may not

involve you ladies and gentlemen, and the government have

reached an understanding as to what the Chin order referred to in terms of the report and any memoranda or correspondence relating to it in the possession of the government; is that not so?

MR. BACH: We haven't discussed it. We haven't reached --

MR. BARKOW: I meant in the case before Judge Chin, your Honor.

THE COURT: All right. What is that understanding, again, in regard to the phrasing of memoranda or correspondence? I was, in my own mind, I had taken a very relatively narrow view of that, that is, things that would say here's the report. But go ahead.

MR. BARKOW: That is essentially the understanding that we have and I think the defense lawyers in the case before Judge Chin have. I think that Mr. Bach had a conversation with my co-counsel about this subject that I wasn't a party to, but I don't think we reached any agreements or understandings in interpreting that.

THE COURT: It seems to me that transmittal memos or something like that, I am not going to have them produce all of the backup information that related to the report. It is the report that is the central thing here.

Let's move on to the third area, and that is the Stock

Exchange documents regarding surveillance and monitoring practices, that is, the determination to use the timing of 10/15 seconds rather than the 60 seconds.

Does the government have possession of those documents and have you reviewed them?

MR. BARKOW: No, your Honor. We have never seen them.

THE COURT: I wouldn't think so. That was the representation that was made in the other case.

I am going to hold this -- it is the same analysis as the screenshots themselves. No joint investigation. The government hasn't reviewed them. The government doesn't have access to them, doesn't possess them. So I'm going to deny the Rule 16 application. The same as the Rule 17 subpoenas, but, again, that is not in front of us.

Sir.

MR. MEISTER: Your Honor, David Meister.

May I just be heard briefly on that?

THE COURT: Yes, sure.

MR. MEISTER: As I heard your Honor's ruling with respect to the first category of documents, the screenshots, your Honor's decision was based on the notion that the government doesn't have access to the Stock Exchange's materials, and I think what your Honor said was --

THE COURT: And it wasn't a joint investigation. I wasn't limiting it to Rule 16, to joint investigations in terms

of the government -- definition of "the government" but I went beyond. Go ahead.

MR. MEISTER: As I understood, your Honor said that if the government had access to the information, that maybe you

would have come out differently, but your Honor concluded that the government did not have access because they didn't have sort of permission to --

THE COURT: Well, the SEC or the Stock Exchange, the third entity could say no, we don't want to give them to you.

MR. MEISTER: Your Honor, just on that point, I just want to bring one thing to your attention that maybe we haven't brought to your attention in all of our briefing, and that is that there is a Consent Order as between the SEC and the New York Stock Exchange that requires the New York Stock Exchange to provide any material that the SEC asks. They don't have a right to object.

And we can bring that Consent Order to your Honor's attention. I actually just read it myself this past week, and so it is our fault if we haven't brought the material to your attention to date. But it is not like the government or particularly the SEC, the SEC would have to go to a Court to seek permission to gain access to this material. The SEC has an open right to that material.

THE COURT: All right. The government in response could say, hey, the government does have access here because of

this Consent Order of some kind.

MR. BARKOW: Your Honor, I don't have the Consent Order in front of me. I will make a few points about it, though.

First, that same Consent Order was brought to the attention of Judge Baer, and just so the Court is aware, and it did not persuade him and that litigation shifted to the Rule 17 context.

Secondly, the access given --

THE COURT: To the extent the issue is whether or not the government has access regardless of Judge Baer's analysis, it seems to me that it may be relevant. So address that.

MR. BARKOW: Secondly, the -- again, I don't have it in front of me, but the Consent Decree gives access to the SEC, not to the U.S. Attorney's Office, and as part of this civil settlement.

And thirdly --

THE COURT: If that is so, that seems to me dispositive on this issue.

Go ahead.

MR. BARKOW: Well, and, thirdly, these documents relate to the investigation of the Stock Exchange, and that, as is set forth in the papers, is a wholly separate part of the SEC investigation than the investigation of the specialists. And so the wall that I think the Court recognized earlier in

its decision between the two separate investigations, the SEC investigation of the specialists and the SEC investigation of the Stock Exchange, we have no contact at all. I can't even identify a name for the Court who the SEC people are who work on the investigation of the Stock Exchange. And so that's just -- it is not something that the U.S. Attorney's Office has access to because the SEC can make requests in connection with

its Stock Exchange investigation.

THE COURT: All right. I am adhering to the ruling that the defense can present the terms of that to me later on if they want and see if it changes anything.

MR. MEISTER: Thank you, your Honor.

MR. BARKOW: I think the Court is getting to the next issue, which is data for nonindicted stocks.

THE COURT: Yes.

MR. BARKOW: And before the Court gets there, I want to tell the Court that this has been -- I can't keep it straight right now, but in another case this has been ordered to be produced in the form that it currently exists, and we are willing to do that here as well, so long as that production is not viewed or taken as a concession on admissibility, because we do not believe -- we don't believe that it was necessarily appropriately produced, but we don't believe it is admissible, and so long as we can litigate that issue down the road.

THE COURT: Turning things over now does not concede

admissibility. So given the fact that the government has agreed, and I think the papers indicate that the government has agreed, I don't have to rule on it. So those reports will be turned over.

MR. BERKE: Judge, to the extent it is helpful and your Honor would like us to address it, I think it is fairly straightforward, the Consent Decree is an exhibit to our motion papers and I can pass up a copy to your Honor.

THE COURT: Yes.

MR. MEISTER: It looks like it is Exhibit 11.

MR. BERKE: Exhibit 11 on our motion papers.

THE COURT: I have it.

What section do you want to address me to?

MR. BERKE: Judge, if I can, it is toward the end of the document. It is the end of Section C, Paragraph 30. Then it lays out -- it is Paragraph 30. And it lays out all the things the Stock Exchange has agreed to do pursuant to this agreement.

And if I could note, Judge, on 30A, one of it is "to produce any and all documents and information requested by the Commission's staff without subpoena."

And in the preceding paragraph, it refers to --

THE COURT: Wait just a moment.

MR. BERKE: I'm sorry, Judge.

(Pause)

THE COURT: Yes. Go ahead.

MR. BERKE: And, Judge, if I can --

THE COURT: That seems to me that that doesn't address the issue. What that says is the Stock Exchange will produce, without service of a subpoena, any documents that the SEC wants. Isn't that what that says?

MR. BERKE: Yes.

THE COURT: How does that address the issue before us here with regard to the Southern District of New York?

MR. BERKE: Judge, if I can, I think there are three

steps here. As I understand, and we've outlined in our papers probably ad nauseam that there is this question that very much is going to be a subject at trial, what is appropriate time parameters in order to draw assumptions as to whether conduct was intentional.

The Stock Exchange had the time parameter that had been used prior to any investigation. Thereafter, there is the SEC investigation of the New York Stock Exchange resulting in a variety of different things, including the OCI report that we have.

The OCI report, as we understand it, describes that the SEC determined that the appropriate time parameter was not the parameter historically used by the Exchange but rather the 10 seconds and 15 seconds we've described, and they've done that based on all sorts of information that we don't have and I

don't believe that we're going to have in response to the OCI report. That will just have, I believe, the conclusion and a description of how that conclusion was reached.

So what we're saying is the government -- the U.S. Attorney's Office now simply adopted what the SEC determined based on steps it took in connection with the New York Stock Exchange.

THE COURT: In terms of the time?

MR. BERKE: In terms of the time.

We are then left eventually saying we are going to have to cross-examine witnesses, we are going to argue at trial all about this 10 seconds, and we are not going to have any understanding or basis as to how they reached it. We believe there are documents that exist that will outline in great detail why the government believes this 10 seconds is appropriate and how the 10 seconds was reached in order to identify --

THE COURT: Not in the possession of the Southern District and the Southern District doesn't have access. This doesn't give the Southern District access, does it?

MR. BERKE: Judge, now what we are talking about is your Honor originally addressed whether or not the U.S. Attorney's Office has access to the quasi-public New York Stock Exchange. This is a step different. The SEC clearly has access to what is in the possession of the New York Stock

Exchange on this issue we believe pursuant to the Consent Decree, and we would submit that the --

THE COURT: Say that again. I want to make sure that I am following it. That the SEC has access to the Stock Exchange on the basis of this document?

MR. BERKE: Exactly.

THE COURT: Right. Go ahead. I am with you.

MR. BERKE: We believe that the U.S. Attorney's Office has access to the documents in the possession of the SEC related to these issues. And I can go in greater detail why that is the case. I think is a very different analysis whether the U.S. Attorney's Office for the Southern District has access to documents in the possession of the SEC than whether they

have access to documents in the possession of the New York Stock Exchange.

THE COURT: So you're in effect conceding the lack of access to the Stock Exchange but saying you can get there the same way by going through the SEC because the SEC, by virtue of this Consent Decree, can get them easily from the Stock Exchange.

MR. BERKE: With all respect, your Honor, I'm conceding your Honor's ruling on the issue of access to the Stock Exchange, but I am saying it is a much stronger position as to the SEC.

THE COURT: I understand. Go ahead.

I don't think you get there, but if the government wants to concede this point, I will take it.

MR. BARKOW: I don't, your Honor, so maybe I should sit down on this one.

THE COURT: Say it, but make your record.

MR. BARKOW: The only thing I was going to stay in addition to what I had said before is the caption here I think illustrates my point. This is the investigation by the SEC of the Stock Exchange, not the specialists.

THE COURT: I don't think the defense gets there but I appreciate your argument, and I now better understand the use that you are trying to make of this Consent Decree. You just don't get there.

Let's turn to the bill of particulars.

Mr. Barkow, you have talked about trying to be consistent here between the cases, and because I clearly didn't have enough to read, Mr. Berke was kind enough to give me more today with this letter with the transcript from Judge Chin.

I take it, you are prepared to adopt your description of the allegations of what conduct is at issue as set forth there on page 9 and 10?

MR. BARKOW: You are referring, your Honor, to the Judge Chin transcript?

THE COURT: Yes.

MR. BARKOW: Yes.

THE COURT: It is -- just so we are literally on the same page, it is the attachment to Mr. Berke's February 6th letter, and on the right-hand margin it looks like the pagination is page 9 of 10. It is your statement there beginning on line 18, page 9, to line 10, page 10.

MR. BARKOW: I am turning to that, your Honor, and I haven't gotten there yet, but what I said yesterday before Judge Chin I am ready to adhere to here.

THE COURT: Take a look at it.

MR. BARKOW: OK.

(Pause)

MS. GOLDBERG: I stand behind that statement, your Honor.

THE COURT: All right. All the parties here know that a bill of particulars is a discretionary matter for the Court, and the purpose is to provide sufficient information about the

charge to enable a defendant to avoid unfair surprise or to preclude a second prosecution for the same offense. It is not for discovery purposes. It is not to force additional discovery. And everyone here knows the cases, United States v. Torres, United States v. Bortnovsky. The defendants contend the Indictment is insufficient because it doesn't specify the conduct that was illegal. They argue that it simply tracks the language of the statutes.

I do think that both in the Indictment and, as using

Mr. Barkow's statement before Judge Chin, the conduct that is alleged is quite clear, and I don't think the defense is entitled to further specificity here.

MR. MEISTER: Your Honor, may I be heard on that?

THE COURT: The codefendants are a separate issue that the defendants wanted and began under Nachamie, United States v. Nachamie. I really don't think you are entitled to it. The issue is whether or not the co-conspirators' identity is necessary, not whether it would be helpful. And based on what the government says in its papers here, the unindicted co-conspirators are people that the defendants had been aware of, that they worked with as part of the alleged conspiracy. So I am not at this point going to require further specification or, specifically, names of unindicted co-conspirators.

Yes, sir, somebody wanted to say something?

MR. MEISTER: Yes, your Honor, just with respect to the nature of the crime.

I understand that your Honor -- or that Mr. Barkow is now relying on the statements he made to Judge Chin, I think it was just yesterday --

THE COURT: Yes. I don't think there is anything surprising about that and it just gives you further specification.

Go ahead.

MR. MEISTER: It was, frankly, your Honor, it was surprising to us. It was the first time that we had heard the government say that, in part, its case was based on implied misrepresentations, or what the government has said -- the government did not say that in the brief to your Honor. What the government said in the brief to your Honor was that its case was -- that there are no affirmative misrepresentations made, that they were going to -- that the fraud was based on omissions of material facts.

THE COURT: "By trading ahead or interpositioning, their failure to say that they were going to do these things constitute omissions. So there are no particular false statements that can be identified, but the failure to inform the public that they were going to do these things constitute omissions, and that is what we have told defense counsel."

MR. MEISTER: Not implied misrepresentations. Your Honor, I believe --

THE COURT: What is your question?

MR. MEISTER: Your Honor, I guess my request, your

Honor, is that --

THE COURT: I mean, go back earlier in the statement: "In the context of a bill of particulars, there were no particular false statements that we could identify because the false statements theory here is that the defendants made implied representations that they would not cheat customers,

steal from customers wishing to trade on the Stock Exchange," etc. I think the government is adhering to that. In other words, they implied that they weren't going to cheat, that they weren't requesting to interposition or trade in front, and that is the false statement; is that right, government?

MR. BARKOW: Yes, your Honor.

THE COURT: All right. It is straightforward. It seems to me it is straightforward.

MR. MEISTER: I guess, your Honor, what we would request is if the government could provide a bill that just states that? Your Honor, we have been following what the government has been saying from case to case and including in this case, and just from our point of view, the government changes or adds from time to time.

THE COURT: Well, you have this statement. You have the government sit before Judge Chin. You have the government now saying that's their theory of the case. I'm not going to require them to say it again.

All right.

MR. MEISTER: Yes, your Honor, just on the second point, if I can just be brief?

THE COURT: Go ahead.

MR. MEISTER: On the second point, I understand your Honor has said that, we'll, based on the government's representations, the seven defendants here should know the

other co-conspirators because these were people who they worked with -- with whom they worked for some period of time.

I would just stress to your Honor there were hundreds of people who worked at VDM. And this is not your typical conspiracy case, Judge, where, for example, there is some sort of drug activity where everyone in the drug activity should know or should know of others who were participating in the same activity. We are talking about a large company, all of whom were working in the same type of environment essentially doing the same sort of trading, whether or not the government says it was illegal or not. We are honestly in the dark as to where the government draws the line.

THE COURT: All right. Mr. Barkow, why don't you respond to that, because what Mr. Meister has just said is that he is analogizing it to United States v. Strawberry, which was Judge Parker's decision where he directed that the names of co-conspirators be turned over because the defendant hadn't been present at the incriminating events. I think what the defense is just arguing is this is similar because when you've got a company with hundreds of people participating, the defendants are at sea.

Is that fair enough?

MR. MEISTER: That is very well stated, your Honor, yes.

MR. BARKOW: Your Honor, first, the drug analogy is

helpful to the government, because as opposed to a case involving narcotics distribution where you might have people who are in a wide network who don't know each other, who use nicknames, who don't have all that contact except for a few people at the top, here we have specialists who sat sometimes for years this close, right next to them, to their clerks, to their secondary clerks, to their backup clerks, who were supervised by their supervisors. So they have intimate knowledge of the people who were around them.

I recognize the company is a big company, but there may be unknown people, unknown to the defendants, who are also unknown co-conspirators. The government alleged co-conspirators known and unknown. I submit here that what is really at play here is that the defendants are attempting to get a witness list, because if we identify co-conspirators, there would be one particular type of co-conspirator who we identified that would be clerks. Those are the types of people who they worked with for years, who they know very well, and who sat right next to them for many months day after day after day. And it is just not the same as a drug conspiracy or even the conspiracy in Strawberry, where it might have pervaded some large entity. The conspirators know these defendants know. And so in the government's view this is a request for a witness list of people who they already know.

THE COURT: All right. I am not going to change my

decision.

Is there anything else we need do today?

MR. BARKOW: I have two things, your Honor.

One just relates back to the Court's ruling, and I just want to get clarification of something for myself and for the Stock Exchange.

With respect to the screenshots, the government's proposal was to give the defendants access -- of actually really the Stock Exchange to give the defendants access to the SIAC facility for the screenshots.

THE COURT: On each of the days --

MR. BARKOW: That is not my question. My question is just the physical location. Our proposal was to give them access and that they need to go to the facility. I think at some point the Court might have used the word "produced," that the government should produce the data, and I just want to be clear that the Court wasn't ordering us to get it and give it to them but instead the SIAC --

THE COURT: No. Given what I understand are the mechanics and time involved, no, I am not asking the government to do that.

MR. BARKOW: That was one question.

And the other one I guess is something that will probably inevitably come up, but the government would like to inquire, through the Court of the defendants and to the Court

627DBONC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

627dbonc

itself: We have a trial date of May 1st. We will be ready to go on that date, we are preparing for trial now. But what we would like to avoid -- this is a large case, there is a lot of preparation here -- we don't know whether the defendants truly intend to go, and we would like to know now whether that is a date that we're committed to to go to trial or -- and if it is not, we would like to change it now, and if it is, we would like to keep it and stick with it.

THE COURT: I understand.

Defendants, are you ready to go on May 1, because the Court is ready to go on May 1?

MR. BERKE: Judge, if I can address some issues?

Let me say that the defendants requested a trial in May because we would like to try the case in May. I think there are a couple of issues that we wanted to raise with your Honor that certainly impact on whether a trial is in May, whether we may need a few extra weeks, if your Honor's schedule permitted it, and we are inclined to entertain that.

One of the things that concerns us about the government's offer regarding SIAC is we understand that in order to access this data, the government has put a tremendous amount of restrictions on what our experts will be permitted to do in accessing this data. We certainly appreciate the confidentiality, proprietary issues and are prepared, obviously, to enter into a very stringent confidentiality

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

627dbonc

order, as we have done relating to other documents.

But what the government has said were the conditions for accessing the material essentially would preclude our experts from removing any of the materials that they review during their visit to SIAC, from bringing any computers in which, again, deal with computer data. That is essentially what experts use in order to be able to look and work and try to make sense of this data.

They would -- the expert is prohibited under what they offer, would be prohibited from reproducing, recording, reverse engineering, making derivative works or compiling or decompiling any computer code or program related to the display book materials.

One of the key purposes for accessing the material -- I'm sorry, for accessing the material would be to do just that, to be able to in fact test what the government has done on display books screenshots to see if in fact that is accurate, reliable, etc., and to do other things that we have identified in our papers. So that the conditions that have been attached would not only extraordinarily delay the process of making use of the material but would also essentially render it largely, we believe, you know, if not ineffective, not particularly effective.

THE COURT: Have you talked to each other about this?

MR. BERKE: Well, we had a discussion with --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 20

THE COURT: Because I can start going into it. I mean, I would have to be educated on the computer aspect of it.

In general, it seems to me that the experts have to be allowed to manipulate the data they see. That's what experts do. And presumably the Stock Exchange wouldn't want that manipulation to occur in their computers.

So I would think the experts would have to be able to manipulate the data on their own computers. But, you know, I don't think I could take it to much greater depth or sophistication. That is just my general sense. I think the parties ought to talk about the issue before presenting it to me. So I am just asking whether or not you have talked to each other.

MR. BERKE: Here is what I would suggest, Judge. I had a conversation with Ms. Goldberg, Mr. Barkow's colleague on this case, very early on when this offer was made, and it was clear in our discussion that we were not going to reach agreement about what they are offering. The issue has essentially been in abeyance while we have been litigating these issues. I think it does make sense and we are happy to have those conversations forthwith.

Based on subsequent conversation I did have with Ms. Goldberg, I believe we probably are going to end up agreeing to disagree about some fairly core issues, but I agree it makes sense, before we present the substance of the

disagreement, to discuss further, in light of your Honor's ruling and --

THE COURT: What you want to be able to do, or what I want the parties to be able to do, is for the experts to be able to have access to the data to be able to manipulate it in any way they want without interfering with the New York Stock Exchange's proprietary system or database and for it all to be held within the parameters of this case and not used for any other purpose. It seems to me that's where we all want to end up.

Sir.

MR. BARKOW: Yes, your Honor.

Your Honor, the agreement to which Mr. Berke is referring is very detailed. It has been entered into in virtually all of the cases that are pending that are related; in fact, perhaps all. We are walled off, actually, from the agreement so I don't know exactly what the status is. But it is very detailed, and it is designed to protect the proprietary nature of the Stock Exchange's information.

Without getting into detail, one of the core elements of that is that the defendants' experts do their work at the facility on the computers that are at the facility and that belong to the Stock Exchange. When they are there, they can do all the things that these defendants want to do. They can make their own screenshots. They can make screenshots for an entire

day. They can deconstruct and delve beneath the screenshots

that we've produced. They can do -- they can make screenshots 40 times longer than the ones we have. They can attempt to rip down the screenshots. They can do everything I think that they want to do, but they need to do it on the SIAC or NYSE computers.

THE COURT: Is there then something built into the system so everyone knows the Stock Exchange is not then going to get access to that information if it is on their own computers?

MR. BARKOW: Well, we are walled off, Ms. Goldberg and I are and the agent and I think -- I don't have the agreement in front of me but I think the SEC are walled off from the work product that is done at the facility, and so because of proprietary concerns, the Stock Exchange's counsel has a review mechanism in place to make sure that no proprietary information is taken out, but we're walled off from that.

We're even walled off from the identity of the experts who go in and perhaps some other things, as well, and that's why I don't even know who sent in the agreements because I'm walled off from it. So I want to put that out there.

This is a very stringent agreement. It was drafted by the Stock Exchange and it is extremely important to them, but we think -- I've seen the facility, accompanied by SIAC's security, and it is a private facility. There are three

computers there, and they will sign up for time. Their expert will sign up for time. Lawyers can go with them, and they will be able to do everything they need to do but they will have to do it there.

If I can add one other point? Because of that agreement, one of the factors in the agreement is that the defendants' experts, as well as the defense counsel, have to get security clearance by SIAC to go in and out on their own time. So they can get IDs. That is a several-week process and because of the pendency of the dispute over screenshots, the experts will not actually physically be in SIAC doing this work for a few weeks.

Once they do that, there are defendants in other cases who are signing up for access to this facility. I think they are sharing experts, but, again, I don't know because I am walled off so there are not as many experts as there are defendants. But there is going to be competition for the space and basically hours of the full business day but not necessarily what, you know, the kind of 24-hour approach that they might want to do.

We haven't had conversations with these defendants about this in detail because of the pendency of the dispute over what they should have access to. Now that it's resolved, we will be ready and we would like to go to trial on May 1st.

I don't know that they are going to be able to do the

things that they want to do by then, but it is our request that we decide that issue now because we basically are already preparing for trial and need to continue to do so now. But I don't think they are going to get there for a few weeks.

THE COURT: I think the discussion of the proposed agreement is premature until the parties talk more about it and see what can be worked out among them.

I think the request is fair, as I understand it. The trial date has been set for May 1. The Court is ready to try it on May 1, and the government is saying are the defendants serious about May 1. If so, they will know that. But if the defendants are not serious about May 1, the government wants to know that as well, and then presumably the parties will see whether the Judge is serious about May 1.

Yes, sir.

MR. BERKE: Judge, let me tell you where we are.

We are serious about a date May 1 or shortly thereafter. I say "shortly thereafter." We have been talking May 1, May 15, possibly even June 1st, your Honor's schedule obviously permitting. Everyone is anxious to try this case.

For us, the issue is we do know about this agreement. I should say that the other defendants that have entered into it have done it not exclusively. I think they specifically said they'll take it as a first step, although they are reserving all their rights to say it is completely inadequate,

etc. I don't think any expert has been in yet to look at the materials.

THE COURT: Let's start getting it underway. I think you all have more knowledge about that than I do, obviously, because you are talking to your co-defense counsel. Let's get those clearances underway as quickly as we can, because I would like to adhere to that May 1 date.

Go ahead.

MR. BERKE: Judge, the first of my two-part question: Can we schedule a conference perhaps in three weeks to come back before your Honor? Obviously, I think we will start talking today about getting our people into SIAC as soon as possible. I am hopeful it can be much quicker, as a way to expedite this process, and then report back to you where we stand because the delay --

THE COURT: I will do it in ten days. Why wait three weeks?

MR. BERKE: That is fine, your Honor. I am saying three weeks because I would like it to be the day after our experts actually see what is being offered at SIAC, and I just -- my hope is that in three weeks, they would be in and actually look at it. If we can do it within ten days, as quickly as the government believes we may have access to it, we will do it.

MR. BARKOW: Your Honor, the process has been on going

for more than ten days for every other defendant who has been engaged, and no one has gone there yet.

One of the things that has to happen is the experts and all the other people who wish to enter need to get fingerprinted, and those fingerprints need to be sent to a background check. They need to make two I think trips to the facility and one to another one to go through various stages.

And it just -- I know that there is one group of defendants that started this procedure a few weeks ago and they are not done. I think they are close to going but nobody has gone --

THE COURT: Let me urge you all --

MR. BARKOW: I just don't think it is going to happen in ten days.

THE COURT: OK. I want to try this case on May 1. I want to get it moving. The defendants have a right to a speedy trial. You have heard Mr. Berke articulate several times his clients want to go to trial. Let's let him have his speedy trial rights. The government has said that it wants to go to trial as well.

May 1 it is.

Now, we have to work backwards from that. I urge the parties not to be just paying lip service to wanting to go to trial but to actually act consistent with that articulation. And what that means is pushing against the bureaucracy. It shouldn't take -- I understand sometimes it just does, but it

shouldn't take a great deal of time to get these clearances. Somebody can walk the fingerprints through to wherever they need to go. Both the government and the defense have enormous resources here. Just push through on these procedural hurdles so we can get those experts in there.

MR. BARKOW: Your Honor, I just want to be clear, it is not government bureaucracy. This is a Stock Exchange SIAC process that we do not control, and we have been -- and they are working hard on it. I don't want to say that they are not. But we have been -- there is a lot of things that they are doing that have nothing to do with this case, and we cannot just cut through the bureaucracy as we can perhaps if it were a government bureaucracy.

THE COURT: I can't do anything except repeat myself. Go to them. Say, I represent the United States government. See what that does. Tell them you've got a crazed judge who is going to trial on May 1 and it is very important that this case move forward. Tell them you don't want to come back in front of that judge again and say I couldn't get the New York Stock Exchange to take fingerprints. Do what is necessary within the facts.

MR. BERKE: Judge, can I say first, because I want to make sure that I wasn't misunderstood and I didn't misspeak, because I am mindful of the fact that I am also not speaking only on behalf of my client but of the fact that I am speaking

for many other lawyers in the room, sparing your Honor from hearing everybody speak, and what I was intending to convey is that people want to go to trial in May. The question is can we, given these issues with the data, and because, obviously, we need to have the data that is underlying much of the government's proof.

And the question I ask your Honor is really two-fold. One, would your Honor be able to entertain a request for a trial date that began on May 15th or June 1st, number one? And number two, could I have a minute to confer with other counsel

regarding the discussions we have had today? I think there has been quite a bit of additional information for us about the trial date issue, because, obviously, I think our one concern is while we want to go to trial, we want to go to trial with the material we need to be prepared to present to your Honor.

THE COURT: I understand that, but what I'm trying to determine is whether the defense is speaking with forked tongue in regard to the trial date, because very often defense attorneys want to go to trial, on the one hand, and on the other hand, that is the last thing they want to do.

So if you genuinely want to go to trial on May 1, or May 15, that kind of two-week period I can live with, the parties will work to make sure that happens. And that's my current intention. Do I have a window there? Of course I have a window.

But what I don't want to see happen is, you know, a month down the line we suddenly find that there are motions that are going to take months to brief and so the May 1 date is absolutely impossible. I think that would be unfair to the Court and it would be unfair to the government.

If we are working to May 1, or a couple of weeks either way, that's OK

MR. BERKE: Your Honor, if I may lay it out? I assure you, you will never have to worry about either me or I think anyone else in this case speaking to you with forked tongue about trial date or anything else, and I understand your Honor's concern that we are trying to gain some strategic advantage through that date and I assure you we are not.

THE COURT: No, it is not a question of strategic advantage in so much as let's set a date and let everybody work consistent with that date and get this trial on and have a jury determine the facts.

MR. BERKE: What I think may be useful, your Honor, if I could try your Honor's patience for just a minute or two, is just to lay out: We've spent many hours as a group discussing these very issues, and I can assure you that when I came and said that we would like to try it whether it is May 15th or June 1st, I meant it, and that was based on these discussions.

I think what may be helpful is for us to lay out to you the issues as we've identified them in our own discussions

that relate to that question.

THE COURT: The trial date is May 1 or May 15. That's what we are talking about.

Go ahead. Talk amongst --

MR. BERKE: Your Honor, if I may have a minute?

THE COURT: Talk amongst yourselves.

MR. BARKOW: Your Honor, if I may --

THE COURT: I don't think you are a part of that.

MR. BARKOW: Can I ask you a question?

MR. BERKE: Yes.

(Discussion off the record)

MR. BERKE: Judge, thank you for your patience. We appreciate it.

Judge, in addition to the data issue, which I think I've said enough about, Mr. Shapiro outlined sort of the other things that we anticipate, just so your Honor knows what we know. But first --

MR. SCHAPIRO: First, we accept May 15th. We are very happy with May 15th.

THE COURT: No, no. May 1 or two weeks thereafter. So our window is May 1 to May 15.

MR. SCHAPIRO: That is perfect. We are very happy with that, your Honor, and we think we can do that.

And just so that there is no confusion, your Honor, we just want to lay out a couple of things that will happen

between now and then. If the Court wants to set a schedule, we can do it now, or otherwise we can raise these as seems appropriate, but I want to flag them to the Court.

THE COURT: Go ahead.

MR. SCHAPIRO: In between now and trial, among the things that we anticipate happening, we expect to file a motion pertaining to the government's Brady disclosure. We think we can do that quite soon, quite soon. If the Court wants to set a schedule, fine. Otherwise, we will do it as soon as we can and that is coming down the pike.

We expect to file our motion to dismiss -- I can't guarantee that we'll do it but we strongly expect that we will -- based on the theory of the case as laid out by the government before Judge Chin yesterday. Because while the Court has ruled that that provides us with enough particularity concerning the conduct that happened, we believe it doesn't actually state a crime.

Third, we anticipate that there is a reasonable likelihood, depending on what turns out from the SIAC investigation by our experts, of a Daubert hearing as to the admissibility of the screen shots. That is going to have to happen sometime between now and the trial, but, obviously, that can't happen until after our experts have spent some time at SIAC.

We would like to approach the Court about early 3500

material. We are all trying to move forward in a constructive way, be ready for trial between May 1st and two weeks thereafter. We think everyone is advantaged by having 3500 material early. And this being a white-collar case, where there is no accusation of violence or threats, we think that one of our countervailing concerns that are outweighed by the advantage we would have to gain or may have by getting piles of transcripts for my imagination is 15, 16, 17 clerks, not to mention all the people who Mr. Barkow has told us he will produce with respect to their 3500 material, not to mention others who testified in depositions. I gather, from what Mr. Barkow said earlier today, that there are a variety of witnesses who testified before the SEC or whose deposition transcripts the government has and he said that it's classic 3500 material. So we would like to have that in time to make good use of it.

Then finally 17(c) subpoenas. It is obviously possible that some of the parties or entities who we subpoena will litigate the subpoenas, and so we want to make sure that time is built in for that. We obviously didn't want to start subpoenaing until we had your Honor's rulings on discovery, because if Rule 16 covers certain matters, we didn't want to send out Rule 17 subpoenas. So that is one other issue.

Those seem to us to be the main things that will need to be resolved between now and the beginning of our trial on

May 1st or two weeks thereafter.

THE COURT: Well, it is an awful lot. When do you plan to make the motion to dismiss?

MR. SCHAPIRO: Your Honor, I think we can have that -- we can have our brief and our motion in 21 days from now.

THE COURT: March 1.

The government, do you have a sense of how long you will need to respond?

MR. BARKOW: Your Honor, I guess if they take three weeks to write them, we would like to have three weeks to reply, then.

THE COURT: March 22 for the response. For reply, March 31.

It may be more realistic to make it May 15. I am just trying to be as realistic as possible because I am not going to be able to dig into it until April if we are talking May 1.

Is the government's estimation still approximately three months?

MR. BARKOW: Well, your Honor, I think that was the combination of the government's case and the defense case because our estimate was six to eight weeks. So for our case.

THE COURT: And I think it is more realistic to make it May 15. We won't be shooting for May 1 because I am going to need time on that motion to dismiss.

If there are going to be Rule 17(c) subpoenas, but you

heard what I said as part of that, obviously get them out as soon as you feel you can. Talk to each other about the 3500 material. I don't think we can do anything on a Daubert hearing until you get your experts in there and know more about it. Make your Brady disclosure motion as soon as you can.

Now, in regard to getting the experts into the SIAC facility, the government, you said really ten days didn't make sense, so when do you want to do it for a status report?

MR. BARKOW: Your Honor, if the defendants are going to submit -- if they are not going to negotiate any terms in the agreement and they are going to start submitting signed agreements tonight to the Stock Exchange, not to us because we don't get them, then I think my impression is that the background check takes -- can I have a moment because there is actually someone here from the Stock Exchange in the back?

THE COURT: Yes, sure.

(Pause)

MR. BARKOW: Your Honor, what I propose is that -- again, this is premised on the notion that the agreements are

sent to the Stock Exchange later today or tomorrow -- that we set a date for two weeks and if it slides a day or so, then we could tell the Court.

THE COURT: Let's do it.

MR. BARKOW: Although, your Honor, I was told that that is the belief of the Stock Exchange as to the fastest they

will be able to process this.

THE COURT: Let's make it February 22. Let's make it 9 a.m. I have a trial but we will make it 9 a.m.

MS. PEERCE: Your Honor, I think a number of us have school break week that week. I am just looking at my own calendar.

MR. MEISTER: She is the bravest one of us all.

MS. PEERCE: I am the mother in the room, your Honor.

THE COURT: Well, that better gives the Stock Exchange a little more time.

February 27.

MS. PEERCE: Thank you.

THE COURT: So February 27th. Let's do it at 12:30. I will break the trial just before lunch. February 27th at 12:30 for a status report.

Now, I don't know what the trial schedules are on the other cases, government, but perhaps the Stock Exchange can provide access to the experts based on trial dates. I don't know how the Stock Exchange is going to negotiate it if there are lots of different experts. Maybe the defense is sharing experts. But I put that out so that maybe we can get the experts in this case in and then out expeditiously.

Since you indicated that somebody is here from the Stock Exchange, you can see that the Court is interested in getting this case on for trial, and I would appreciate anything

the Stock Exchange can do to expedite access to the materials. It obviously should feel comfortable in terms of that its proprietary information is being kept proprietary, but I would appreciate anything to give these experts the amount of time and access to the facilities that they need in order for us to get this case ready for trial.

Thank you.

Government.

MR. BERKE: Judge, as to the agreement, we will begin speaking to the government immediately, including tomorrow, and, hopefully, either reach agreement hopefully tomorrow or figure out what we don't agree on and can agree on. And if we reach the unfortunate position that we can't agree, would your Honor be open to us contacting your Honor to appear before you by phone or in person, however you prefer, to work out the issues as quickly as possible?

THE COURT: We won't do it by phone, but we will do it in person. And to the extent there are computer issues, somebody is going to have to educate me on them. But, yes, I am here if there is a dispute. Try not to have a dispute. If there is one, I will handle it.

MR. BERKE: Thank you, your Honor.

THE COURT: OK.

MR. BARKOW: Your Honor, I would ask that the Court exclude time between now and the trial date in the interest of

justice.

THE COURT: Defense counsel, on the record?

MS. PEERCE: No objection, your Honor.

MR. RIOPELLE: No objection, Judge.

MR. BROWN: No objection, your Honor.

MR. MEISTER: No objection.

MR. BACH: No objection.

MR. SCHAPIRO: No objection.

MR. BERKE: No objection.

THE COURT: With the motion having been made by the government for an exclusion of time pursuant to the Speedy Trial Act from today until May 15th, the date of trial, having been made and each of the defendants specifically stating they have no objection, I hereby exclude time from today until May 15th pursuant to 18 U.S.C. 3161(h)(8)(A).

The purpose of the exclusion is for continuity of counsel as well as for trial preparation. There are going to be motions, apparently. During the pendency of those motions, there will be additional automatic exclusions, but this is to each and any exclusion. I make the finding that the ends of justice outweigh the interests of the public and each of the defendants in a speedy trial, given the significant material that has to be processed and the work involved for counsel on both sides to prepare for trial.

All right. Thank you. I will see you on the next

date.

ALL COUNSEL: Thank you, your Honor.

THE CLERK: All rise.

- - -

627DBONC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 30